EXHIBIT A

```
0001
   1              IN THE UNITED STATES DISTRICT COURT
   2                 FOR THE DISTRICT OF MARYLAND
   3                       NORTHERN DIVISION
   4     ---------------------------------:
   5     JAIME GARCIA, et al.,            :
   6               Plaintiffs             :
   7          v.                          :  CASE NO.
   8     RONALD D. KIRSTIEN, et al.,      :  L-01-103
   9               Defendants             :
  10     ---------------------------------:
  11            Deposition of JOSE JAIME GARCIA
  12                   Baltimore, Maryland
  13                Thursday, January 8, 2004
  14                        9:00 a.m.
  15
  16
  17
  18
  19
  20    Job No.:1-27865
  21    Pages 1 - 152
  22    Reported by: Kathleen T. Dunn
```

```
0002
 1               Deposition of JOSE JAIME GARCIA held at
 2    the offices of:
 3               ALBRIGHT, BROWN & GOERTEMILLER
 4               Suite 2150
 5               120 East Baltimore Street
 6               Baltimore, Maryland 21202
 7               (410) 244-0350
 8
 9               Pursuant to agreement, before Kathleen
10    T. Dunn, court reporter and Notary Public of
11    Harford County, Maryland.
12
13
14
15
16
17
18
19
20
21
22
```

```
0003
   1                A P P E A R A N C E S
   2  ON BEHALF OF THE PLAINTIFFS:
   3       DAVID F. ALBRIGHT, SR., ESQUIRE
   4       ALBRIGHT, BROWN & GOERTEMILLER
   5       120 East Baltimore Street, Suite 2150
   6       Baltimore, Maryland 21202
   7       (410) 244-0350
   8
   9  ON BEHALF OF DEFENDANT RANDY HABECK:
  10       PATRICK J.KEARNEY, ESQUIRE
  11       SELZER, GURVITCH, RABIN & OBECNY
  12       4416 East-West Highway, 4th Floor
  13       Bethesda, Maryland 20814
  14       (301) 986-9600
  15
  16  ON BEHALF OF DEFENDANTS ROTHSTEIN
  17  AND KIRSTIEN:
  18       CRAIG D. ROSWELL, ESQUIRE
  19       NILES, BARTON & WILMER, LLP
  20       111 South Calvert Street, Suite 1400
  21       Baltimore, Maryland 21202
  22       (410) 783-6300
```

```
0012
 1       A    I finished what I was doing and, you
 2  know, that was not a long term employment.  That
 3  was -- you know, the contract was up.
 4       Q    I thought you said you were with Chef
 5  Garcia for 16 years.
 6       A    That's correct.
 7       Q    I assume you are including the
 8  predecessor companies to Chef Garcia.  Is that --
 9  let me back up.  When did you start with Chef
10  Garcia, Inc.?
11       A    In 1984.
12       Q    And in 1984 who owned Chef Garcia,
13  Inc.?
14       A    I did.
15       Q    At what point in time did you change
16  the ownership of Chef Garcia, Inc.?
17       A    I didn't change the ownership.
18       Q    Did there ever come a time where the
19  ownership in Chef Garcia, Inc. changed?
20       A    I guess when we got the investors in
21  1994.
22       Q    Did you have involvement in a company
```

```
0013
 1    known as JEJ?
 2         A    JEJ was a parent company of Chef
 3    Garcia.
 4         Q    And JEJ existed in 1984?
 5         A    That's correct.
 6         Q    How about McWax & Company?
 7         A    McWax & Company, I acquired that in
 8    1990, I believe.
 9         Q    What type of operation was McWax &
10    Company?
11         A    That was a USDA operation.
12         Q    Forgive my ignorance in the food
13    business.  What is a USDA operation?
14         A    USDA is where you process meats and you
15    have a federal inspector at the premises.
16         Q    So the meat goes through the
17    slaughterhouse and then comes to a USDA kitchen
18    for further processing?
19         A    For further processing, that is
20    correct.
21         Q    And then what business was JEJ in?
22         A    JEJ was the parent company of both
```

```
0014
   1    companies, McWax and Chef Garcia.
   2         Q    Do you know what state Chef Garcia was
   3    incorporated in?
   4         A    It was just in the state of Virginia.
   5         Q    Was JEJ solely a parent company or did
   6    it actually produce and manufacture items as
   7    well?
   8         A    Can you repeat your question, please?
   9         Q    I will do the best I can.  Did JEJ --
  10    which entity did you use to actually produce the
  11    products that you sold?
  12         A    Chef Garcia and Tortilla Maya.
  13         Q    What is Tortilla Maya?
  14         A    It was basically the one that started
  15    --
  16              (Interruption by the reporter.)
  17         A    That was the first branded name that
  18    JEJ started with.
  19         Q    So JEJ branded the name Tortilla Maya?
  20         A    That's correct.
  21         Q    When was the first time you had outside
  22    investors in any of your companies?
```

```
0015
   1          A    That was --
   2               (Interruption by the reporter.)
