IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)



JAIME GARCIA, et ux.                    *

    Plaintiffs                         *        Civil No.:  CCB 01 CV 0103

v.                                      *

RONALD D. KIRSTIEN, et al.              *

    Defendants                         *

                  *        *        *        *        *        *        *

## PLAINTIFF, JAIME GARCIA'S RESPONSES TO
## DEFENDANT, RONALD D. KIRSTIEN'S FIRST SET OF INTERROGATORIES

Jaime Garcia, Plaintiff, by his undersigned counsel, responds to the First Set

of Interrogatories propounded by Defendant, Ronald D. Kirstien, and says:

INTERROGATORY NO. 1:  Identify the person executing the responses to
these Interrogatories and all persons providing information used to formulate the
responses by name, address and title.

RESPONSE TO INTERROGATORY NO. 1:

Jaime Garcia, Plaintiff

Elvira Garcia, Plaintiff

INTERROGATORY NO. 2:  Identify each person who has knowledge of
Plaintiff Jaime Garcia's character and reputation and in whose opinion Plaintiff's
character and reputation have been injured as a result of the alleged spreading of false
information concerning Plaintiff's abilities and reputation in the industry.

RESPONSE TO INTERROGATORY NO. 2:

Jaime Garcia, Plaintiff

Elvira Garcia, Plaintiff

INTERROGATORY NO. 3:   If Plaintiff Jaime Garcia contends that the Defendant Kirstien began to compete with Plaintiff while working on the Board of Directors, specify in detail all facts upon which Plaintiff bases his contention and specify the date upon which Plaintiff contends such competition began.

RESPONSE TO INTERROGATORY NO. 3:

The exact date when the competition began is unknown, but believed to be from the start of the Defendants business relationship with Plaintiffs.

The deceitful actions of the Defendants in the last year of the Plaintiffs employment with Chef Garcia, Inc. that led to the erroneous firing of Plaintiffs include but are not limited to the following:

- Excessive deductions for promotions, samples, spoilage, etc., as evidenced, but not limited to the accounts of Giant, JP Foods, Alliant and John Charles.

- Ongoing deceitful management of JP Foods account.

- Poor performance of Intermark and Sales.

- Plaintiffs made to pay excessive brokerage to Defendants.

- Plaintiffs forced to assume payroll expenses of Intermark/Impact Sales in August, 1997.

- $50,000 charged to Chef Garcia, Inc., but given directly to Defendant Habeck by Defendants Kirstien and Rothstein in July 1997,

- John Charles credit memo of $53,000 in December 1997,

- $50,000 ledger change made by Randy McDonald under Defendants' instructions

2

- Plaintiffs accused of $50,000 theft from this ledger change,

- Few sales in December, 1997

The deductions given by Defendants for 1997 include the following:

- $604,725.85 (product of $424,664.10 in total Sales Discounts, $115,544.23 in Halperin Drayage, 64,517.52 in Open Receivables.)

- $100,540.03 (Habeck and Zaitz accrual charges)

- $128,392.75 (Habeck and Zaitz commissions paid in 1997)

- $57,149.76 (Intermark charges paid in 1997)

- $65,004.21 (packaging materials ordered by Defendant Habeck and Ms. Robinson that were never used.) (Exhibit no. 57)

- $35,000 paid on 2/18/97 from FNB loan (Exhibit no. 171)

- $25,000 paid on or around 10/14/97 to Intermark from Defendants but charged to Chef Garcia, Inc. (Exhibit no. 168)

- Food items ordered by Ms. Robinson for Redskins (Exhibit no. 57)

- $53,000 credit to John Charles on 12/24/97 (Exhibits no. 56)

- $92,000 Halperin buyback (Exhibit 174)

- $50,000 paid to Defendant Habeck by Defendants Kirstien and Rothstein, on or around July 26, 1997, but charged to Chef Garcia, Inc.

- Total $1,169,466.43

The case of JP Foodservice clearly outlines the embezzlement, deeply discounted sales, hidden deductions, bogus sales and other elements of competition by Defendants.

Defendants entered into contracts with JP Foodservice, unbeknownst to Plaintiffs, that used projected earnings as a way to figure deductions and incentives for the distributor. The higher the projected earnings, the larger the percentage of deductions that JP was able to take off the food it purchased from Chef Garcia. The deductions were credited ahead of the actual sales, but would be refunded later if sales did not reach projections. This type of accounting practice was common at JP Foods, now US Foodservice, which is under investigation currently by the SEC in relation to Royal Ahold.

