deductions amounted to 82.99% of invoices referenced. This deduction also highlights a balance owed to Alliant of $2,512.76. (Exhibit No. 50)

- On 9/24/97 a check for $505.86 was issued with $1,215.73 of unsupported, undocumented deductions, representing 70.62% deductions off of invoices referenced. Exhibit No. 51)

Plaintiff Jim Garcia complained often about the deductions referenced by Alliant Foods. Written communication between May 1997 and October 1997 demonstrate Jim Garcia's requests to clarify these deductions. In a memo from Randy McDonald to Marjorie Robinson, dated May 29, 1997, and copied to Plaintiff Garcia, Defendant Ron Kirstien and Defendant Randy Habeck, Plaintiff Jim Garcia, through Mr. McDonald, complained about Alliant's old receivables and the undocumented "dumping" of nine cases of product. (Exhibit No. 52) In a memo on July 21st, 1997 (Exhibit No. 8), regarding the upcoming Board Meeting, Plaintiff Jim Garcia asked Defendant Ron Kirstien about Alliant Foods Deductions. In a follow-up letter of the same day to Defendant Randy Habeck and copied to Defendant Ron Kirstien, Defendant Harvey Rothstein and Marjorie Robinson, Jim complains about only receiving 17% of invoices referenced, and follows-up with a plea to investigate the deductions, because, in his words "instead of selling the product for a profit, we are taking a loss." (Exhibit No. 9) On September 16, 1997, Marjorie Robinson writes a letter to Chef Garcia Board of Directors as a "recap of 9/15/97 Organizational Meeting". (Exhibit No. 14) In this letter Alliant Food Service is outlined as one of

the companies where aging accounts receivable are not scheduled to be received, but that the Broker would be reconciling and enforcing company policies, an obvious admission of Defendant Habeck's responsibility. On October 27, 1997, Plaintiff Garcia sent a memo to Marjorie Robinson which was copied to Ron Kirstien, Harvey Rothstein and Randy Habeck, saying that someone in the company had "sent product to JKC Stadium for Alliant Foods without a purchase order", and that Alliant Foods had "refused to process the invoice for payment." Furthermore, Jim Garcia closed this memo by saying, "Again, no order will be processed without a customer PO." (Exhibit No. 53) Marjorie Robinson gave Redskins stadium free food, with no invoice and no way for Chef Garcia to get paid.

The competition is evident in the large deductions that were also given to the merchandise picked up from Halperin Distributing, thus decreasing the company's bottom line. Halperin is a large warehouse and distribution company that Chef Garcia, Inc. used to help distribute its merchandise. Chef Garcia would send inventory to Halperin and customers, such as Giant, Safeway, Shoppers, etc., would pick up orders from Halperin. Examples of large deductions given by Defendants include:

- Deductions of 37% given on 10/31/97 off invoices totaling $17,696.76. Payment received = $11,018.70 or 63%. (Exhibit No. 89)

- Deductions of 37% given on 10/14/97 off invoices totaling $86,403.34. Payment received = $54,014.20 or 63%. (Exhibit No. 93)

- For week ending 10/11/97, deductions of $15,481.82 off of $17,230.53 worth of merchandise were given. Payment received equaled $1,820.60 or 10.5%. (Exhibit No. 94)

- Week ending 9/6/97, deductions placed Chef Garcia $7,234.02 in the red at Halperin. (Exhibit No. 95)

- On 8/7/97 Giant was given deductions of $42,643.01 off of $71,475.67 worth of merchandise. Payment received was $28,832.66 or 40%. (Exhibit No. 97)

- On 8/13/97 Giant was given deductions of $10,741.38 off of $26,182.11 worth of merchandise. Payment received was $15,440.78 or 59%. (Exhibit 97)

- On 8/1/97 Safeway was given a discount for $3,481.92 from transactions dated 3/8/96, 3/20/96, 4/15/96 and 5/28/96, more than a year before.

