EXHIBIT 1

**Page 9**

1  Q  Let me go in the opposite direction.
2  You left -- you were terminated from Chef Garcia
3  in January of 1998; is that correct?
4     A  That's correct.
5     Q  And from there did you -- where did you
6  next go to work after that?
7     A  I didn't work for six months. I was in
8  shock. So I didn't do anything for six months.
9  After six months I wake up and I have bills to
10 pay, so I had to find work. But it was very
11 difficult for me because, you know, after being
12 with Chef Garcia for 16 years and had only one
13 job prior to that, it was difficult for me to
14 find a direction.
15    Q  So what did you do once you got over
16 the shock?
17    A  I went to -- I was called to do a
18 consulting job in North Carolina for a
19 manufacturer.
20    Q  What was the name of that manufacturer?
21    A  Casa Christina.
22    Q  Who is the name of the individual you

**Page 10**

1  worked with at Casa Christina?
2     A  His name is Chester Brunty.
3     Q  How long did you serve as a consultant
4  to Casa Christina?
5     A  About a year and a half.
6     Q  What did you do for them as a
7  consultant?
8     A  I trained the management and lead
9  persons, rearrange the organization for the
10 manufacturing and the distribution center,
11 sanitation.
12    Q  You did that for about a year and a
13 half?
14    A  That's correct.
15    Q  How did that employment come to an
16 end?
17    A  They got another partner in and the
18 partner brought in his son-in-law.
19    Q  What was your next job after that?
20    A  I went to do a consulting job in
21 Georgia for another manufacturer.
22    Q  Who was that?

**Page 11**

1     A  Los Amigos.
2     Q  The same type of consulting that you
3  had done --
4     A  That's correct.
5     Q  How long did you do that for?
6     A  Almost two years.
7     Q  Now, did you have any ownership stakes
8  in either Casa Christina or Los Amigos?
9     A  No.
10    Q  From Los Amigos where did you go?
11    A  I came back to the Virginia area where
12 I live now.
13    Q  Is that when you picked up at the
14 Marriott?
15    A  No. I worked for Denny's -- CNS
16 Company and they had some Denny's restaurants. I
17 was the general manager there in one of them.
18    Q  What brought about the end of your
19 consulting at Los Amigos?
20    A  What?
21    Q  Why did you stop working for them or
22 with them?

**Page 12**

1     A  I finished what I was doing and, you
2  know, that was not a long term employment. That
3  was -- you know, the contract was up.
4     Q  I thought you said you were with Chef
5  Garcia for 16 years.
6     A  That's correct.
7     Q  I assume you are including the
8  predecessor companies to Chef Garcia. Is that --
9  let me back up. When did you start with Chef
10 Garcia, Inc.?
11    A  In 1984.
12    Q  And in 1984 who owned Chef Garcia,
13 Inc.?
14    A  I did.
15    Q  At what point in time did you change
16 the ownership of Chef Garcia, Inc.?
17    A  I didn't change the ownership.
18    Q  Did there ever come a time where the
19 ownership in Chef Garcia, Inc. changed?
20    A  I guess when we got the investors in
21 1994.
22    Q  Did you have involvement in a company

Page 13

1  known as JEJ?
2      A   JEJ was a parent company of Chef
3  Garcia.
4      Q   And JEJ existed in 1984?
5      A   That's correct.
6      Q   How about McWax & Company?
7      A   McWax & Company, I acquired that in
8  1990, I believe.
9      Q   What type of operation was McWax &
10 Company?
11     A   That was a USDA operation.
12     Q   Forgive my ignorance in the food
13 business. What is a USDA operation?
14     A   USDA is where you process meats and you
15 have a federal inspector at the premises.
16     Q   So the meat goes through the
17 slaughterhouse and then comes to a USDA kitchen
18 for further processing?
19     A   For further processing, that is
20 correct.
21     Q   And then what business was JEJ in?
22     A   JEJ was the parent company of both

Page 14

1  companies, McWax and Chef Garcia.
2      Q   Do you know what state Chef Garcia was
3  incorporated in?
4      A   It was just in the state of Virginia.
5      Q   Was JEJ solely a parent company or did
6  it actually produce and manufacture items as
7  well?
8      A   Can you repeat your question, please?
9      Q   I will do the best I can. Did JEJ --
10 which entity did you use to actually produce the
11 products that you sold?
12     A   Chef Garcia and Tortilla Maya.
13     Q   What is Tortilla Maya?
14     A   It was basically the one that started
15 --
16         (Interruption by the reporter.)
17     A   That was the first branded name that
18 JEJ started with.
19     Q   So JEJ branded the name Tortilla Maya?
20     A   That's correct.
21     Q   When was the first time you had outside
22 investors in any of your companies?