   3          A    These were the only investors,
   4    Rothstein and Kirstien.
   5          Q    Are you familiar with an entity known
   6    as O'Stein Brothers Limited Partnership No. 4?
   7          A    I think I have seen one.  I am not
   8    familiar with it.
   9          Q    Do you know if O'Stein Brothers Limited
  10    Partnership No. 4 owned stock in Chef Garcia,
  11    Inc.?
  12          A    I have no idea.
  13          Q    Do you know if Mr. Rothstein or Mr.
  14    Kirstien individually owned any stock in Chef
  15    Garcia, Inc.?
  16          A    I don't know their dealings.
  17          Q    After 1994 did you own stock in Chef
  18    Garcia, Inc.?
  19          A    Yes, I did.
  20          Q    Do you know what percentage of the
  21    stock you owned?
  22          A    Fifty percent.
```

```
0020
  1   make people accountable for --
  2        Q    Did Mrs. Garcia work for the company in
  3   1994?
  4        A    Yes, she did.
  5        Q    What was her role?
  6        A    She basically run the human resources,
  7   and take all of my calls coming in, screening,
  8   and do the bank deposits, go to the bank, screen
  9   all of the new hires.
 10        Q    Did she have any role in actual
 11   accounts payable?
 12        A    No.
 13        Q    Who mailed out checks for accounts
 14   payable?
 15        A    She did.  The checks were run by the
 16   accountant and she will mail it out.
 17        Q    So Walter would create the checks?
 18        A    Right.
 19        Q    And then Mrs. Garcia would make sure
 20   they went out?
 21        A    Right.
 22        Q    Did her duties and responsibilities
```

```
0044
   1    ahead.
   2         A    I am trying to recall exactly when they
   3    were, whether it was before or after we kind of
   4    got tight on cash.
   5              (Defendants' Deposition Exhibit Number
   6    10 was marked for identification and was attached
   7    to the transcript.)
   8         Q    I will show you Exhibit Number 10, I
   9    believe.  Is this the agreement you entered into
  10    with the O'Stein Brothers Limited Partnership No.
  11    4?
  12              MR. ALBRIGHT:  Do you want the witness
  13    to read the whole thing or just a portion?
  14              MR. ROSWELL:  I am going to ask him
  15    some questions about certain parts of it.
  16              MR. ALBRIGHT:  Or do you want him to
  17    identify his signature?
  18              MR. ROSWELL:  Why don't we do that.
  19         Q    Did you sign this agreement, Mr.
  20    Garcia?
  21         A    Yes, I did.
  22         Q    Other than the day you signed it, have
```

```
0045
   1    you seen this document at any other point?
   2         A    I may have.
   3         Q    Do you have any other written
   4    agreements between yourself and O'Stein Brothers
   5    Limited Partnership No. 4?
   6         A    I believe there is other agreement.
   7         Q    What is the other agreement?
   8         A    That is the -- either that -- I mean
   9    this may be the only one.  I don't know.  I got
  10    to read it and see what it says because there was
  11    a job agreement and there was also a stock
  12    purchase agreement.
  13         Q    An employment agreement?
  14         A    An employment agreement, right.
  15         Q    Was that between you and O'Stein
  16    Brothers or between you and Chef Garcia?
  17         A    Between us and Chef Garcia.
  18         Q    Well, you said you wanted a chance to
  19    read that.  Please feel free.  I do want to ask
  20    you some questions about it, so if you would like
  21    to look through it --
  22         A    Go ahead.
```

```
0052
   1        A    September?
   2        Q    1994.
   3        A    I don't recall.
   4        Q    Did you need $60,000 to fund the
   5   September 30, 1994 payroll obligation?
   6        A    I don't recall in particular.
   7        Q    Were you having any problems meeting
   8   your payroll obligations in September, 1994?
   9        A    We might have.  Again, you know, we
  10   were living, you know, and our cash flow issue
  11   was -- came along.
  12        Q    Additionally, O'Stein No. 4 was to
  13   transfer $86,000 to the accounts of trade
  14   creditors of JEJ and McWax.  Did they do that?
  15        A    Again, I don't recall.  I don't
  16   remember seeing those particular --
  17        Q    The agreement continues that the
  18    "$86,000 in satisfaction of outstanding and
  19   overdue claims so that JEJ and McWax may continue
  20   to receive manufacturing supplies and inventory
  21   to continue to produce salable goods."
  22             Were you having a problem receiving
```

```
0063
 1                    MR. ALBRIGHT:  No.  I object.  Why
 2      don't you leave the room here.  Off the record.
 3               (The Garcias leave the room.)
 4               (Discussion off the record.)
 5               (Brief recess was taken.)
 6               (The Garcias return.)
 7      BY MR. ROSWELL:
 8          Q    Mr. Garcia, I am done with this
 9      agreement, so we can hand that over there.
10      Mr. Garcia, do you personally own any patents or
11      trademarks?