Defendants made projected earnings for 1997 that were several times the amount sold to JP Foods in 1996. In 1996, gross sales to JP Foods were $129,000. (exhibit 136) Projected sales for 1997 jumped to $633,000, (exhibit 140) for a 490% increase over 1996. The higher projected sales translated into higher deductions to JP Foods. The higher deductions were taken, even though actual sales did not come near projected sales.

Plaintiffs knew nothing about the arrangements defendants made for the deductions given to JP Foods. Plaintiffs were told that JP Foods would take the standard deduction that other food service distributors would take: samples .5%, promotion 2%, distributors 4%, shows .1%. The other fees, brokerage 4.5% and

intermark 4% were paid separately and were not included in deductions referenced here. (Exhibit 140) In fact total deductions amounted to 66% off gross sales.

Defendants used the accounting practices of JP Foods to their benefit to create a cash flow crisis at Chef Garcia, Inc.  By the end of 1997, $112,000 was owed to Chef Garcia for $178,000 of food bought by JP Foods.  Chef Garcia had been paid only $66,000 or 37% of the gross purchase price.  Plaintiffs complained about the deductions taken by JP Foods, defendants promised on numerous occasions to take care of the money owed from JPFoods, but the money was never recovered while plaintiffs were employed by Chef Garcia.

JP Foods had been given deductions unknown to Plaintiff Garcia but known to Defendant Habeck at least since 1996.  In a memo from Randall (Randy) McDonald, Director of Accounting for Chef Garcia, to Plaintiff Jim Garcia dated November 4, 1996, a telephone call from JP Foods Corporate Office Accounts Payables is detailed during which Tanya, the spokesperson for the company "said the authorization for all deductions" i.e., delinquent receivables, deductions, samples and bill backs, "are coming from the broker." (Exhibit No. 1)  Randy McDonald reiterated that Plaintiff Jim Garcia's signature must be on all deductions, which Tanya related to each satellite office.  Habeck and Zaitz, one of Defendant Habeck's companies, assumed responsibility to resolve all discrepancies with the individual brokers.  Habeck and Zaitz had the final responsibility of the broker deals.  Two weeks later on November 16, 1996 another memo was sent from

Garcia to Habeck and his agents, placing JP Foods on credit hold until Habeck could clear up deductions. (Exhibit No. 2)

The problem of reconciling JP Foods' numbers for 1996 appeared again on January 24, 1997, when the company attempted to get a $150,000 loan from First National Bank of MD secured by equipment. (See Exhibit No. 3). Of the eleven questions FNB asks, one was, "Why does JP Foodservice have a large portion of its A/R over 90 days?" Also questioned was why $75,000 of A/R (accounts receivable) was written off in 11/96. Defendant Habeck was fully aware of the deductions given to JP Foods, because he was the one responsible for all the deductions. He repeatedly promised to clarify the problems, but he never did. Instead he took actions that resulted in more deductions.

In a memo dated March 7, 1997 from Randy McDonald, and copied to Plaintiff Jim Garcia, and Defendants Randy Habeck, Ron Kirstien and Harvey Rothstein, Plaintiff Garcia implored Marjorie Robinson, agent for Defendants, for paper work to substantiate deductions for JP Foods and to help reconcile JP's numbers for 1996. (Exhibit No. 4) This memo shows that there had been an ongoing problem with JP Foods that all Defendants were well aware of. As well in this memo unexplained problems for 1997 appeared, outlining pricing discrepancies.

Three days later on March 10, 1997, Randy McDonald, acting for Plaintiffs, vehemently complained to Defendants Habeck and Kirstien, by memo, that the problems of JP continue, highlighting the receipt of a check of only $22.83, for

$1,854.65 of merchandise invoiced. He stated that the numerous communications that they have had, have "had no effect", the practice "is out of control" and that Garcia "will not tolerate this any longer" because it "is now becoming a financial issue." He concluded by saying that Garcia "is expecting immediate results". (Exhibit No. 5)

JP Deductions were also discussed at the Chef Garcia Board Meeting on March 26, 1997 for which Defendant Kirstien was present. Yet in May 1997 problems with JP persisted. In a memo from May 29, 1997 to Marjorie Robinson and copied to Jim Garcia, Ron Kirstien and Randy Habeck, JP was sending invoices without authorization, given a deduction for a product Garcia did not sell and most importantly, there had been no response from JP Foods regarding past deductions. (Exhibit No. 6) It is clear that "no response" was given because there were secret dealings behind Plaintiffs' backs.

During the same time period, between 6/4/97 and 6/18/97, several very old accounts were being cleared possibly to mollify Jim Garcia. Check remittance advice reports show three invoices "paid" from (estimated) late summer 1996, one five months, one four and one half months, and one over three months past invoice date.