- On 6/28/96 Giant Food was given deductions of $9,560.37 off of $25,077.86 worth of merchandise. Payment received was $15,517.49 or 61%. (Exhibit No. 101)

Competition from Defendants is also seen in the "Accounts Receivable Discrepancy Report" on August 4, 1997, for a discount approved by Defendant Randy Habeck for customer Ziggy's. (Exhibit No. 107) A $1,500.00 deduction was given without support and it was taken without giving Plaintiffs a reason. This type of deduction, given freely and often by Defendants, without support or reason, is a symptom of the unfair competition that damaged Plaintiffs' company.

The cash crisis resulting from Defendants' deductions caused Plaintiffs to borrow money to cover production costs. Plaintiffs borrowed from Defendants Kirstien and Rothstein on several occasions. On April 25, 1997, Randy McDonald sent a letter to Defendants Kirstien and Rothstein detailing the repayment of a $125,000.00 loan. (Exhibit 170) On September 8, 1997, Plaintiffs borrowed $80,000.00 from Defendants Kirstien and Rothstein. (Exhibits 166, 169) On or around October 14, 1997, Defendants Kirstien and Rothstein loaned Plaintiffs $25,000.00 to cover Impact Sales and Intermark bills. (Exhibits 167 and 168) All of these loans were repaid to Defendants.

Plaintiffs also took out personal loans to cover Chef Garcia's expenses. Plaintiffs took out a personal loan of $11,000.00 on September 3, 1997. (Exhibit 112) Another personal loan from Plaintiff Elvira Garcia's credit cards equal to $16,000.00 was performed on July 23, 1997. (Exhibit 113) On July 17, 1997, $14,000.00 in cash was loaned from Plaintiff Elvira Garcia's personal credit cards. (Exhibit 114) On April 23, 1997, $18,000.00 in cash was loaned from Plaintiff Elvira Garcia's personal credit cards. (Exhibit 115). On July 17, 1997, an additional $1,000.00 in cash was loaned from one of Plaintiff Elvira Garcia's credit cards for petty cash for the company. (Exhibit 116) On August 4, 1997, another check from Elvira for $5,000.00 was loaned. (Exhibit 117) In contrast to the loans from Defendants mentioned above, these loans were never repaid to Plaintiffs.

Habeck and Zaitz and Intermark were overpaid during 1997. Checks totaling $128,392.72 were sent to Habeck and Zaitz, Defendant Habeck's company, from

Chef Garcia, Inc.  (Exhibit 172)  An additional $35,000.00 was wired from First National Bank through the equipment refinancing loan on or around February 18, 1997.  (Exhibit 171)  Fifty thousand dollars was paid to Defendant Habeck from Defendants Rothstein and Kirstien and charged to Chef Garcia, Inc.  Somewhere on or around the July 26, 1997 Board Meeting.

Checks sent to Intermark directly from Chef Garcia equaled $57,149.76. (Exhibit 172)  Additionally, when Plaintiffs were forced to absorb the salary costs of Intermark and Impact Sales starting on or around September 1997, additional money was paid.  The check for $25,000.0 from Defendants Kirstien and Rothstein to cover Impact Sales, Inc. payroll billing for September 1997 and Intermark expense excess was in addition to the $57,149.72 that Plaintiffs paid directly to Intermark.  (Exhibit 168)

When figures are totaled, Defendant Habeck and his companies received at least $295,542.48 in 1997, despite the gross deductions given by all Defendants.

According to the original Broker Agreement between Habeck and Zaitz and Plaintiffs, Habeck and Zaitz were responsible for all brokerage, sales and marketing costs.  (Exhibit 18)  Prior to September 1997, Plaintiffs had not been directly responsible for salary and expense costs of Intermark and Impact Sales, as these costs were considered part of Defendant Habeck's responsibility.  Intermark had been receiving large percentages off of all sales.  The maneuver by all Defendants to force Plaintiffs to absorb Intermark and Impact Sales expenses was a play to paralyze Plaintiffs' business.