Page 15

1      A   That was --
2          (Interruption by the reporter.)
3      A   These were the only investors,
4  Rothstein and Kirstien.
5      Q   Are you familiar with an entity known
6  as O'Stein Brothers Limited Partnership No. 4?
7      A   I think I have seen one. I am not
8  familiar with it.
9      Q   Do you know if O'Stein Brothers Limited
10 Partnership No. 4 owned stock in Chef Garcia,
11 Inc.?
12     A   I have no idea.
13     Q   Do you know if Mr. Rothstein or Mr.
14 Kirstien individually owned any stock in Chef
15 Garcia, Inc.?
16     A   I don't know their dealings.
17     Q   After 1994 did you own stock in Chef
18 Garcia, Inc.?
19     A   Yes, I did.
20     Q   Do you know what percentage of the
21 stock you owned?
22     A   Fifty percent.

Page 16

1      Q   Did Mrs. Garcia own stock in Chef
2  Garcia, if you know?
3      A   We both own 50 percent.
4      Q   The 50 percent was yours together?
5      A   Right.
6      Q   Do you know in 1994 after the
7  investment who owned the other 50 percent?
8      A   It was Rothstein and Kirstien. But
9  what do they own separately, I don't know.
10     Q   You don't know if it was individually
11 or through some other --
12     A   Right.
13     Q   -- vehicle? Prior to the new investors
14 coming in, I want to talk to you some about the
15 financial status of your company in 1994. Okay?
16     A   Okay.
17     Q   How was business in the early 1990s?
18     A   It was really good.
19     Q   Were you making a profit?
20     A   Yes.
21     Q   Did you have any problems with checks
22 bouncing in 1994 prior to the investment?

Page 25

1  recall.
2      Q  How about Geest Foods USA, G E E S T,
3  Foods USA?
4      A  Again, there were -- I talked to
5  several brokers, you know, that they were trying
6  to acquire our company.
7          (Defendants' Deposition Exhibit Number
8  1 was marked for identification and was attached
9  to the transcript.)
10     Q  Mr. Garcia, in front of you is what I
11 marked as Exhibit Number 1, which is a letter of
12 February 9, 1993 and a financial statement for
13 JEJ Food Company, Inc. for the year ending
14 December 31, 1992. Take as much time as you
15 would like to look through that. Sir, it is my
16 understanding that that document shows a net loss
17 of $190,566 for the year?
18     A  That's correct.
19         (Defendants' Deposition Exhibit Number
20 2 was marked for identification and was attached
21 to the transcript.)
22     Q  In front of you is Exhibit Number 2,

Page 26

1  which is the financial statement for the year
2  ended 1993. And this was prepared by Behrens &
3  Associates; is that correct?
4      A  1993?
5      Q  Yes, sir.
6      A  That is correct.
7      Q  Was Behrens & Associates the certified
8  public accountants you were using at the time?
9      A  At that particular time, yes.
10     Q  Were you ultimately involved in a
11 lawsuit with Behrens & Associates?
12     A  Did I?
13     Q  Yes. Or was the company?
14     A  It was the company, correct.
15     Q  What was the nature of that lawsuit?
16     A  Randy Habeck promised him -- brought
17 him, you know, for service and promised him that
18 he was going to get paid because he was owed some
19 money. He was owed some money also. He had some
20 money on the payables.
21     Q  Who was owed money?
22     A  Behrens & Associates.