12          A    Do I personally own any trademarks?
13          Q    Patents, anything like that.
14          A    I used to.  Chef Garcia, Tortilla Maya.
15          Q    Chef Garcia, Tortilla Maya?
16          A    Right.
17               (Interruption by the reporter.)
18          A    Umkax, U M K A X.
19          Q    And were these registered trademarks?
20          A    They were registered, yes, in
21      Virginia.
22          Q    When did you register them in
```

```
0064
   1    Virginia?
   2         A     When I first started the company.  The
   3    first one was Tortilla Maya.  The second was Chef
   4    Garcia, and the third one was Umkax.
   5         Q     And they were registered in Virginia
   6    and were they registered with you as the owner or
   7    the company as the owner?
   8         A     The company, JEJ.
   9         Q     So the trademarks belong to JEJ?
  10         A     JEJ.
  11               (Defendants' Deposition Exhibit Number
  12    11 was marked for identification and was attached
  13    to the transcript.)
  14         Q     Mr. Garcia, let me show you what we
  15    marked as Exhibit Number 11.  Have you seen that
  16    memo before?
  17         A     No.
  18         Q     Do you see your name listed as the
  19    first person to whom it was purportedly sent?
  20         A     Yeah, but I never got it.
  21         Q     You never got it?
  22         A     (Witness shakes head.)
```

```
0095
  1    check, who signed it, who delivered the check,
  2    that sort of thing?  Can you tell me what the
  3    control was for the payment of trade payables?
  4         A    The invoice would go out.  It will come
  5    back signed by the receiver.  It will go in as a
  6    receivable.  When the money was received, it will
  7    accumulate to the particular broker.
  8         Q    Let's flip this around.  I am
  9    interested in just the -- I think -- and maybe
 10    you are answering my questions in a longer way.
 11    If you had a payable, if somebody gave you an
 12    invoice, what process did you go through in order
 13    to determine how and when to pay that?  Not how
 14    and when, but what process did -- the invoice
 15    comes in to Chef Garcia.  What was the process
 16    from receiving that invoice to the invoice going
 17    out?  Who would touch it?  Who would sign the
 18    checks?
 19         A    The invoice was processed.  The
 20    accountant will process the check, you know,
 21    according to the date it needs to be paid.  The
 22    check is either brought to me or Mrs. Garcia when
```

```
0101
   1    and filed various things, including claims.
   2         Q    What date were you terminated on, sir?
   3         A    I think January 8 or January 14th.
   4         Q    Somewhere between --
   5         A    Somewhere around there.  I don't recall
   6    the exact date.
   7         Q    Who was at the meeting when you were
   8    terminated?
   9         A    That was Mr. Kirstien, and Rothstein,
  10    and Mr. Albright, and myself.
  11         Q    You testified earlier about $50,000 --
  12         A    And David Norman.
  13         Q    David Norman.  You testified earlier
  14    that Randy Habeck was paid $50,000 I think it was
  15    in the middle of 1997?
  16         A    Somewhere around there.  I don't
  17    recollect the exact time, but I know I can't
  18    forget that because I was approached with that.
  19         Q    How were you approached with that?
  20         A    Randy -- not Randy.  Harvey Rothstein
  21    approached me saying to me that I better stop
  22    playing with his money.  So when I reply I say
```

```
0131
  1        A    More than full time.
  2        Q    Right.  In other words, you were
  3   devoting you life to Chef Garcia at that point?
  4        A    That's right.
  5        Q    Okay.
  6             Those are my questions.  That's it.
  7             MR. ROSWELL:  Nothing further.
  8             MR. ALBRIGHT:  I have a couple of
  9   questions.  Off the record.
 10             (Discussion off the record.)
 11        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 12   BY MR. ALBRIGHT:
 13        Q    Would you take Exhibit 16, that is
 14   Defendants' 16.  Look at the first page and it is
 15   1.3.  Do you see that?  "In the event of the
 16   termination of the employee's employment, the
 17   employer shall have no further obligation to pay
 18   any further compensation to the employee, except
 19   to pay all monies owed to employee, and to take
 20   all commercially reasonable efforts to relieve
 21   employee of company liabilities prior to the last
 22   day of employment."
```

```
0132
 1                    Do you recall that provision?
 2          A    Yes.
 3          Q    Is that related to your understanding
 4    of exoneration of guarantees?
 5          A    That is correct.
 6               MR. ROSWELL:  Objection.  Go ahead.
 7          A    What I understood from this is that at
 8    any termination the investors will take
 9    responsibility and take me off all of the
10    guarantees.  That is to my understanding.  And it
11    was discussed as well, you know, orally.
12          Q    Have you come across any evidence that
13    the defendants have done anything at all to seek
14    to relieve you from the guarantees?
15          A    Absolutely nothing and none -- the
16    other way around because they didn't pay the rent
17    and they let them put judgment against my assets
18    and that is --
19               (Interruption by the reporter.)
20          A    Yes, they have done that on purpose to
21    breach my assets.
22          Q    Just a couple more questions.  With
```