At the Chef Garcia Board Meeting of 6/17/97 Defendant Kirstien asked the Board "where the company stands with unpaid accounts?" (See Exhibit No. 7) He was told by Randy McDonald that JP Foods still owed money for deductions. Defendant Habeck's agent Marjorie Robinson then stated, "(we) will have the

situation resolved in two weeks." At this point the cover-up by the Defendants was made extremely clear to Plaintiffs. It was obvious to them that the Defendants were not being truthful, and that the Defendants' attempts to clear up deductions were non-existent; they were deceiving Plaintiffs. In the several dozen documents of actual JP deductions, the irregularities, and the discrepancies are evident.

JP deductions were also mentioned in a letter to Defendant Kirstien from Plaintiff Jim Garcia dated 7/21/97 (Exhibit No. 8), five days before the July Board Meeting, and in a memo to Defendant Habeck from the same date copied to Defendants Kirstien and Rothstein. (Exhibit No. 9) Garcia complained that he received only 28% of the purchase price of the invoices referenced for a check. When open receivables are mentioned at the July Board Meeting, 7/26/97, Defendant Kirstien again passed the onus to Marjorie Robinson, but did nothing to follow through with these deductions, the deductions that were causing severe economic shortfalls to Plaintiffs Garcia and to the company. (Exhibit No. 10) The economic shortfalls were so severe as to cause a lack of cash flow that inhibited production on several occasions. Plaintiff Elvira Garcia took many personal loans from her personal credit cards to relieve this cash crisis. (Exhibits Nos. 112 – 119) It is clear from these memos and the actual check remittance advice reports from JP that there was a pattern to the JP deductions. The pattern is as follows: JP was given deductions by the Defendants; the Garcias did not know about the deductions until they received payments often grossly reduced from the invoices referenced; the Garcias tried to resolve the issue, by bringing it to the attention of the Board, to JP

Foods and to Sales and the brokers; JP assures Plaintiffs Garcia that the deductions were coming from the brokers; nothing was done by any of the Defendants for several months, causing a cash flow crisis to occur; the Plaintiffs receive small partial payments from JP, then the cycle repeated itself.

In the following memos Plaintiff Jim Garcia continually asked Defendants for proof of deductions, help in collecting open accounts receivables and continually asserted and reminded Defendants that no deductions could be allowed without his approval.  Plaintiff Garcia, frustrated with the lack of results from Defendants, contacted JP Foods directly for open accounts receivable of over $80,000, by letter of September 8, 1997.  (Exhibit No. 11)  After no results Plaintiff Jim Garcia sent a memo on October 24, 1997 to Marjorie Robinson (Exhibit No. 12) and another on October 27, 1997, and copied to Defendants Ron Kirstien, Harvey Rothstein, and Randy Habeck, stating that the $80,000 was still owed to Chef Garcia.  (Exhibit No. 13) (Plaintiff Garcia did not add to this figure the el Pasado line reimbursement that he was promised by Defendants; see below)  All Defendants knew about these deductions.  It was the fiduciary responsibility of Defendants Kirstien, Rothstein and Habeck to investigate these and other deductions fully.  They did not.  They stood silently and watched as the company proceeded in its downward spiral.  Plaintiff continually asked them for support at Board Meetings, in letters and in memos, since at least November 1996, but none but the most cursory assistance was ever given.

In Fall of 1997, JP Foods discontinued its el Pasado line with Garcia, but Sales reported that JP Foods had promised to purchase all of the inventory and packaging for this line by the end of September 1997. (Exhibit no. 14) Then in a later memo the date was moved to October 17 (Exhibit 15). On November 6, 1997, JP had still not paid for this product, and it was still in Halperin's warehouse, as opposed to another storage facility specified by JP Foods. (Exhibit No. 16) On January 8, 1998, days before Plaintiff was fired, he complained to Habeck's agent, Robinson, that JP Foods owed $112,447, of which $30,745 worth of inventory and packaging was from the el Pasado line. (Exhibit No. 17) It is clear that there was never a deal with JP Foods to buy excess packaging and inventory, and that Defendants' old habit of telling Plaintiffs that they were working to resolve issues, was a lie, made to put Plaintiffs' company further and further into debt.