Marjorie Robinson, agent of the Defendants, regularly over-invoiced and over-shipped product to customers. These inflated shipments were never supported by actual sales. Sales to John Charles, Alliant, and Redskins Stadium among many others were handled in this fashion. The results of this over-invoicing were numerous. First, the false "increase" in sales, enabled the Sales team and Habeck/Zaitz to appear as if they were doing their job. Second, they were able to cover up losses and poor business. Third, large quantities of food were produced without invoices. No records were kept indicating what happened with the large amounts of food, opening the door for hundreds of thousands of dollars worth of theft by Sales and Brokers. Fourth, they were able to maneuver a situation in which they accused Plaintiff Garcia of fraud. Defendants Kirstien and Rothstein were notified over and again by Plaintiff Garcia by memos, letters, phone calls and face to face communication of the misconduct of Defendant Habeck, but they refused to take any action.

Marjorie Robinson put a large order of food products into the system on or around December 24, 1997 for John Charles. (Exhibit No. 54) As practice dictated, Plaintiff Garcia would produce the products as the orders popped into the system. On January 8, 1998, six days before he was fired, Plaintiff Garcia found a credit memo for John Charles in Randy McDonald's office for $53,655.00 authorized by Marjorie Robinson (Exhibit No. 55) and Defendant Randy Habeck. (Exhibit No. 56) Marjorie Robinson had deceptively inflated the invoice and shipped truckloads of

free food to John Charles.    It is suspected that the food was returned from John Charles, and stolen by Defendants.

By hiding deductions and open receivables, by keeping improper paperwork and by giving deductions without paperwork, the Defendants were hiding the financial state of the company in an ongoing manner.  As a direct result, the Defendants completely blocked Plaintiffs out of the daily financial business of their company, for which the Defendants held Plaintiffs responsible. Plaintiffs were unjustly given the blame and lost their company as a result of this highly unethical and deceitful behavior.

In 1996, the main focus of the company was to increase the food service business, as well as maintaining the well-established retail sales.  Estimates made in 1996 were to have projected sales for 1997 equal $8.3 million, 1998 equal $12.8 million, 1999 equal $18.4 million and 2000 equal $24.1 million.    As is documented, 1997 sales amounted to a mere $4.2 million almost one half of sales projected in November 1996. (Exhibit "Food for Thought" No. 63)

During the time period when Defendants were involved with Chef Garcia, Inc., actual retail sales fell 25% between 1993 and 1994 and came to a plateau through 1996.  (Exhibit 63)  Sales of 1997 fell even more, falling approximately 10% to $4.2 million.  (Exhibit No. 57)  Plaintiffs were fired early 1998, and even though Plaintiff Jim Garcia remained on the Board of Directors until on or around August 27, 1998, he received no information from Defendants.

The Defendants, who were well established in the food service arena (Exhibit No. 60), were aware that it would be economically advantageous for them to create a strong food service business out of the Garcias' company, but they were equally aware that if they replaced the Garcias with co-packers, or outsourced the products, their profits would rise. Defendants knew they had a quality product: Chef Garcia products scored 33% higher than Old El Paso in product quality. (Exhibit No. 61) Plaintiff Jim Garcia's manufacturing methods, such as cutting some meat by hand and using high quality ingredients, made his products uncompetitive for a large-scale business. By hiring co-packers for chips and tortillas, Defendants would be able to keep the well-established retail end of the business, which brought in approximately $4 million worth of sales. There are numerous examples of grandiose sales objectives put forth by Defendant Habeck and his companies and well-known and approved by Defendants Kirstien and Rothstein during months of Board Meetings. (Exhibit 140 and Exhibit No. 63)