Page 27

1      Q  So he filed suit because he hadn't been
2  paid?
3      A  No. Because Randy Habeck incurred more
4  expenses because he called him to use him and
5  then after he rendered service, you know, the
6  investors said Randy Habeck told him that he
7  wasn't going to get paid. And I guess that was
8  one of the causes for him to sue the company.
9      Q  Because he hadn't been paid?
10     A  Because he hadn't been paid, right.
11     Q  Included on page 9 of Exhibit Number 2
12 are two 12 percent notes. Down at the bottom on
13 page 9. To whom is that first note payable?
14     A  That is to Salvador Zuniga.
15     Q  Who is that?
16     A  He is my father-in-law.
17     Q  What was the amount of that note?
18     A  $57,000.
19     Q  When did you obtain the money from
20 him?
21     A  I don't recall the exact date or year.
22 It might have been '92, '91. I don't recall the

Page 28

1  year.
2      Q  How about the 12 percent note payable
3  to the Garcia farm. What is the Garcia farm?
4      A  That is the farm owned by us in
5  Shenandoah.
6      Q  Owned by you and Mrs. Garcia?
7      A  Mrs. Garcia.
8      Q  So that $190,000 was lent to the
9  company by whom?
10     A  By us, by Garcia's farm.
11     Q  Is Garcia's farm a separate
12 corporation?
13     A  It's not a corporation. It's owned by
14 us.
15     Q  What is it? Is it a partnership? Is
16 it -- do you know? Does it have some separate
17 legal status?
18     A  Yes, it does.
19     Q  Do you know what that status is?
20     A  As far as? Can you explain the
21 question in a better manner?
22     Q  I can try. Who owns Garcia farm?

**33**

1  And our contract had not been signed yet. You
2  know, it was left on the desk of the purchaser,
3  the buyer. So, therefore, they did not honor the
4  contract. And that attributed to more than a
5  half a million dollar loss in product, inventory,
6  and equipment that was invested in.
7   Q   When was that, 199 --
8   A   1992.
9   Q   Did those losses continue in '93 and
10 '94?
11  A   Of course. Our company being small and
12 in need of cash, you know, it was not easy to
13 recoup. That was one of the reasons to look for
14 investors.
15       (Defendants' Deposition Exhibit Number
16 5 was marked for identification and was attached
17 to the transcript.)
18  Q   I will show you Defendants' Number 5.
19 My understanding is there was a lawsuit brought
20 by Waycaster Trading Company against JEJ Food
21 Company?
22  A   That's correct.

**34**

1   Q   Were you aware of this lawsuit in
2  1994?
3   A   Yes. When they brought it, yes.
4   Q   Did you disclose this lawsuit to
5  defendants Habeck, Kirstien and/or Rothstein at
6  any point?
7   A   Yes. Everything was disclosed. There
8  was nothing hidden.
9   Q   What relationship had you had with
10 Waycaster Trading Company?
11  A   What they did, there was two
12 individuals that looked for sales for us, you
13 know, and they were getting like one percent or
14 two percent of the sales, you know, whatever they
15 -- for products that they sold, you know, to
16 different companies, but they only had one with
17 Giant.
18  Q   Do you know what the result of that
19 lawsuit was?
20  A   They lost.
21  Q   They being the plaintiffs?
22  A   Pardon.

**35**

1   Q   Waycaster Trading lost?
2   A   Yes. Because they were alleging that I
3  didn't pay them and everything was proved that
4  they were paid up to the last penny.
5       (Defendants' Deposition Exhibit Number
6  6 was marked for identification and was attached
7  to the transcript.)
8   Q   Exhibit Number 6, this is the lawsuit
9  by Behrens & Associates against JEJ Food
10 Company? Did you bring this lawsuit to the
11 attention of the board of directors of Chef
12 Garcia, Inc.?
13  A   Yes. I don't -- I believe that he sued
14 the company after we had closed --
15  Q   After you had closed the deal with
16 O'Stein Brothers?
17  A   Right.
18  Q   And you brought this lawsuit to their
19 attention?
20  A   Yes, I did. They knew all about it.
21  Q   Because you told them about it?
22  A   No, because they sent -- he sent -- in

**36**

1  fact, Norman was the registered agent at that
2  time.
3   Q   David Norman was the registered agent
4  for JEJ Food Company?
5   A   That's correct.
6       (Defendants' Deposition Exhibit Number
7  7 was marked for identification and was attached
8  to the transcript.)
9   Q   I will show you Exhibit Number 7, a
10 suit brought by Optimum Choice versus JEJ Food
11 Company. Do you know if this lawsuit was
12 disclosed to the board of directors of Chef
13 Garcia, Inc.?
14  A   That was in 1995?
15  Q   Yes, sir.
16  A   Again, the registered agent was
17 Norman. And I am trying to recall who was
18 Optimum Choice.
19  Q   I believe a health insurer. Do you see
20 on there, sir, that it says serve on resident
21 agent, and it has your name?
22  A   Yes.