In the memo of January 8, 1998 from Plaintiff Jim Garcia to Marjorie Robinson, Plaintiff Jim Garcia referred to "all the discussions we have had in the past about these two customers in particular" (Giant Foods also owed $78,021.60.) He urged her to "pay attention to this matter as quickly as (she) can," as it had been "so long and too many times (they) have talked about this." (Exhibit 17) Marjorie Robinson worked directly with Defendant Habeck and took directives from him. She did not clarify amounts owed to the company or seek proper paperwork for deductions because the Defendants did not want her to. They wanted to be able to take deductions and offer deals when and how it suited their interests. When the Defendants saw how well the company was doing in April of 1997, they made sure

they put themselves in the position to produce a cash flow problem that resulted in the demise of Chef Garcia, Inc.

Although no other broker contract exists than that of 1993 (Exhibit No. 18), Defendant Habeck had proposed the following percentages for 1997: x 140 samples equaled .5%, promos 2%, shows .1%, spoilage .5% for Food Service. Total sales for JP Foods in 1997 were $178,584.79. When promotions, discounts, spoilage, deductions on check remittance advices, discontinued inventory and accompanying packaging, etc. are combined and subtracted from total sales for 1997, the resulting figure is $66,137, a loss of $112,447.62 (or a loss of 63% of all sales). (See Sales and Marketing 1997, Exhibits 15, 120-130, 132, 133, 135, 137, 138, 141, 144-162) The margin for these products combined was only $34,004.49. So not only did the Defendants' practices obliterate any margin, but incurred almost $80,000 of extra debt.

Other irregularities include the following: 1) certain JP branches were given dollar deductions that far exceed the dollar amount of product sent to the branch, 2) a large deduction for spoilage given to a JP branch, but not explained to Garcia until 4 months later, 3) A/R's allowed to be paid by branches as late as six months after the shipment of goods, 4) a large portion of JP A/R over 90 days, 5) Garcia having to pay back money owed after receiving and cashing a check from JP Foods, even though that money was owed to him 6) the great disparity between 1996 figures and 1997, 7) individual checks with greatly reduced payments on them, 8) orders

were shipped when it was said that they were not, and 9) deductions appear months after invoices.

JP Foods branch 3H had invoiced sales of $623.25 for 1997.  (See <u>Sales & Marketing 1997</u>)  During 1997, this branch was given $2,523.42 of deductions, or deductions given equaled 404% of all sales.  (Exhibits Nos. 120 , 121, 122, 128, 129, 131, 132, 134, 141, 144, 145, 151, 153, 158, 162)  Other branches were given very large deductions: 3F was given deductions equal to at least 51% of all sales (Exhibits Nos. 129, 134, 138, 146, 153, 154, 156, 158, 160), 3G was given at least 32% (Exhibits Nos. 123, 129, 153, 154, 155), 3K given at least 36% (Exhibits Nos. 129, 131, 134, 148, 152, 153), and 2C given at least 30% (Exhibits Nos. 122, 124, 128, 134, 144, 145, 147, 153, 157, 162), all deductions far exceeding the standard 2.6% for Food Service sales.  (Exhibit 140)  Branch 3H was given deductions several months after the last sales occurred.  The last product was shipped to JP3H on 8/4/97.  Deductions were given as late as 12/01/97 to this branch. (See <u>Sales & Marketing 1997</u>)

The excessive deduction of $11,312.72 was given to JP branch 2C, Baltimore, with broker Habeck and Zaitz listed on the check remittance advice of 5/12/97.  (Exhibit No. 20)  No reason was given for this deduction.  On 9/4/97 the reason for the deduction finally is entered into the system as "spoilage".  (See <u>Sales & Marketing 1997</u>)  There was never a discrepancy report filed for the deduction. Historically, when an individual broker, hired by Habeck and Zaitz for an individual JP branch, questioned any deduction given to JP, the broker would file a

discrepancy report.  This practice was common.  No discrepancy report was ever generated by a broker.  No broker ever questioned this large deduction, because the broker for the branch in question, 2C, was Defendant Habeck, himself.  This kind of practice gave Defendant Habeck extreme latitude to use Chef Garcia food as a bargaining chip when brokering other foods.  Branch 2C, which was directly brokered by Defendant Habeck, was given $26,080.22 of deductions.  His bargaining negatively impacted Chef Garcia's bottom line.

A/R's were often paid extraordinarily late, resulting in severe cash flow problems, and thus having a large impact on Plaintiffs abilities to run their business effectively.  Defendants Habeck, Kirstien and Rothstein were fully aware of the late A/R's, in fact were the cause of the late payments, but they did nothing to help.  See Board Meetings, letters and memos.  Some examples of late A/R's were a "payment" of invoice #219903 (Branch 2C), presumably from as early as June 1996, paid on 5/12/97.  (See Exhibit No. 20)  A "payment" for invoice #219989 from presumably June of July 1996 was "paid" on 6/04/97.  (Exhibit No. 152)  On the same check remittance, invoices #220057 and 220277 were also from perhaps August/Sept of 1996, and invoice 221560 was from 11/1/96.  These past due invoices "totaled" $3,821.70 for an unknown amount of inventory and were 9-12 months overdue.