According to the Weekly Sales Report 3/10/97 from Sales, Sodexho would soon "roll out" Tierra Del Sol" (product line for next test site, University of Chicago) with accounts equal to $9 million in sales. (Exhibit No. 62) In a document from 3/25/97 (Exhibit 61), presented at a 3/26/97 Board Meeting, titled "Chef Garcia Sales", there was a proposal worth $16 million in potential sales, if they combined their efforts with Alliant Foodservice's Esplandito line. In the same document there is a proposal with Sodexho USA that "offer(ed) national distribution (with Sysco) under the Chef Garcia label which (would) increase (...) brand equity and give (Chef

Garcia) national recognition as the supplier to the world's largest contract feeding organization." This deal would offer a minimum of $2 million in sales. The Defendants knew they had an excellent product, that could yield huge food service contracts.

At the Board meeting on 3/25/97 there was a discussion about lowering prices. (See Exhibit No. 61) Two weeks prior to the March 26, 1997 Board Meeting, Plaintiff Jim Garcia sent a letter to Marjorie Robinson and copied to Defendants Habeck, Kirstien and Rothstein and also to Randy McDonald. (Exhibit 17) In this letter Plaintiff Jim Garcia outlined the costs of the reformulation of the chicken mix and how these costs affected the many products that also useds the chicken mix. Plaintiff Jim Garcia had to raise the prices of all of these products to keep producing quality products. However, Sales did not want to increase prices, but instead re-offered the idea of co-packers for these products, further attempting to squeeze Jim out of his business. At the Chef Garcia Board Meeting on April 16, 1997 the status of co-packers was again discussed. (Exhibit 143) On June 10, 1997, Plaintiff Jim Garcia received a memo from Marjorie Robinson that was copied to all Defendants. Robinson suggested large price reductions in key products to Sydexho and all other customers as a result (military, Sodexho, Marriottetc.), and if Plaintiffs were not able to produce according to her price schedule, co-packers needed to be found. (Exhibit No. 64) On October 22, 1997 an agenda was sent from Marjorie Robinson to Jim Garcia for an upcoming meeting. At this meeting Marjorie brought up the issue of co-packers for all kitchen items. (Exhibit No. 15)

This significance of co-packers becomes important when we look at the guarantees that were left after Defendants Kirstien and Rothstein took the company into bankruptcy.   Plaintiff Garcia was left with the guarantees of the kitchen equipment and the kitchen, yet as early as March of 1997, there is evidence of an ongoing plan by Defendants to eliminate some and then all of the items that the kitchen would produce.

The Defendants made the work atmosphere a hostile environment for the Plaintiffs.  The Plaintiffs complained about Defendants and their employees, calling him names, yelling at him, and being sarcastic to him and his employees.  (See Exhibits Nos. 46, 65, 66 and 70)

In May of 1997 sales and marketing produced a document that described potential new sales of $8.9 million.  Many presentations were done, but few if any new sales resulted.

As late as 9/29/97 sales and marketing are budgeting total yearly sales at 5.3 million, considerably less than the goal of 10 million in February, but considerably more than the 4.2 million in actual sales for that year.

Sales and marketing needed more support for their programs and their existence than was warranted by the amount of sales that they produced.  Even when new customers were added, old ones were dropped.  See "Revised Forecast for September thru Dec." from 9/29/97.  (Exhibit No. 67)  Sales for Jan, Feb, and March 1997 were $1.2 million or up 16% from 96. If we calculate 96 earnings of $4.6 million and raise total year by 16%, the resulting figure would be $5.3 million

in sales if the 16% increase remained steady.  But if the percentage increases rose more, as should have been the case, more sales would have resulted.  In a Company Update written by Plaintiff Jim Garcia (Exhibit No. 83) he states that Feb, March and April are historically slow months.  Since these months were historically slow and sales still rose by 16%, the company should have been able to meet and exceed the low end of the budgeted figures ($5.3 million for 1997), instead the company was only able to squeeze by with $4.2 million dollars. April 1997 continues the increase sales with 517K.