**Page 45**

1  you seen this document at any other point?
2  　A　I may have.
3  　Q　Do you have any other written
4  agreements between yourself and O'Stein Brothers
5  Limited Partnership No. 4?
6  　A　I believe there is other agreement.
7  　Q　What is the other agreement?
8  　A　That is the -- either that -- I mean
9  this may be the only one. I don't know. I got
10 to read it and see what it says because there was
11 a job agreement and there was also a stock
12 purchase agreement.
13 　Q　An employment agreement?
14 　A　An employment agreement, right.
15 　Q　Was that between you and O'Stein
16 Brothers or between you and Chef Garcia?
17 　A　Between us and Chef Garcia.
18 　Q　Well, you said you wanted a chance to
19 read that. Please feel free. I do want to ask
20 you some questions about it, so if you would like
21 to look through it --
22 　A　Go ahead.

**Page 46**

1  　Q　You have had a chance to review the
2  document?
3  　A　A little bit.
4  　Q　There are references in here to a
5  forbearance agreement with Riggs Bank. Was there
6  a concern that Riggs Bank was going to issue a
7  default on the loan?
8  　A　I am trying to recall. I don't
9  remember them saying they will recall the loan or
10 anything back then.
11 　Q　You do not recall that?
12 　A　No.
13 　Q　Do you recall hearing any discussion of
14 a possible default?
15 　A　There is a possibility.
16 　Q　Did you attend a meeting with
17 Mr. Norman, Mr. Habeck, Mr. Rothstein, and
18 representatives of Riggs Bank?
19 　A　Yes, I did.
20 　Q　Do you recall what the meeting was
21 about?
22 　A　They were trying to, I guess, make

**Page 47**

1  clear that Rothstein and Kirstien were coming as
2  investors. And if I recall, also that Randy
3  Habeck represented himself as a CF -- FCO of the
4  company.
5  　Q　Mr. Habeck represented himself as a CFO
6  of the company?
7  　A　CFO of the company, right.
8  　Q　In front of these representatives of
9  Riggs Bank?
10 　A　That is correct.
11 　Q　Did you correct him?
12 　A　Yes, I did.
13 　Q　At that meeting?
14 　A　They asked me, they said is that
15 right. I say I am not aware of, I say, you know,
16 if O'Stein made any changes. You know, I am not
17 -- he says, well, you know, I am helping you, I
18 am directing the company. And I said, well.
19 　Q　Who was present at that meeting?
20 　A　That was Norman and Rothstein.
21 　Q　Anybody else?
22 　A　I am trying to remember if Kirstien was

**Page 48**

1  there as well. I believe, yeah, that they both
2  were there.
3  　Q　Was Mr. Habeck there?
4  　A　Yes. Of course. He is the one that
5  said that he was the CFO of the company.
6  　Q　Do you recall who was there from Riggs
7  Bank?
8  　A　I don't recall his name.
9  　Q　Do you know a Richard Amador?
10 　A　Amador. No. He was not a
11 representative of the company.
12 　Q　How about Robert Roan, R O A N?
13 　A　It could be. I don't recall because,
14 you know, they changed people a couple, three
15 times.
16 　Q　How many meetings did you attend with
17 Riggs Bank after O'Stein Brothers became
18 involved?
19 　A　Just that one.
20 　Q　Just the one meeting?
21 　A　Yeah.
22 　Q　Was there any discussion at that

Page 61

1  didn't get paid was because he didn't collect the
2  money. So how can I pay something that he didn't
3  collect? He needed to collect the money first
4  before he got paid.
5    Q   Is that what that agreement required?
6    A   As normal in the industry.
7    Q   Continuing on at page 2 -- actually,
8  going to page 3, paragraph B(2), cooperation with
9  terms imposed by Riggs National Bank. Was there
10 to be a negotiation to obtain a forbearance in
11 declaring a default from Riggs Bank?
12   A   That is a possibility.
13   Q   Let me ask you this. In this time
14 frame when you become involved with O'Stein
15 Brothers were there any discussions about placing
16 the business in bankruptcy?
17   A   Yes. In fact, the last meeting that we
18 had they tried to intimidate me, and especially
19 Randy Habeck when he told me that if I didn't
20 sign the agreement to take the company to
21 bankruptcy, you know, I was going to lose
22 everything and I was going to lose all of my