- 221371 (2C) Habeck direct broker, was "paid", $1321.90, three months and one week after invoice.  (Exhibit No. 151 and "Sales & Marketing 1997")

- 221002 (2C) Habeck direct broker, was "paid" $2604.45, four and one half months after invoice.  (Exhibit No. 150 and "Sales & Marketing 1997")

- 220905 (2C) Habeck direct broker, was "paid" $1313.70, five months late after invoice.  (Exhibit No. 149 and "Sales & Marketing 1997")

- A large portion of A/R to JP Food Service was over 90 days, according to FNB report mentioned above.  (Exhibit No. 3)

- $227.50, still appears on open receivables on 12/27/97 on invoice 222376 Branch 2C.  (Exhibits Nos. 21 and 134)

On 11/10/97, $13,405.18 was credited to JP Foodservice, Branch 3F, resulting from a payment on 11/03/97 for 2 invoices that were not Chef Garcia invoices, but were paid by check erroneously.  (Exhibits Nos. 22 and 134)  Chef Garcia gave a credit to JP Foodservice, even though at that time JP had $25,878 worth of open receivables over 30 days past the invoice due date.  Plaintiffs Garcia should never have been made to pay back the money to JP, as JP was so far in debt to their company.

There are numerous examples of checks that were received with greatly reduced payments.  Examples of these are as follows:

1. Check #056748 on 5/12/97 for $657.95 for $15,705.04 invoiced. (Exhibit No. 20)  An additional $944.52 in deductions were given on these shipments, but not included on check remittance that equaled

$944.52, causing the company to 'owe' JP Foods $286.57.  (no payment) (See "Sales & Marketing 1997")

2. Check #033441 on 03/05/97 for $22.83 for $1854.65 worth of merchandise invoiced. (1% payment) (Exhibit No. 158)

3. Check #019542 on 1/22/97 for $994.45 for $11,027.90 worth of merchandise invoiced.   With an addition $150 unaccounted deduction. (7.6% payment) (Exhibit No. 162 and "Sales & Marketing 1997")

4. Check #099080 on 9/3/97 for $380.27 for $4420.62 worth of merchandise of a payment of 8.6%. (Exhibit No. 128)

5. Check #078049 on 7/14/97 for $1034.34 for $3759.70 worth of merchandise invoiced or a payment of 27.5% (Exhibit No. 148)

6. Check #117557 on 10/27/97 for $1569.22 off of $2363.86 worth of merchandise invoiced or a payment of 66%. (Exhibit No. 123)

7. Check #027616 on 2/17/97 Deductions totaling $1716.09 off of $5824.90 invoiced, for a deduction of 29%. (71% payment) (Exhibit No. 160)

8. Check #086050 on 8/4/97 for $3287.76 for $4465.10 worth of merchandise invoiced or a payment of 73.7% (Exhibit No. 137)

The $112K total deductions given to JP for sales of $178,584.79 for 1997 are broken down as follows: $98,454.99 in discounts, promotions, line deductions, spoilage, miscellaneous parts, open receivables, and JP packaging and inventory

that was "promised" to be remitted.   $9,385 was current or a week past the prescribed 15-day net. Approximately, $4600 is still being researched.

In 1996 according to Habeck-Zaitz, JP Foods' sales equaled $128,955 and deductions equaled $10,300.  (Exhibit No. 23)  Then in 1997, sales jumped to $178K, but with $112K of deductions.

In a matter similar to JP Foods, Plaintiffs actively tried to collect open receivables from Giant Foods in Summer and Fall of 1997 and Winter of 1997/1998.  They repeatedly asked Defendants for documentation of deductions. Nothing substantial is given.  On his own, Plaintiff Jim Garcia contacted Giant for the money only to be told by Giant that instead of Giant owing Chef Garcia $50,000, Chef Garcia owed Giant Foods $30,000, in other words Chef Garcia had incurred a debt of $80,000.  Habeck's company, Impact Sales, had been sitting on the receipts for several months without Plaintiffs' knowledge.