Sales fell and remained flat after April 1997, when it was brought to the Defendants Kirstien and Rothstein's attention that the company was making a considerable profit.  (Exhibits Nos. 68 and 69)  The Defendants were able to project how much money the company would need to make in sales for the rest of the year. After April of 1997, an interesting occurrence happens in sales.  Previously sales per month fluctuated naturally between a low of the upper $200K and high of over $500K.  However, after April 1997, sales began to remain at a steady level of approximately 360K/month.  October sales surged to over 400K, and then November brought sales of slightly less than $300K.  (Exhibit 41)  All Defendants were well aware from the Balance Sheets published monthly how many sales, how many deductions and how many dollars worth of open receivables would be necessary to force the company into a cash flow crisis and ultimate bankruptcy. They summarily removed Jim Garcia from his position because he would not agree to bankruptcy.  They blamed the financial woes of the company on Plaintiff Jim

Garcia, although the evidence is clear that Jim Garcia's company was profitable, before April 1997 and that year.

In addition to making grandiose sales projections that yielded no results, Sales and Marketing was interviewing for a regional sales manager for the Mid-Atlantic, another paid position that actual sales figures did not warrant causing more loss in profits to Plaintiffs' business. Sales also requested Jim's approval of a Sales blitz reward (10/10/97-11/30/97) where the company would give $1,000 cash incentives to brokers for getting $5,000/month of new sales, even with no check as to whether old accounts were dieing. (Exhibit No. 82)

Sales projections produced on 10/13/97 for 1998 were unrealistic based on prior $2.2 million in sales were forecasted for the first three months, or $9 million for 1998, evidence of sales and marketing's inability to reach its goals.

Plaintiffs often complained about Intermark's poor sales performance. Sales did not increase since Marjorie Robinson's date of hire on February 6, 1995. In letters dated September 12 and 13, 1996 to Defendants Kirstien and Habeck, Plaintiff Jim Garcia summarizes his problems with Intermark: drastic loss in food service, decline in sales, failure to match budget, customers not serviced properly. (Exhibit No. 71) Then in August 1997, another memo was sent from Plaintiff to Defendants Kirstien and Rothstein where Plaintiff formally requested to get involved in sales. (Exhibit No. 72) In this memo he also stated that Chef Garcia could not absorb the costs of Intermark. Previously Intermark expenses had been paid through the brokers. This move to place Chef Garcia directly responsible for

37

Intermark expenses was a move that placed Chef Garcia in a weak financial position.    Defendants understood this position, but forced Plaintiffs to absorb Intermark's expenses, despite Plaintiffs' strong objections and Plaintiffs' proven sales ability.  (See also Exhibit No. 73 which describes costs of Intermark for fiscal year September 1996 thru August 1997, plus September 1997 expenses and December and part of November expenses)

Plaintiff Garcia wrote a letter to Defendants Kirstien and Rothstein about Marjorie Robinson's benefits request.    In it he summarizes Intermark's poor performance once again.  In this letter he outlines $133,000 worth of program costs from Intermark which resulted in no sales.   (Exhibit No. 74)    Other memos highlighting Intermark's poor performance are as follows:   a memo from Impact Sales to Marjorie Robinson on October 3, 1997, to sell soon-to-be-discontinued products. (Exhibit No. 75), a memo from Plaintiff Jim Garcia to Marjorie Robinson and copied to Defendants on July 1, 1997, regarding product that was produced per her request but was not being moved (Exhibit No. 76), a memo from Plaintiff Jim Garcia on October 27, 1997 to Marjorie Robinson and copied to all Defendants complaining about Intermark and Alliant Foods (Exhibit No. 53), a complaint about expired product complaining that the company "continue(s) throwing product away". (Exhibit No. 77).  Intermark instituted a price reduction for Ziggy's without authorization as related in a memo to Plaintiff Jim Garcia from Marjorie Robinson on June 12, 1997.  This was copied to all Defendants. (See Exhibit No. 78)