Page 62

1  assets and live in a mobile home.
2    Q   What year was that?
3    A   That was 1997.
4    Q   How about as far back as 1994?
5    A   Yes. Prior of 1994?
6    Q   Yes, sir.
7    A   No, never did. There was no need.
8    Q   In the context of these discussions
9  with Riggs Bank there was never a discussion of
10 bankruptcy?
11   A   Bankruptcy, no. Not that I recall.
12   Q   Did the company retain a bankruptcy
13 attorney?
14   A   Did the company retain a bankruptcy
15 attorney?
16   Q   Yes, sir.
17   A   Not that I am aware of. Unless, you
18 know, the O'Stein Brothers did. Because that
19 wouldn't surprise me with all of the things they
20 did without my consent.
21   Q   Well, at some point did JEJ or Chef
22 Garcia retain Mr. Albright?

Page 63

1        MR. ALBRIGHT: No. I object. Why
2  don't you leave the room here. Off the record.
3        (The Garcias leave the room.)
4        (Discussion off the record.)
5        (Brief recess was taken.)
6        (The Garcias return.)
7  BY MR. ROSWELL:
8    Q   Mr. Garcia, I am done with this
9  agreement, so we can hand that over there.
10 Mr. Garcia, do you personally own any patents or
11 trademarks?
12   A   Do I personally own any trademarks?
13   Q   Patents, anything like that.
14   A   I used to. Chef Garcia, Tortilla Maya.
15   Q   Chef Garcia, Tortilla Maya?
16   A   Right.
17       (Interruption by the reporter.)
18   A   Umkax, U M K A X.
19   Q   And were these registered trademarks?
20   A   They were registered, yes, in
21 Virginia.
22   Q   When did you register them in

Page 64

1  Virginia?
2    A   When I first started the company. The
3  first one was Tortilla Maya. The second was Chef
4  Garcia, and the third one was Umkax.
5    Q   And they were registered in Virginia
6  and were they registered with you as the owner or
7  the company as the owner?
8    A   The company, JEJ.
9    Q   So the trademarks belong to JEJ?
10   A   JEJ.
11       (Defendants' Deposition Exhibit Number
12 11 was marked for identification and was attached
13 to the transcript.)
14   Q   Mr. Garcia, let me show you what we
15 marked as Exhibit Number 11. Have you seen that
16 memo before?
17   A   No.
18   Q   Do you see your name listed as the
19 first person to whom it was purportedly sent?
20   A   Yeah, but I never got it.
21   Q   You never got it?
22   A   (Witness shakes head.)

**89**

1  that at any given time, you know, if they or we
2  decide to be apart that they will take care of
3  all my personal guarantees that I had for the
4  company.
5      Q   Is that a separate agreement?
6      A   No. It's in the sole agreement of the
7  business agreement.
8      Q   So it's in either the letter agreement
9  or the stock purchase agreement?
10     A   The stock purchase agreement.
11     Q   That they would take care of all
12 personal guarantees?
13     A   All personal guarantees. That was
14 the -- that is on the agreement.
15     Q   Has anyone or any business tried to
16 collect from you on any personal guarantees?
17     A   Yes.
18     Q   Who?
19     A   Green Associates collect about $40,000
20 or more from me for the rent.
21     Q   When was that?
22     A   In '98, and I believe we finished the

**90**

1  transaction in '99 or 2000. And he also collect
2  -- he had a judgment against me, so he was
3  collecting the rent of my house in Springfield
4  when I was in Georgia.
5      Q   Which lease was that for?
6      A   McWax Kitchen. The other one -- I just
7  found out also that --
8          (Interruption by the reporter.)
9      A   -- Fullerton Associates put a judgment
10 against me on my property in Springfield for
11 $400,000.
12     Q   Which property was that for?
13     A   That was for the building, the rent in
14 Springfield, 7608-F Fullerton Road.
15     Q   Did you make any demands on defendants
16 Rothstein and Kirstien to satisfy these personal
17 guarantees?
18     A   They knew that they are supposed to do
19 that according to the agreement. I have not
20 talked to them personally or particularly, you
21 know, since they fired me.
22     Q   And, again, this is all controlled in