It is customary practice for brokers to keep abreast of sales so that the manufacturer can optimize profit.  Brokers track sales to find out which stores are selling which products, when, how many, and so forth.  Brokers then tell the manufacturer how much product to produce in order to keep the store shelves stocked.  This practice becomes especially important during a promotion.  The broker must keep accurate tabs of how much product the store has immediately before the promotion starts and how much product the store will have and has after the promotion ends.  When this is done, the broker and manufacturer then know how much product will be produced and sold to the store for the sale price and

how much product will be produced and sold for the regular purchase price. For example, when a broker makes an arrangement for a promotion, before the promotion starts he makes sure that the product the store has on its shelves, that had been manufactured for the regular retail price, is just enough in quantity to last until the promotion starts. Meanwhile, the manufacturer begins manufacturing product that he knows will be sold to the store at a promotional rate. With the help of the broker he will produce only enough product that the store can sell during the promotional product. The store will buy x amount of product at a reduced price from Garcia, and will pass on the savings to the customer. When the promotion has ended the broker will have monitored sales and production carefully so that the store does not have left over product that it bought from the manufacturer at a reduced price, but then will sell at the regular price to the consumer when the promotion has ended. The broker's job is to make sure that all of these variables work to insure the manufacturer from gets paid from the store accordingly. Defendant Habeck did not do this for Plaintiffs. Plaintiff, Jim Garcia, went to the stores before and after the promotion and could tell by the manufacturing date stamped on the product that the stores were selling product that they had bought through the broker at the promotional price, but were being sold to the customer at the regular price. It is the broker's job to monitor the balance between product and promotion. Defendant Habeck intentionally sold too much product at the promotion price during the chip promotion of Fall 1997 and did nothing except hinder Plaintiffs ability to recover their money.

Another example of the Defendants' competition and deceit is the dealings with Giant Food, Inc.  Plaintiffs had a long-standing amicable and prosperous business with Giant Food, Inc. well before their relationship with the Defendants. Giant Food, Inc. was Plaintiff's largest retail client.  At least since the beginning of 1997, problems began occurring with Chef Garcia's relationship with Giant Food, Inc.

Defendants gave Giant Food large deductions on products, did not stick to their proposed budgeted deductions, hid the full amounts of the deductions from Plaintiffs, withheld the invoices from Plaintiffs, did not service the stores properly, made total sales to Giant Food for 1997 fall below margin, thus obliterating any profit, and thereby seriously inhibited Plaintiffs' ability to manage their business.

The deductions given to Giant Food Store by Marjorie Robinson and Defendant Randy Habeck for chips and tortillas were well over the 6.6% budgeted for the year but never solidified in a broker agreement.  Additionally, the original Broker Agreement called for 2.5% brokerage commission fees on all private labels, Giant Food included.  In 1997 Defendants proposed brokerage commissions of 5% gross, 4.5% net, plus an additional 2% for Intermark: (Exhibit No. 140)  If the chips and tortillas were sold at regular retail prices, the cost per unit per chips and tortillas produced margins of approximately 23%.  Defendants regularly gave deductions that grossly exceeded promotional budget and far exceeded cost of goods.  Cost of goods does not include brokerage fees, marketing, and a significant portion of operating expenses.  (See Sales & Marketing 1997)

18

In the following examples the deductions for promotions were between 11.9% and 17.8% significantly over the 6.6% "Sales and Marketing Budget 1997" (Exhibit No. 140) for chips to Giant Food, Inc., which included a 6% allowance for promotions.

- Invoices #221413, 221412, 221349 from 3/17/97, 3/17/97, and 03/04/97, respectively, for the sale of chips, allowing a $1600 promotional allowance, off a $13464.00 invoice, or a promotional allowance of 11.9%. Invoice paid 04/04/97. (Exhibit No. 24)

- Invoices #221462, 221466 from 3/24/97 and 3/21/97, respectively, for the sale of chips, allowing a $1600 promotional allowance off an $11,306 invoice, or a promotional allowance of 14%. (Exhibit No. 25)

- Invoices #221523, 221533, 221535, 221536, 221808 from 4/01/97, 04/02/97, 04/02/97, 04/02/97, 05/01/97, respectively, showing a promotional allowance of $2,650 off a $20,954.75 invoice or a promotional allowance of 12.75%. (Exhibit No. 26)

- Invoice # 221490 from 03/28/97 for the sale of chips allowing a $788.00 promotional allowance off a $4420.68 invoice or a promotional allowance of 17.82%. (Exhibit No. 27)

Randy Habeck gave a deduction for $15,633, on the sale of $19,570.20 of chips to Giant Food in June 1997.   (Exhibit No. 28)  The unit cost for these chips was $16,095.30, but the net received from Giant after deductions was $3,236.37, or a deduction of 83.4% off of retail, clearly an inordinately low net sales, wiping out

profit and only recouping 20% of manufacturing costs, which does not include costs that go the brokers and sales, etc. Randy Habeck authorized this deduction.