Marjorie Robinson continually undercut Plaintiffs' business. A further memo shows that Marjorie Robinson was always processing orders with little notice, causing severe production problems. (Exhibit No 79) Marjorie Robinson would take credit for business that Plaintiffs got on their own. (See Exhibit No. 80) Military, schools and related food service should have been house accounts. Defendants Habeck and Robinson insisted that they get commissions on these sales. At the March 29, 1997 Board meeting, Plaintiff Jim Garcia complained about Robinson's offer to Anita's which cut too far into margin. (Exhibit No. 81) Intermark was brought into Chef Garcia through Defendant Habeck. Marjorie Robinson worked through Habeck. Another memo was sent on November 28, 1997 from Plaintiff Jim Garcia to Marjorie Robinson concerning items soon to go out of date. Plaintiff Garcia sent Marjorie Robinson a memo on November 5, 1997 (Exhibit No. 85) underling her responsibilities as Sales. On the same day he sent her another memo where he complained about 7,000 cases of Giant Chips that were made for the Fall chip promotion that were not sold to Giant. 7,000 cases represents approximately $70,000 worth of product. On November 25, 1997, Jim sent another memo (Exhibit No. 86) concerning items soon to go out of date, as well as the lack of new orders. These actions point to deliberate sabotaging on her account, as well as the Defendants for continuing to support her for years after Plaintiffs were fired.

Projections that yielded no sales are as follows: When Defendant Habeck was originally put on as a broker, he told Plaintiff Garcia that the company would

triple its business immediately. Habeck had made a bad deal with Sysco whereby Habeck got rid of Garcia's other brokers and used Sysco's brokers instead. As a result of Habeck's deal with Sysco, Chef Garcia lost a huge amount of food service business. When sales were souring and Jim would ask Habeck about this, time and time again Habeck would reply, "We're working on it."

Defendant Habeck had other business practices that damaged Plaintiff Garcia's business. Defendant Habeck constantly "sold" products in deals that reduced products below margin. Plaintiff Garcia continually generated reports that stated the price each individual product would have to sell for in order to make a profit. Defendants Habeck, Kirstien, and Rothstein were made fully aware of these reports. The deductions that were given on products as well as open receivables were two controversial issues that came up at every Board Meeting. When Plaintiff Garcia asked Defendant Ron Kirstien about these issues, Ron's reply, invariably, would be, "Don't worry, we'll take care of it." When Plaintiff Garcia discovered that Defendant Habeck was "selling" products under margin and complained to Defendants, they did nothing.

During the 6/17/97 (Exhibit No. 7) Board Meeting Defendant Habeck said, "immediate action" should be taken to clarify deductions and collect open receivables. None was taken. At the same Board Meeting it was requested that Ms. Robertson should give the Board an explanation of price adjustments whenever they were done. This never occurred. Other things that were discussed at the Board Meeting of 7/26/97 (Exhibit No. 10) include: walking invoices through problem

40

accounts, calling each company and securing ways to get accounts paid on time, visiting companies once a week by Ms. Robertson, Ms. Robertson and Mr. McDonald going through invoices with deductions to make sure they were "cleared up immediately", and Defendant Kirstien's suggesting that Defendant Habeck "take a close look at the budget and give the board some feedback and suggestions." None of these measures were ever done, and not one of the Defendants followed through with these suggestions that would have benefited the company.

At the July 26, 1997 Board of Directors' meeting, Defendant Randy Habeck began orchestrating the big Fall chip promotion at Giant Foods. He said there had been a big fall in chip sales and that an aggressive chip promotion was needed for long term sales on chips. In fact when chip sales are reviewed for Giant Foods, the leading seller of chips, it is found that sales were consistent from at least February 1997 through July 1997. During these meetings Plaintiff Garcia still believed that Defendants Habeck, Kirstien and Rothstein were working to keep the company profitable and were working in the best interests of the company, but in retrospect, after his firing and their subsequent tracking and stalking of him for the next several years, Plaintiff Garcia realized that they were acting and deceiving him.