**91**

1  the stock purchase agreement?
2      A   Right.
3      Q   Going on to paragraph 21(c), what loan
4  agreements were breached?
5      A   The Riggs National Bank they also
6  default or not paying because the amount was,
7  according to my recollection, about $500,000.
8  $250,000 was paid for the liquidation of the
9  equipment, and the remainder of $250,000 was in
10 breach of the loan.
11     Q   Has Riggs Bank pursued you?
12     A   They send me at the beginning -- after
13 I left they sent me letters of trying to collect
14 the money. And when I ask them for
15 documentation, they deny it. Because I told
16 them, I said, you know, I am entitled -- I am not
17 getting any financials, I say, and I assume you
18 are getting them, so I need to know where you are
19 at. So I need you to fax me the financials of
20 the company.
21         And that was like three or four months
22 later. And they refused to give me information

**92**

1  and told me that, you know, I was no longer
2  employed by the company, so I had no rights to
3  the financials. My answer to them was that I was
4  still a board member and I still own 50 percent
5  of the company.
6          And after that, you know, that denial,
7  I believe we had another meeting and they never
8  bothered me after that. But still they have a
9  judgment against me or hold up in my house in
10 Springfield for $250,000. Actually, there is
11 still $800,000 because it was never --
12         (Interruption by the reporter.)
13     A   -- closed or satisfied.
14     Q   On page 7, paragraph 23, you accuse my
15 clients of misappropriating the inventory and
16 assets of plaintiffs. Didn't the inventory and
17 assets belong to the companies?
18     A   What is the number you are reading?
19     Q   23.
20         MR. KEARNEY: 24.
21     Q   After stripping plaintiffs of their
22 American Food business.

**97**

know, the board members, the investors, you know, approached me that I inflated the inventory. And I say how do you -- what do you know, how do you know that I inflated. I said do you have a copy of the inventory. I said I just finished the inventory. The accountant himself -- you know, because, like I said before, you know, he was trained by Rothstein, you know, that he will work on it for him and do whatever he wanted him to do.

Q  Let me just interrupt you. That is Mr. McDonald you are talking about?

A  Right. He already had sent him a copy of that before I got there, you know, so the numbers wouldn't match. The numbers that I had versus what they had didn't match, and they said that I inflated the inventory. And I say in what regard. So I say -- so Kirstien request that I go back and do -- because I denied the allegations. So Kirstien request that I go back and do inventory immediately again. I say, okay, just to satisfy them. And since he was the

**98**

chairman of the board, you know, I got to do what he says.

So I went back and did inventory again and the numbers did not change to when I previously done inventory. But then they show me that there was $50,000 inflated in there, you know, and that is when I found out that Randy McDonald had intentionally gone into the general ledger and put $50,000 in there, you know, with no proof of any kind.

Q  You testified that you took the managers with you when you went to do the physical inventory.

A  That is correct. I always carry the managers when we did inventory.

Q  Who were those managers?

A  One of them was Vertano Zarco and the other one was Neftali Rodriguez. They were basically the two managers.

Q  When you found out that Mr. McDonald inflated the numbers by $50,000, did you confront him about this?

**99**

A  Yes, I did.

Q  What did he say?

A  He said that he just put it in there by mistake. I said there is no such thing. How can you put things by mistake?

Q  $50,000 is a big mistake.

A  That is a lot of money. I said what were you trying to do, you know. And he got very nervous and called Harvey Rothstein, you know, and told him that I was accusing him of this and that and I was giving him a lot of pressure. I said I can care less.

I say your name is in the computer and it is in the register. It is in the general ledger because the general ledger, who makes the changes. So there was no question about it because, you know, his name is in the general ledger because he is the only one authorized to make changes because he is the only one that had the password.

Q  Who had authority to change the password on that computer system, do you know?

**100**

A  I have no idea.

Q  When Chef Garcia went into bankruptcy, that was toward September of 1998; is that correct? Does that sound right?

A  Yes, probably.

Q  Were you represented by an attorney during the Chef Garcia bankruptcy?

A  I was not even -- like I say, you know, I was advised by a letter because I was still a member of the board, and I resigned then before the bankruptcy because I had no information.

Q  But after they filed did you hire Mr. Albright to represent you personally in the Chef Garcia bankruptcy?

A  He is - yeah, he has always been my attorney.

Q  And did you receive notices at home from the bankruptcy court concerning the Chef Garcia bankruptcy?

A  Yes, we did.

MR. ALBRIGHT:  I mean there is no question that we participated in the bankruptcy