In the following example invoices #222713, 222708, and 222542 dated 08/14/97, 08/14/97, and 07/24/97, respectively, totaling $13,896 were sold to Giant Food, Inc. (Exhibit No. 29) Only $1,046 was remitted to Chef Garcia, Inc. in a check dated 08/29/97. A deduction of $12,400 was recorded on invoice number R-73223, dated July 16, 1997. Defendant Randy Habeck's company, Impact Sales, authorized this deduction. Plaintiffs gave no authorization, nor had any knowledge of this deduction. With this excessive deduction the regular retail unit price of $11.58 was dropped to $0.87 (a recoup of only 7.5% of regular retail, or a recoup of only 9.4% of unit cost). These deductions happened at the same time Plaintiff Elvira Garcia was forced to take out loans from her credit cards to keep the company solvent.

In July of 1997 Plaintiff Jim Garcia presented to the Board "a budget for each item sold in the past 6 months and explained that money (was) being lost." Defendant Ron Kirstien "suggest(ed) that Randy H. (Defendant Habeck) take a close look at the budget and give the Board some feedback and suggestions." (Exhibit No. 10) The actions that Defendant Habeck took after this meeting were to continue to give excessive deductions on product as he had been previously. None of his actions changed. Three days after this meeting, on July 30,1997, Defendant Habeck gave Giant Food a deduction for $6,029.60 off invoices totaling $20,858, or a deduction of 29%. (Exhibit No. 30)

By year's end Chef Garcia's biggest customer, Giant Foods, was given such large deductions by the Defendants that total sales to Giant Foods fell below margin for 1997 with severe adverse effects to Chef Garcia's bottom line and to Jim Garcia's ability to run the company.

At the same board meeting (Exhibit No. 10), Defendant Habeck said that chip sales had fallen and suggested a large chip promotion. When the sales analysis book is analyzed, no such fall occurred, between at least February 1997 and July 1997. However, Defendant Habeck proceeded to plan a chip promotion that has a ruinous effect on Plaintiffs' business.

In the fall chip promotion to Giant several large deductions were given to Giant. R-80646 on 11/11/97 details a $2,500 deduction (Exhibit No. 31); R-79830 on 10/22/97 details a $17,982 deduction (Exhibit No. 32); R81599 on 11/6/97 details a $23,000 deduction (Exhibit No. 33) and R82505 dated 12/4/97 details a $3,360 deduction (Exhibit No. 34). Plaintiff Garcia witnessed product on the shelves in the Giant Food Stores that had been produced at the promotional price being sold by the stores at full price. It was the Defendants' responsibility to make sure that the shelves were properly monitored and that product was sold at the correct price at the correct time. Plaintiff Garcia witnessed this both before and after this unusually long promotion. Plaintiffs also objected to the longitudinal nature of this promotion, which was highly unusual in the food business.

The promotion started in the stores at the end of October, although production for this huge promotion started in September of 1997. (Exhibit No. 35)

On October 17, 1997 (Exhibit 36), Sales is shipping orders without filling the trucks, costing the company too much money in shipping.  The same day Marjorie Robinson places 20 more truckloads of orders for Giant.  (Exhibit No. 37)  On October 22, 1997, an additional 6,200 cases are ordered for the week of November 3, 1997.  Exhibit No. 38)  Sales had predicted huge sales for Giant, however on November 5, 1997 Plaintiff Jim Garcia writes to Marjorie Robinson that Giant has not picked up the orders (Exhibit No. 39) and on December 11, 1997, Plaintiff Jim Garcia writes Marjorie Robinson, Ron Kirstien and Harvey Rothstein because he has just discovered the Defendant Habeck's company had been hiding invoices for deductions since October and that instead of Giant owing Chef Garcia $35,000, Chef Garcia, Inc owed Giant $50,000.  (Exhibits Nos. 40 and 41)  In addition only one new order for December had been received from Giant despite Sales predictions of 7,900 cases of food.  When Habeck sent supporting documentation on December 19, 1997 for the fall chip promotion, the paperwork is irrelevant. (Exhibit No. 44)  The supporting documentation is a promotional agreement signed by Randy Habeck on December 15, 1995, two years before the fall chip promotion. The paperwork is out of date.  Defendants Kirstien and Rothstein instead of demanding an explanation of this outrageous behavior by Defendant Habeck, accuse Plaintiff Garcia of bad practices.  Shortly after these events, the events surrounding the threatened bankruptcy by all Defendants occur.  On December 1997 Giant sends Chef Garcia $10 for $4,840 worth of merchandise.  (Exhibit No. 42)