Other deceitful business practices of Defendants include Defendant Habeck's agent Marjorie Robinson's failure to maintain proper records. In addition Habeck and Zaitz pressed to get commissions and fees paid from Plaintiff Garcia before Garcia received checks for payment of sales. The evidence is clear that Defendant Habeck should have received no commissions on any sales from 1997,

41

nor should his company, Intermark, despite commissions and fees that had been paid. (Exhibit No. 84)

Defendant Habeck stiffed the brokers working for him. Koff brokerage firm, who brokered some of JP Foodservice sales, retired Chef Garcia because Koff was not getting paid for its services from Habeck and Zaitz. (Exhibits Nos. 87 and 147)

Defendant Habeck also lied in his dealings with the Sydexho account acquired by Plaintiff Garcia. In 1997, Plaintiff Garcia acquired the Sydexho account through his contacts. The Sydexho account was starting to produce modest monthly sales. After Plaintiffs were fired, and Chef Garcia was unable to produce the products without Plaintiffs, Defendant Habeck took other manufacturers' products and substituted these in the Sydexho sales, without the awareness of Sydexho, the customer. Defendant Habeck deceived this customer, and sold the customer food that was substandard. Three months after Plaintiff Garcia was fired, Sydexho dropped Chef Garcia because of the poor quality of the substituted food.

This mismanaged deceitful dealing is clear evidence that the Defendants erroneously fired and competed with Plaintiff Garcia. When they realized how difficult it was to produce the high quality of food that Plaintiff Garcia was able to manufacture, they should have hired him back for the sake of the company's health. Instead they substituted other manufacturers' products without telling the customers, thereby further besmirching Plaintiff Garcia's name. Plaintiff Garcia's name, image, and trademarks were still on the products (and to this day are still on the products), and he personally suffered as a result of this.

The Defendants Kirstien and Rothstein were well aware of the budgets and norms but did nothing to stop Defendant Habeck from abusing his position as broker. The broker scale was fixed to allow Habeck to choose between taking his commissions off of net or gross sales. This fixing of commissions resulted in a system with no check or control over the waste, theft or other "promotions" or "samples". The broker put himself in a powerful position where he had nothing to lose and everything to gain by promoting and selling discounted product, covering up discounts and give-aways through open accounts receivables, allowing gross excesses in spoilage, and dispensing samples at will. Each time the Plaintiffs complained about discounts, promotions, samples, and spoilage, he was either ignored or lied to.

Defendant Randy Habeck had an original Broker Agreement from 1993 with Plaintiff Jim Garcia. (Exhibit No. 18) Defendant Randy Habeck was in breach of this agreement on several points and was fully supported by other Defendants.

There is another aspect of this broker Agreement which points to gross unethical behavior on the part of the Defendants. As early as March, 1996, but perhaps earlier, Defendant Habeck began negotiating better contracts for himself and for his companies, Habeck and Zaitz, Impact Sales and Intermark. There are numerous memos and letters and notes from sales meetings and board meetings where Defendant Habeck attempts to negotiate different percentages for his deals. Although Plaintiff Garcia repeatedly asks him for a new broker contract, none is forthcoming. In 1996 and 1997 his commissions and fees rise dramatically in

comparison to previous years, but ironically, Chef Garcia sales do not increase. He is able to wheedle and weasel his way into getting more money. At February 1997's Board Meeting a new fee structure is introduced by Sales and Marketing. (Exhibit No. 140)  On April 16, 1997, Plaintiffs were promised a new broker contract by April 23, 1997.  In a July 21 letter, Plaintiff Garcia asked Defendant Kirstien to discuss new brokers contracts at July Board meeting.  In minutes from a meeting with Defendants Habeck, Plaintiff Jim Garcia and Cathy Moni and Marjorie Robinson on or around August 1997, Plaintiff asserted that Defendants had not given him new broker contracts.  In a meeting between Plaintiff Jim Garcia, Randy McDonald and Marjorie Robinson, Ms. Robinson promises to have brokerage agreement by October 29, 1997.  However, in Plaintiffs' list of frustrations and disappointments presented at the Board of Directors Meeting of December 16, 1997 (Exhibit 16), he described that broker contracts had not yet been resolved.  (Exhibits 143, 8, 139, 15 and 59, respectively)  The Defendants' unwillingness to resolve broker contract issues was detrimental to Plaintiffs' business.  The Defendants refused to execute the promised new written contract.