On December 19, 1997 Giant Food sends Chef Garcia $10 for $2,462 of merchandise. (Exhibit No. 43)

Plaintiffs were consistently short of cash because of the hidden deductions, embezzlement, barring them from Sales, and lack of reports. As a result, the Plaintiffs: 1) were consistently being contradicted by Sales in customer relations; 2) were unable to pay vendors on time; and 3) even had to "beg" to get raw material. Defendants' malicious maneuverings and deceptive dealings kept Plaintiffs ensnarled in a web of deceit that threatened to choke their company.

Defendants Kirstien and Rothstein were well informed by Plaintiff Jim Garcia of these problems throughout 1997 and before. In board meeting after board meeting problems concerning excessive deductions and open accounts receivables were put forth, but still the problems persisted. See Board meeting notes from 6/17/97 and 7/26/97 (Exhibits Nos. 17 and 10, respectively), explicitly noting problems of deductions and open account receivables, Plaintiff Garcia's notes from Board Meeting on 1/30/97, where he asks, "Is the game to get me out?" (Exhibit No. 45), Board of Directors' Meeting Agenda 02/12/97 ("Have clear understanding on promotion schedules and deductions from customers) (Exhibit No. 47) and notes from 9/96 Board meeting where Plaintiff Garcia complains to Defendants Kirstien and Rothstein that Defendant Habeck changes brokerage agreements at his convenience. (Exhibit No. 46)

In retrospect, when reviewing the events of December 1997 and January 1998, the competition from Defendants becomes quite clear. Also clear is that

Plaintiffs desperately sought help from Defendants, but none was forthcoming. In fact, as soon as Plaintiffs began to bring the evidence of the unfair competition from Defendant Habeck to Defendant Kirstien and Rothstein, instead of reviewing the evidence, Defendants "vote" at a Special Meeting of the Board of Directors to fire Plaintiffs. Defendants not only fire Plaintiffs, but they demand their immediate removal from the premises and associated Chef Garcia premises (Exhibit No. 58) and search Plaintiff Elvira Garcia's purse. On December 16, 1997, at the Board of Directors meeting, Plaintiff Jim Garcia presented a list of frustrations and disappointments (Exhibit No. 59) that went unanswered. This 20-item list includes such things as "(u)nable to get help on controlling deductions"; Plaintiffs asked for help from all Defendants on numerous occasions. Other items on this list implicate Sales, controlled by Habeck, yet overseen by Kirstien and Rothstein, on its prior job performance. "Not able to meet budget, not even once," "not able to execute or close sales opportunities," and "embarrassment with customers by contradicting ourselves."

This list of disappointments and frustrations sums up the process of deception. Defendant Habeck, as Broker, was authorizing deductions causing severe cash losses. Plaintiffs complained to all three Defendants; nothing was done. Sales, run by Defendant's agent, Marjorie Robinson, was doing a poor job getting new customers and servicing old customers, causing more loss with no new cash input. Plaintiffs, on numerous occasions, asked to get involved in Sales and were refused by Defendants for no discernable reason. Product was being wasted and

embezzled. Defendants wanted "to squeeze" Plaintiffs out.  Defendants wanted to hide fraudulent practices.  Sales and Brokers were keeping reports from Plaintiffs, despite his objections.

Other events of competition by Defendants surround the sales to Alliant Food Service, Inc.  The following is a series of deductions that were unauthorized by Plaintiffs and undocumented:

- A check for $6,059.82 dated 4/23/97 was sent from Alliant representing under 50% of the referenced invoices; $6,261.18 worth of unsupported deductions authorized by Habeck and Zaitz were reported for this transaction.  Deductions for this transaction amounted to 51% of the invoices referenced.  (Exhibit No. 88)

- On 7/16/97 a check for $864.68 was sent to Garcia from Alliant. $3826.98 was taken in deductions brokered by Randy Habeck, $1750 authorized per Randy McDonald for a food show booth fee, the remaining $2,076.98 in deductions were unsupported.  Total deductions on this transaction were 82% of the invoices referenced. (Exhibit No. 48)

- On 7/28/97 a check for $814.21 with $168.87 unsupported deductions was taken, representing deductions of 17.18% of invoices referenced.  Broker was Defendant Habeck.  (Exhibit No. 49)

- On 9/8/97 a check for $1,071.42 was issued for invoices with $5,226.56 worth of unsupported, undocumented deductions.  Total