It is a conflict of interest that the Defendants amended contracts to benefit themselves, when Plaintiff Jim Garcia, as president, did not have any control.  The broker contract itself became ambiguous because of its fluidity.  It was talked about, but never solidified.  The original contract was not being followed and the replacement was never put in formal terms, but they took "agreed" upon money. The Defendants, therefore, had complete control; they proceeded to take fees and

commissions that were based on sales that were so discounted as to fall well below margin.

Defendant Habeck never had to detail broker accounts. Habeck sent checks directly to suppliers, thus Plaintiff Garcia was barred from seeing the money that went to suppliers.

Plaintiff Garcia paid the vast majority of the commissions and fees. In years, 1993, 1994, and 1995 the balances owed each year were approximately $25K/year. (Exhibit No. 142) Iin 1996, when the contract becomes more fluid, the fees and commissions go up disproportionately to the amount of total "sales".

Defendant Habeck brought the Chef Garcia business opportunity to Defendants Kirstien and Rothstein. Habeck was Garcia's broker before Defendant Kirstien and Rothstein were involved. Defendant Kirstien and Rothstein's laxness with the broker contract, allowed Habeck to profit at the expense of Plaintiffs Garcia.

Defendant Habeck's negotiations after Plaintiffs Garcia were fired, led to the loss of several aspects of the business including the military contract ($400,000/year), the new D.C. school system contract ($3-4 million dollars/ year) and the Sydexho account. Furthermore, after Plaintiffs had been fired, and Defendants Kirstien and Rothstein told Plaintiffs that Defendant Habeck should be removed from the business, Defendant Habeck was seen on the premises on several different occasions.

$50,000 was given to Defendant Habeck by Defendants Kirstien and Rothstein for Chef Garcia, Inc., but never appeared on the books.

Defendants did not put the money into the company that they said they put in with their original investment.

Total deductions given by Defendants for their benefit and to the catastrophic loss of Plaintiffs equal at least $1,169,466.43.

This interrogatory is further answered pursuant to rule 33 (d) by documents that are available for inspection at Albright and Goertemiller. We reserve the right to supplement this interrogatory as further evidence is known.

INTERROGATORY NO. 4: If Plaintiff Jaime Garcia contends that the Defendant Kirstien, in allegedly competing with Plaintiff, used specialized, unique, or confidential information the Defendant gained while serving on the Board of Directors, identify the information as to this contention, and state the facts upon which Plaintiffs base their contention that the Defendant gained the information while on the Board of Directors.

RESPONSE TO INTERROGATORY NO. 4: See Response to Interrogatory No. 3

INTERROGATORY NO. 5: Identify all creditors that Plaintiff Jaime Garcia made personal guarantees regarding the debts of the business. If said guarantees are in writing, identify all persons having possession, custody, or control of said writings.

RESPONSE TO INTERROGATORY NO. 5:

A list of personal guarantees is as follows:

1. $75,786.12 guarantee of rent including interest made to Green Associates, Cafferty Commercial Real Estate Services for the kitchen at 6441B General Green Way. This guarantee was negotiated down to

RESPONSE TO INTERROGATORY NO. 24:  He was in a position of control.


I HEREBY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.


_____
Jaime Garcia



_____
David F. Albright
Albright & Goertemiller, LLC
120 E. Baltimore Street
Suite 2150
Baltimore, MD  21202
(410) 244-0350

Attorneys for Plaintiffs