## STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made as of ~~August 31~~, 1995 between CHEF GARCIA, INC., a Delaware corporation (the "Company"), and Jaime Garcia and Elvira Garcia (hereinafter "Garcia"). Except as otherwise indicated, capitalized terms used herein are defined in part 7 hereof.

The parties hereto agree as follows:

1.   <u>Authorization (of the Preferred Stock</u>.  The Company will authorize the issuance and sale to Garcia of 2668 shares of its Class C 9½% Cumulative Preferred Stock, par value $1.00 per share (the "Class C Preferred"), having the rights and preferences set forth in Exhibit A attached hereto.  The Class C Preferred is referred to herein as the "Preferred Stock."

2.   <u>Purchase and Sale of Common Stock</u>.  At the Closing, the Company will sell to Garcia 10,000 shares of Common Stock, par value $.01 per share (the "Common Stock") in exchange for the transfer to the Company of all of the Common Stock held by Garcia in The JEJ Food Company and McWax & Company.

2A.  <u>Purchase and Sale of the Preferred Stock</u>.  At the Closing, the Company will sell to Garcia and, subject to the terms and conditions set forth herein, the Purchaser will purchase from the Company, 2668 shares of Class C Preferred for a purchase price of $100.00 per share to be paid by the cancellation of $266,800.00 in subordinated indebtedness owed to Garcia by The JEJ Food Company.

2B.  <u>The Closing</u>.  The closing of the purchase and sale of the Common and Preferred Stock (the "Closing") will take place at the offices of Mason, Ketterman & Morgan, 300 E. Lombard Street at 10:00 a.m. on August 31, 1995 or at such other place or on such other date as may be mutually agreeable to the Company and Garcia. At the Closing, the Company will deliver to Garcia certificates evidencing the Common Stock and the Preferred Stock to be purchased by Garcia, registered in Garcia's or its nominee's name, upon payment of the purchase price thereof as described above.

3.   <u>Conditions of Garcia's Obligation at the Closing</u>.  The obligation of Garcia to purchase and pay for the Common Stock and the Preferred Stock at the Closing is subject to the satisfaction as of the Closing of the following conditions:

3A.  <u>Representations and Warranties</u>.  The representations and warranties contained in paragraph 6 hereof will be true and correct at and as of the Closing as though then made, except to the extent of changes caused by the transactions expressly contemplated herein.

**EXHIBIT**

8

3B. <u>Certificate of Incorporation</u>.  The Company's Certificate of Incorporation (the "Certificate of Incorporation") will include the provisions set forth in Exhibit A hereto, will be in full force and effect at the Closing and will not have been amended or modified.

3C. <u>Management Employment Agreement</u>.    The Company will have entered into management employment agreements, in <u>form</u> and substance substantially similar to Exhibit B attached hereto (the "Management Employment Agreements"), with Jaime Garcia and Elvira Garcia (collectively "Garcia"), and such Management Employment Agreement will not have been amended or modified and will be in full force and effect as of the Closing.

3D. <u>Registration Agreement</u>.  The Company, O'Stein Bros. Limited Partnership No. 4 (the "Purchaser"), and Garcia will enter into a registration agreement, in form and substance to be agreeable to all parties.

3E. <u>Bank Agreement</u>. The Company and Riggs National Bank (the "Lender") will enter into (a) loan agreement(s) (the "Bank Agreement") providing for loans to the Company in an amount sufficient to continue the operations of the Company on terms no less favorable than those under which the Company operated in 1994 (the "Senior Debt"), in form and substance reasonably satisfactory to the Purchaser, and the Bank Agreement will be in full force and effect as of the Closing and will not have been amended or modified.

3F. <u>Closing Documents</u>.  The Company will have delivered to Garcia all of the following documents:

(i)  Stock Purchase Agreements between the Company and Jaime and Elvira Garcia and the Company and O'Stein Bros. Limited Partnership No. 4;

(ii)  Employment Agreements between the Company and Jaime Garcia and Elvira Garcia; and

(iii)  a copy of the Certificate of Incorporation and such other documents relating to the transactions contemplated by this Agreement as the Purchaser or Garcia or counsel may reasonably request.

3G. <u>Proceedings</u>.  All corporate and other proceedings taken or required to be taken in connection with the transactions contemplated hereby to be consummated at or prior to the Closing and all documents incident thereto will be satisfactory in form and substance to the Purchaser and counsel.

3H. <u>Waiver</u>.    Any condition specified in this paragraph 3 may be waived if consented to by the Purchaser;

provided that no such waiver will be effective against the
Purchaser unless it is set forth in a writing executed by the
Purchaser.

    4.   <u>Covenants</u>.

    4A. <u>Financial Statements and Other Information</u>.  The
Company will deliver to each holder of at least 10% of the Common
Stock:

    (i)  as soon as available but in any event within
30 days after the end of each monthly accounting period
in each fiscal year for each of the first eleven monthly
accounting periods of each fiscal year, and within 60
days after the end of the last monthly accounting period
of each fiscal year, unaudited consolidating and
consolidated statements of income and changes in
consolidated financial position of the Company and its
Subsidiaries for such monthly period and f or the period
from the beginning of the fiscal year to the end of such
month, and consolidating and consolidated balance sheets
of the Company and its Subsidiaries as of the end of
such monthly period, setting forth in each case
comparisons to the annual budget and to the
corresponding period in the preceding fiscal year, and
all such statements will be prepared in accordance with
generally accepted accounting principles, consistently
applied;

    (ii)  accompanying the financial statements
referred to in subparagraph (i) an Officer's Certificate
stating that there is no Event of Noncompliance in
existence and that neither the Company nor any of its
Subsidiaries is in default under any of its other
material agreements or, if any Event of Noncompliance or
any such default exists, specifying the nature and
period of existence thereof, and what actions the
Company and its Subsidiaries have taken and propose to
take with respect thereto;

    (iii) within 90 days after the end of each fiscal
year, consolidating and consolidated statements of
income and changes in financial position of the Company
and its Subsidiaries for such fiscal year, and
consolidating and consolidated balance sheets of the
Company and its Subsidiaries as of the end of such
fiscal year, setting forth in each case comparisons to
the annual budget and to the preceding fiscal year, all
prepared in accordance with generally accepted
accounting principles, consistently, applied, and
accompanied by (a) with respect to the consolidated
portions of such statements, an opinion of an

independent accounting firm of recognized standing
acceptable to the holders of a majority of the
outstanding Class A Preferred and the holders of a
majority of the Common Stock, (b) a certificate from
such accounting firm, addressed to the Company's board
of directors, stating that in the course of its
examination nothing came to its attention that caused it
to believe that there was an Event of Noncompliance in
existence or that there was any other default by the
Company or any Subsidiary in the fulfillment of or
compliance with any of the terms, covenants, provisions
or conditions of any other material agreement to which
the Company or any Subsidiary is a party or, if such
accountants have reason to believe any Event of
Noncompliance or other default by the Company or any
Subsidiary exists, a certificate specifying the nature
and period of existence thereof, and (c) a copy of such
firm's annual management letter to the board of
directors;

     (iv)  promptly upon receipt thereof, any additional
reports, management letters or other detailed
information concerning significant aspects of the
Company's operations and financial affairs given to the
Company by its independent accountants (and not
otherwise contained in other materials provided
hereunder);

     (v)  at least 30 days but not more than 90 days
prior to the end of each fiscal year, annual budget
prepared on a monthly basis for the Company and its
Subsidiaries for the succeeding fiscal year (displaying
anticipated statements of income, changes in financial
position and balance sheets), and promptly upon
preparation thereof any other significant budgets,
including proposed capital expenditures by the Company
and its Subsidiaries for the succeeding fiscal year,
which shall contain such information and additional
supporting documentation as requested by Purchaser and
which shall be subject to the approval of the Purchaser
(so long as Purchaser holds any Class A Preferred)
(which, upon such approval will be referred to herein as
the "Approved Capital Expenditures"), which the Company
prepares and any revisions of such annual or other
budgets, and within 30 days after any monthly period in
which there is a material adverse deviation from the
annual budget, an Officer's Certificate explaining the
deviation and what actions the Company has taken and
proposes to take with respect thereto;

     (vi)  promptly (but in any event within five
business days) after the discovery or receipt of notice

of any Event of Noncompliance, any default under any material agreement to which it or any of its Subsidiaries is a party or any other material adverse event, or circumstance affecting the Company or any Subsidiary (including the filing of any material litigation against the Company or any Subsidiary or the existence of any dispute with any Person which involves a reasonable likelihood of such litigation being commenced), an Officer's Certificate specifying the nature and period of existence thereof and what actions the Company and its Subsidiaries have taken and propose to take with respect thereto;

(vii) within ten days after transmission thereof, copies of all financial statements, proxy statements, reports and any other general written communications which the Company sends to its stockholders and copies of all registration statements and all regular, special or periodic reports which it files, or any of its officers or directors file with respect to the Company, with the Securities and Exchange Commission or with any securities exchange on which any of its securities are then listed, and copies of all press releases and other statements made available generally by the Company to the public concerning material developments in the Company's business; and

(viii) with reasonable promptness, such other information and financial data concerning the Company and its Subsidiaries as any Person entitled to receive information under this paragraph 4A may reasonably request.

Each of the financial statements referred to in subparagraph (i) and (iii) will be true and correct in all material respects as of the dates and for the periods stated therein, subject in the case of the unaudited financial statements to changes resulting from normal year-end audit adjustments (none of which would, alone or in the aggregate, be materially adverse to the Company's financial condition, operating results or business prospects).

4B. <u>Inspection of Property</u>. The Company will permit any representatives designated by any holder of at least 10% of the Common Stock, upon reasonable notice and during normal business hours and such other times as any such holder may reasonably request, to (i) visit and inspect any of the properties of the Company and its Subsidiaries, (ii) examine the corporate and financial records of the Company and its Subsidiaries and make copies thereof or extracts therefrom and (iii) discuss the affairs, finances and accounts of any such corporations the directors, officers, key employees and independent accountants of the Company and its Subsidiaries.

4C.  Attendance at Board Meetings.  The Company will give each holder of at least 10% of the Common Stock written notice of each meeting of its board of directors and each committee thereof at least ten days prior to the date of each such meeting, and the Company will permit a representative of each such Person to attend as an observer all meetings of its board of directors and all committees thereof; provided that in the case of telephonic meetings conducted in accordance with the Company's bylaws and applicable law, each such Person need receive only actual notice thereof at least 48 hours prior to any such meeting, and each such Person's representative will be given the opportunity to observe such telephonic meetings.  Each representative will be entitled to receive all written materials and other information given to directors in connection with such meetings at the same time such materials and information are given to the directors.  If the Company proposes to take any action by written consent in lieu of a meeting of its board of directors or of any committee thereof, the Company will give written notice thereof to each such Person prior to the effective date of such consent describing in reasonable detail the nature and substance of such action.  The Company will pay the reasonable out-of-pocket expenses of each representative incurred in connection with attending such board and committee meetings.

4D.  Designation of Directors.  So long as Purchaser holds any Preferred Stock, it shall have the right to designate three representatives to be elected to the Company's board of directors and have two such representatives on each committee of the board of directors, and the Company will nominate such representatives for election to the board of directors. The Company will use best efforts to cause such representatives to be selected to the board of directors and committees thereof and will not take any action which would diminish the prospects of such representatives being elected to the board of directors and committees thereof.  All out-of-pocket expenses of each board member incurred in connection with attending regular and special board of director's meetings and any meeting of any committee thereof will be paid by the Company.

4E.  Restrictions.  So long as any Preferred Stock remains outstanding, the Company will not:

(i)  directly or indirectly declare or pay any dividends or make any distributions upon any of its equity securities other than the Preferred Stock, except for dividends of shares of Common Stock issued upon the outstanding shares of Common Stock;

(ii)  directly or indirectly redeem, purchase or otherwise acquire, or permit any Subsidiary to redeem, purchase or otherwise acquire, any of the Company's equity securities other than the Preferred Stock and

except for repurchases by the Company of such equity securities as may be held by management;

(iii)  except as expressly contemplated by this Agreement, authorize, issue or enter into any agreement providing for the issuance (contingent or otherwise) of, (a) any notes or debt securities containing equity features (including, without limitation, any notes or debt securities convertible into or exchangeable for equity securities, issued in connection with the issuance of equity securities or containing profit participation features) or (b) any equity securities (or any securities convertible into or exchangeable for any equity securities), other than issuances pursuant to the terms of Article 5 of the Articles of Incorporation, without the express written consent of the Purchaser;

(iv)  make, or permit any Subsidiary to make, any loans or advances to, guarantees for the benefit of, or Investments in, any Person (other than a wholly-owned Subsidiary established under the laws of a jurisdiction of the United States or any of its territorial possessions), except for (a) reasonable advances to employees in the ordinary course of business, (b) acquisitions permitted pursuant to subparagraph (viii) below and (c) Investments having a stated maturity of greater than one year from the date the Company makes such Investment in (2) obligations of the United States government or any agency thereof or obligations guaranteed by the United States government, (2) certificates of deposit of commercial banks having combined capital and surplus of at least $50 million or (3)  commercial paper with a rating of at least "Prime-1" by Moody's Investors Service, Inc.;

(v)  merge or consolidate with any Person or, permit any Subsidiary to merge or consolidate with any Person (other than wholly-owned Subsidiary);

(vi)  sell, lease or otherwise dispose of, or permit any Subsidiary to sell, lease or otherwise dispose of, more than 10% of the Company's consolidated assets in any transaction or series of related transactions (other than sales in the ordinary course of business);

(vii)  liquidate, dissolve or effect any recapitalization or reorganization in any form of transaction;

(viii)  acquire, or permit any Subsidiary to acquire, any interest in any business (whether by a purchase of assets, purchase of stock, merger or otherwise);

7

(ix)  enter into, or permit any Subsidiary to enter into, the ownership, active management or operation of any business other than business conducted as of the date hereof by the Company;

(x)  expand or permit any Subsidiary to expand its business outside of the current franchise areas;

(xi)  become subject to, or permit any of its Subsidiaries to become subject to, any agreement or instrument, which by its terms would (under any circumstances) restrict the Company's right to perform any of its obligations pursuant to the terms of this Agreement, the Registration Agreement, the Certificate of Incorporation or the Company's bylaws (including, without limitation, all obligations relating to payment of dividends on and making redemptions of the Preferred Stock and conversions of the Class B Preferred);

(xii)  except as contemplated by this Agreement make any amendment to the Certificate of Incorporation, the Company's bylaws, or file any resolution of the board of directors with the Delaware Secretary of State containing any provisions, which would adversely affect or otherwise impair the rights of the holders of the Preferred Stock or the Underlying Common Stock under this Agreement, the Certificate of Incorporation, the Company's bylaws or the Registration Agreement;

(xiii)  enter into, or permit any Subsidiary to enter into, any transaction with any of its or any Subsidiary's officers, directors, employees or affiliates, except for normal employment arrangements and benefit programs on reasonable terms and except as otherwise expressly contemplated by this Agreement;

(xiv)  establish or acquire (a) any Subsidiaries other than wholly-owned Subsidiaries or (b) any Subsidiaries organized outside of the United States and its territorial possessions;

(xv)  create, incur, assume or suffer to exist, or permit any Subsidiary to create, incur, assume or suffer to exist, Funded Indebtedness (other than Funded Indebtedness existing immediately after consummation of the Acquisition) exceeding in the aggregate $250,000 outstanding at any time on a consolidated basis;

(xvi)  make any capital expenditures (including, without limitation, payments with respect to capitalized leases) exceeding $100,000 in the aggregate on a consolidated basis during any twelve-month period,

8

except for the Approved Capital Expenditures;

(xvii)  enter into any lease or other rental agreement (excluding capitalized leases) under which the amount of the aggregate lease payments for such agreement exceeds $100,000 on a consolidated basis for any twelve-month period, other than a renewal of existing leases for its subsidiaries;

(xviii)  change its fiscal year;

(xix)  increase the authorized size of its board of directors above 5 members or below 3 members;

(xx)  adopt any stock option plan or employee stock ownership plan or issue any shares of Common Stock to its or its Subsidiaries' employees; or

(xxi)  employ any descendant (whether natural or adopted), parent, brother, sister, aunt, uncle, niece or nephew of Garcia (a "Family Group Member") as an executive officer or pay any Family Group Member annual consideration exceeding $45,000.00.

4F.  <u>Affirmative Covenants</u>. So long as any Preferred Stock remains outstanding, the  Company will, and will cause each Subsidiary to:

(i)  at all times cause to be done all things necessary to maintain, preserve and renew its corporate existence and all material licenses, authorizations and permits necessary to the conduct of its businesses;

(ii)  maintain and keep its properties in good repair, working order and condition, and from time to time make all necessary or desirable repairs, renewals and replacements, so that its businesses may be properly and advantageously conducted at all times;

(iii)  pay and discharge when payable all taxes, assessments and governmental charges imposed upon its properties or upon the income or profits therefrom (in each case before the same becomes delinquent and before penalties accrue thereon) and all claims for labor, materials or supplies which if unpaid might by law become a lien upon any of its property, unless and to the extent that the same are being contested in good faith and by appropriate proceedings and adequate reserves (as determined in accordance with generally accepted accounting principles, consistently applied) have been established on its books with respect thereto;

9

(iv)  comply with all other obligations which it incurs pursuant to any contract or agreement, whether oral or written, express or implied, as such obligations become due unless and to the extent that the same are being contested in good faith and by appropriate proceedings and adequate reserves (as determined in accordance with generally accepted accounting principles, consistently applied) have been established on its books with respect thereto;

(v)  comply with all applicable laws, rules and regulations of all governmental authorities, the violation of which might reasonably be expected to have a material adverse effect upon the financial condition, operating results or business prospects of the Company and its Subsidiaries;

(vi)  apply for and continue in force with good and responsible insurance companies adequate insurance covering risks of such types and in such amounts as are customary for well-insured corporations of similar size engaged in similar lines of business; and

(vii) maintain proper books of record and account which fairly present its financial condition and results of operations and make provisions on its financial statements for all such proper reserves as in each case are required in accordance with generally accepted accounting principles, consistently applied.

4G.  <u>Compliance with Agreements</u>.  The Company will perform and observe (i) all of its obligations to each holder of the Preferred Stock and all of its obligations to each holder of the Common Stock set forth in the Certificate of Incorporation and (ii) all of its obligations to each holder of Registrable Securities set forth in the Registration Agreement.

4H.  <u>Current Public Information</u>.  At all times after the Company has filed a registration statement with the Securities and Exchange Commission pursuant to the requirements of either the Securities Act or the Securities Exchange Act, the Company will file all reports required to be filed by it under the Securities Act and the Securities Exchange Act and the rules and regulations adopted by the Securities and Exchange Commission thereunder, and will take such further action as any holder or holders of Restricted Securities may reasonably request all to the extent required to enable such holders to sell Restricted Securities pursuant to (i) Rule 144 adopted by the Securities and Exchange Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Securities and Exchange Commission or (ii) a registration statement on Form S-2 or S-3 or any similar registration form hereafter adopted by the

Securities and Exchange Commission. Upon written request, the Company will deliver to such holders a written statement as to whether it has complied with such requirements.

4I. <u>Reservation of Common Stock</u>. The Company will at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of issuance upon the conversion of the Class B Preferred, such number of shares of Common Stock issuable upon the conversion of all outstanding Class B Preferred. All shares of Common Stock which are so issuable will, when issued, be duly and validly issued, fully paid and nonassessable and free from all taxes, liens and charges. The Company will take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which will be immediately transmitted by the Company upon issuance).

4J. <u>Limited First Refusal Rights</u>.

(i) Except for the issuance of Common Stock (a) as contemplated by Article 5 of the Articles of Incorporation upon the conversion of the Class B Preferred, if the Company authorizes the issuance and sale of any shares of Common Stock or any securities (containing options or rights to acquire any shares of Common Stock (other than as a dividend on the outstanding Common Stock), the Company will first offer to sell to the Purchaser and each of the holders of Common Stock purchased from the Purchaser, a portion of such securities equal to the percentage determined by dividing (1) the number of shares of Common Stock held by such holder by (2) the number of shares of Common Stock (calculated on a fully-diluted basis) outstanding. Each such holder of Underlying Common Stock will be entitled to purchase such stock or securities at the same price and on the same terms as such stock or securities are to be offered to any other Persons; provided that, at the request of any holder of Common Stock purchased from or through the Purchaser, the Company will offer to such holder stock or securities which have no voting rights and are convertible into voting securities but which are otherwise identical to the stock or securities being offered.

(ii) Each such holder of Common Stock must exercise its purchase rights hereunder within 15 days after receipt of written notice from the Company describing in reasonable detail the stock or securities being offered, the purchase price thereof, the payment terms and such holder's percentage allotment.

(iii) Upon the expiration of the offering period described above, the Company will be free to sell such stock or securities which such holders have not elected to purchase during the 90 days

11

following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to such holders. Any stock or securities offered or sold by the Company after such 90-day period must be reoffered to such holders of Common Stock pursuant to the terms of this paragraph.

    4K.  Regulatory Compliance Cooperation.

    (i)  In the event that Purchaser determines that it (or any affiliate of such Purchaser) has a Regulatory Problem (as defined below), the Company agrees to take all such actions as are reasonably requested by the Purchaser in order to (a) effectuate and facilitate any transfer by the Purchaser of any securities of the Company then held by the Purchaser (or any affiliate of the Purchaser) to any person designated by the Purchaser, (b) permit the Purchaser (or any affiliate of the Purchaser) to exchange all or any portion of the Common Stock or Preferred Stock then held by such Purchaser on a share-for-share basis for shares of a class of nonvoting stock of the Company, which nonvoting stock will be identical in all respects to the Common Stock or the Preferred Stock (as the case may be) exchanged therefor, except that it will be nonvoting and will be convertible into voting stock on such terms as are requested by the Purchaser in light of regulatory considerations then prevailing, and (c) continue and preserve the allocation of the voting interests with respect to the Company in existence prior to the Purchaser's determination that it has a Regulatory Problem. Such actions may include, but will not necessarily be limited to:

        (x)  entering into such additional agreements as are requested by the Purchaser to permit any Persons(s) designated by such person to exercise any voting power which is relinquished by such person upon any exchange of Common Stock and/or Preferred Stock for non-voting stock of the Company; and

        (y)  entering into such additional agreements, adopting such amendments to the Certificate of Incorporation and bylaws, and taking such additional actions as are reasonably requested by the Purchaser in order to effectuate the intent of the foregoing.

    (ii) For purposes of this Agreement, a "Regulatory Problem" means any set of facts or circumstances wherein it has been asserted by any governmental regulatory agency (or the Purchaser believes that there is a substantial risk of such assertion) that the Purchaser (or any affiliate of the Purchaser) is not entitled to hold, or exercise any significant right with respect to, the Common Stock or the Preferred Stock.

4L.  <u>Public Disclosures</u>.  The Company will not, nor will it permit any Subsidiary to, disclose the Purchaser's name or identity as an investor in the Company in any press release or other public announcement or in any document or material filed with any governmental entity, without the prior written consent of the Purchaser, unless such disclosure is required by applicable law or governmental regulations or by order of a court of competent jurisdiction, in which case prior to making such disclosure the Company will give written notice to the Purchaser describing in reasonable detail the proposed content of such disclosure and will permit the Purchaser to review and comment upon the form and substance of such disclosure.

5.    <u>Transfer of Restricted Securities</u>.

(i)    Restricted Securities are transferable pursuant to (a) public offerings registered under the Securities Act, (b) Rule 144 of the Securities and Exchange Commission (or any similar rule then in force) if such rule is available and (c) subject to the conditions specified in subparagraph (ii) below, any other legally available means of transfer.

(ii)  In connection with the transfer of any Restricted Securities (other than a transfer described to in subparagraph 5(i)(a) or (b) above), the holder thereof will deliver written notice to the Company describing in reasonable detail the transfer or proposed transfer, together with an opinion of Mason, Ketterman & Morgan or other counsel which (to the Company's reasonable satisfaction) is knowledgeable in securities law matters to the effect that such transfer of Restricted Securities may be effected without registration of such Restricted Securities under the Securities Act.  In addition, if the holder of the Restricted Securities delivers to the Company an opinion of Mason, Ketterman & Morgan or such other counsel that no subsequent transfer of such Restricted Securities will require registration under the Securities Act, the Company will promptly upon such contemplated transfer deliver new certificates for such Restricted Securities which do not bear the Securities Act legend set forth in paragraph 10C.  If the Company is not required to deliver new certificates for such Restricted Securities not bearing such legend, the holder thereof will not transfer the same until the prospective transferee has confirmed to the Company in writing its agreement to be bound by the conditions contained in this paragraph and paragraph 10C.

6.    <u>Representations and Warranties of the Company</u>.  As a material inducement to Garcia to enter into this Agreement and purchase the Common and Preferred Stock, the Company hereby represents and warrants that:

6A. <u>Organization and Corporate Power</u>.  The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware and is qualified to do business in every

13

jurisdiction in which the failure to so qualify might reasonably be expected to have a material adverse effect on the financial condition, operating results or business prospects of the Company. The Company has all requisite corporate power and authority and all material licenses, permits and authorizations necessary to own and operate its properties, to carry on its businesses as now conducted and presently proposed to be conducted and to carry out the transactions contemplated by this Agreement. The copies of the Company's charter documents, and bylaws which have been furnished to Garcia reflect all amendments made thereto at any time prior to the date of this Agreement and are correct and complete.

6B. <u>Capital Stock and Related Matters</u>.

(i) As of the Closing and immediately thereafter, the authorized capital stock of the Company will consist of (a) 40,000 shares of preferred stock, of which 15,000 shares will be designated as Class A Preferred (1,500 of which will be issued and outstanding), 10,000 shares will be designated as Class B Preferred (698 of which will be issued and outstanding) 15,000 shares will be designated as Class C Preferred (12,050 of which will be issued and outstanding) and (b) 200,000 shares of Common Stock, of which 20,000 shares will be issued and outstanding and 180,000 shares will be reserved for issuance upon conversion of the Class B Preferred. As of the Closing, the Company will not have outstanding any stock or securities convertible or exchangeable for any shares of its capital stock, nor will it have outstanding any rights or options to subscribe for or to purchase its capital stock or any stock or securities convertible into or exchangeable for its capital stock, except for the Class B Preferred. As of the Closing, the Company will not be subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock, except pursuant to the Certificate of Incorporation. As of the Closing, all of the outstanding shares of the Company's capital stock will be validly issued, fully paid and nonassessable.

(ii) There are no statutory (or to the best of the Company's knowledge contractual) stockholders preemptive rights with respect to the issuance of the Preferred Stock hereunder or the issuance of the Common Stock upon conversion of the Class B Preferred. The Company has not violated any applicable federal or state securities laws in connection with the offer, sale or issuance of any of its capital stock, and the offer, sale and issuance of the Preferred Stock hereunder do not require registration under the Securities Act or any applicable state securities laws. To the best of the Company's knowledge, there are no agreements between the Company's stockholders with respect to the voting or transfer of the Company's capital stock or with respect to any other aspect of the Company's affairs.

6C. <u>Subsidiaries</u>. The Company does not own or hold any rights to acquire any shares of stock or any other security or

interest in any other Person other than its disclosed interests in Chef Garcia Mexican Foods, Inc. and Chef Garcia Kitchens, Inc.

6D. Authorization: No Breach. The execution, delivery and performance of this Agreement, the Registration Agreement, and all other agreements contemplated hereby to which the Company is a party, the filing of the amendment of the Certificate of Incorporation and the Company's bylaws have been duly authorized by the Company. This Agreement, the Registration Agreement, the amendment to the Certificate of Incorporation and all other agreements contemplated hereby each constitutes a valid and binding obligation of the Company, enforceable in accordance with its terms. The execution and delivery by the Company of this Agreement, the Registration Agreement and all other agreements contemplated hereby to which the Company is a party, the offering, sale and issuance of the Preferred Stock hereunder, the issuance of the Common Stock upon conversion of the Class B Preferred, the filing of the amendment of the Certificate of Incorporation and the Company's bylaws and the fulfillment of and compliance with the respective terms hereof and thereof by the Company, do not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constituted default under, (iii) result in the creation of any lien, security interest, charge or encumbrance upon the Company's capital stock or assets pursuant to, (iv) give any third party the right to accelerate any obligation under, (v) result in it violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice to any court or administrative or governmental body pursuant to, the charter or bylaws of the Company, or any law, statute, rule or regulation to which the Company is subject, or any agreement, instrument, order, judgment or decree to which the Company is subject.

6E. Litigation, etc. There are no actions, suits, proceedings, orders, investigations or claims pending or, to the best of the Company's knowledge, threatened against or affecting the Company at law or in equity, or before or by any governmental department, commission, board, bureau, agency or instrumentality; the Company is not subject to any arbitration proceedings under collective bargaining agreements or otherwise or, to the best of the Company's knowledge, any governmental investigations or inquiries (including inquiries to the qualification to hold or receive any license or permit); and, to the best of the Company's knowledge, there is no basis for any of the foregoing. The Company has not received any opinion or memorandum or legal advice from legal counsel to the effect that it is exposed, from a legal standpoint, to any liability or disadvantage which may be material to its business.

6F. Compliance with Laws. The Company is not in violation of any law or any regulation or requirement which violation might reasonably to expected to have a material adverse effect upon the financial condition, operating results or business prospects of the

Company, and the Company has not received notice of any such violation.

6G. <u>Conduct of Business: Liabilities</u>. The Company has not conducted any business, incurred any expenses, obligations or liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to the Company and whether due or to become due), entered into any contracts or agreements (other than agreements expressly contemplated hereby) or violated any laws or governmental rules or regulations.

6H. <u>Disclosure</u>. Neither this Agreement nor any of the schedules, attachments, written statements, documents, certificates or other items prepared or supplied to the Purchaser by or on behalf of the Company with respect to the transactions contemplated hereby contain any untrue statement of a material fact or omit a material fact necessary to make each statement contained herein or therein not misleading. There is no fact which the Company has not disclosed to Garcia in writing and of which any of its officers, directors or executive employees in aware and which could reasonably be anticipated to have a material, adverse effect upon the existing or expected financial condition, operating results, assets, customer relations employee relations or business prospects of the Company and its Subsidiaries.

6I. <u>Closing Date</u>. The representations and warranties of the Company contained in this paragraph and elsewhere in this Agreement and all information contained in any exhibit, schedule or attachment hereto or in any writing delivered by, or on behalf of, the Company to the Purchaser will be true and correct in all material respects on the date of the Closing as though then made, except as affected by the transactions expressly contemplated by this Agreement.

7. <u>Definitions</u>. For the purposes of this Agreement, the following terms have the meanings set forth below:

<u>"Common Stock"</u> means the Company's Common Stock, par value $.01 per share.

<u>"Event of Noncompliance"</u> has the meaning set forth in the Certificate of Incorporation, as amended.

<u>"Funded Indebtedness"</u> means all indebtedness for borrowed money (including purchase money obligations) maturing one year or more from the date of creation or incurrence thereof or renewable or extendible at the option of the debtor to a date one year or more from the date of creation or incurrence thereof, all indebtedness under revolving credit arrangements extending over a year or more and all capitalized lease obligations.

<u>"Investment"</u> as applied to any Person means (i) any direct

or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock securities or ownership interest of any other Person and (ii) any capital contribution by such Person to any other Person.

"Officer's Certificate" means a certificate signed by the Company's president or its chief financial officer, stating that (i) the officer signing such certificate has made or has caused to be made such investigations as are necessary in order to permit him to verify the accuracy of the information set forth in such certificate and (i.i) to the best of such officer's knowledge, such certificate does not misstate any material fact and does not omit to state any fact necessary to make the certificate not misleading.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Proprietary Rights" means any patents, registered and common law trademarks, service marks, trade names, copyrights, licenses and other similar rights (including, without limitation, know-how, trade secrets and other confidential information) and applications for each of the foregoing, if any.

"Purchaser" means O'Stein Bros. Limited Partnership No. 4.

"Restricted Securities" means (i) the Preferred Stock issued hereunder, (ii) the Common Stock issued upon conversion of the Class B Preferred and (iii) any securities issued with respect to the securities referred to in clauses (i) or (ii) above by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. As to any particular Restricted Securities, such securities will cease to be Restricted Securities when they have (a) been effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them, (b) become eligible for sale pursuant to Rule 144 (or any similar provision then in force) under the Securities Act or (c) been otherwise transferred and new certificates for them not bearing the Securities Act legend set forth in paragraph 10C have been delivered by the Company in accordance with paragraph 5(ii). Whenever any particular securities cease to be Restricted Securities, the holder thereof will be entitled to receive from the Company, without expense, new securities of like tenor not bearing a Securities Act legend of the character set forth in paragraph 10C.

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal law then in force.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal law then in force.

"Securities and Exchange Commission" includes any governmental body or agency succeeding to the functions thereof.

"Subsidiary" means any corporation of which the securities having a majority of the ordinary voting power in electing the board of directors are, at the time as of which any determination in being made, owned by the Company either directly or through one or more Subsidiaries.

"Underlying Common Stock" means (i) the Common Stock issued or Issuable upon conversion of the Class B Preferred and (ii) any Common Stock issued or issuable with respect to the Common Stock referred to in clause (i) above by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization. Any Person who holds Class B Preferred will be deemed to be the holder of the Underlying Common Stock obtainable upon conversion of the Class B Preferred regardless of any restriction on the conversion of the Class B Preferred. As to any particular shares of Underlying Common Stock, such shares will cease to be Underlying Common Stock when they have been (a) effectively registered under the Securities Act and disposed of in accordance with the registration statement covering them or (b) distributed to the public pursuant to Rule 144 (or any similar provision then in force) under the Securities Act.

8. Restructuring of Senior Bank Debt. The Company will enter into all agreements and take all further actions necessary to effectuate the restructuring of the Senior Debt on the terms and conditions reasonably proposed by the Purchaser.

9. Miscellaneous.

9A. Expenses. The Company agrees to pay, and hold Garcia harmless against liability for the payment of, (i) the fees and expenses of their counsel arising in connection with the negotiation, execution and consummation of the transactions contemplated by this Agreement, (ii) the fees and expenses incurred with respect to any amendments or waivers (whether or not the same become effective) under or in respect of this Agreement, the agreements contemplated hereby or the Certificate of Incorporation, (iii) stamp and other taxes which may be payable in respect of the execution and delivery of this Agreement or the issuance, delivery or acquisition of any shares of Preferred Stock, (iv) fees and expenses incurred in, respect of the enforcement of the rights granted under this Agreement, the agreements contemplated hereby or the Certificate of Incorporation, (v) the fees and expenses incurred by Garcia in any filing with any governmental agency with respect to their investment in the Company or in any other filing with any governmental agency with respect to the Company which mentions them, and (vi) the fees and expenses of any appraisal and other out-of-pocket expenses incurred with respect to the consummation of the

transactions contemplated by this Agreement and the other agreements contemplated hereby.

9B.  <u>Remedies</u>.  Each holder will have all rights and remedies set forth in this Agreement and the Certificate of Incorporation and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law.  Any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

9C.  <u>Garcia's Investment Representations</u>.  Garcia hereby represents that they are acquiring  the Restricted Securities purchased hereunder or acquired pursuant hereto for their own account with the present intention of holding such securities for purposes of investment, and that they have no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities laws; provided that nothing contained herein will prevent Garcia and subsequent holders of Restricted Securities from transferring such securities in compliance with the provisions of paragraph 5 hereof.  Each certificate for Restricted Securities will be imprinted with a legend in substantially the following form:

"The securities represented by this certificate were originally issued on and have not been registered under the Securities Act of 1993, as amended.  The transfer of the securities represented by this certificate is subject to the conditions specified in the Purchase Agreement, dated as of between the issuer (the "Company") and certain investors, and the Company reserves the right to refuse the transfer of such securities until such conditions have been fulfilled with respect to such transfer  copy of such conditions will be furnished by the Company to the holder hereof upon written request and without charge."

9D.  <u>Treatment of the Preferred Stock</u>.  The Company covenants and agrees that so long as federal income tax laws prohibit a deduction for distributions made by the Company with respect to preferred stock (i) it will treat all distributions paid by it on the Preferred Stock as non-deductible dividends on all of its tax returns and (ii) it will treat the Preferred Stock as preferred stock in all of its financial statements and other reports and will treat all distributions paid by it on the Preferred Stock as dividends on preferred stock in such statements and reports.  The Company acknowledges and agrees that the increased dividend rate on the Preferred Stock provided for in the Certificate of Incorporation

upon the occurrence of certain Events of Noncompliance has been negotiated by (and is intended by) the Company and Garcia as a reasonable increase in yield necessitated by the increased risk to the holders of the Preferred Stock which would arise upon any such occurrence.

9E. <u>Consent to Amendments</u>. Except as otherwise expressly provided herein, the provisions of this Agreement may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the holders of a majority of the Underlying Common Stock. No other course of dealing between the Company and the holder of any Preferred Stock or Underlying Common Stock or any delay in exercising any rights hereunder or under the Certificate of Incorporation will operate as a waiver of any rights of any such holders. For purposes of this Agreement, shares of Preferred Stock held by the Company or any Subsidiaries will not be deemed to be outstanding. If the Company pays any consideration to any holder of Preferred Stock or Underlying Common Stock for such holder's consent to any amendment, modification or waiver hereunder, the Company shall also pay each other holder granting its consent hereunder equivalent consideration computed on a pro rata basis.

9F. <u>Survival of Representations and Warranties</u>. All representations and warranties contained herein or made in writing by any party in connection herewith will survive the execution and delivery of this Agreement, regardless of any investigation made by Garcia or on their behalf.

9G. <u>Successors and Assigns</u>. Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto will bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not. In addition, and whether or not any express assignment has been made, the provisions of this Agreement which are for the Garcia's benefit as a purchaser or holder of Preferred Stock or Common Stock are also for the benefit of, and enforceable by, any subsequent holder of such Preferred Stock or such Underlying Common Stock.

9H. <u>Capital and Surplus</u>. The Company agrees that the capital of the Company (as such term is used in Section 154 of the General Corporation Law of Delaware) in respect of the Preferred Stock issued pursuant to this Agreement will be equal to the aggregate par value of such shares. The Company further agrees that it will not increase the capital of the Company with respect to any shares of the Company's capital stock at any time on or after the date of this Agreement.

9I. <u>Generally Accepted Accounting Principles</u>. Where any accounting determination or calculation is required to be made under

this Agreement or the exhibits hereto, such determination or calculation (unless otherwise provided) will be made in accordance with generally accepted accounting principles, consistently applied, except that if because of a change in generally accepted accounting principles the Company would have to alter a previously utilized accounting method or policy in order to remain in compliance with generally accepted accounting principles, such determination or calculation will continue to be made in accordance with the Company's previous accounting methods and policies, unless otherwise directed by the holders of at least majority of the outstanding Preferred Stock.

9J.  <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

9K.  <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same Agreement.

9L.  <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

9M.  <u>Governing Law</u>.  The corporate law of the State of Delaware will govern all issues concerning the relative rights of the Company and its stockholders.  All other questions concerning the construction, validity and interpretation of this Agreement and the exhibits and schedules hereto will be governed by the internal law, and not the law of conflicts, of Maryland.

9N.  <u>Notices</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally or mailed by certified or registered mail, return receipt requested and postage prepaid, to the recipient.  Such notices, demands and other communications will be sent to the Company and the Purchaser at the address indicated at the address indicated below:

If to the Company:

    Chef Garcia, Inc.
    c/o Chef Garcia Mexican Foods, Inc.
    7608-F Fullerton Road
    Springfield, Virginia
    Attn:  Jaime Garcia

with a copy to:

    David J. Norman, Esquire
    Mason, Ketterman & Morgan, P.A.
    Suite 100
    1657 Crofton Blvd.
    Crofton, Maryland  21114

If to Garcia:

    Mr. and Mrs. Jaime Garcia
    c/o Chef Garcia Mexican Foods, Inc.
    7608-F Fullerton Road
    Springfield, VA

with a copy to:

    Albright & Brown, P.A.
    Suite 2100
    120 E. Baltimore Street
    Baltimore, MD  21202
    Attn:  David F. Albright, Sr., Esquire

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

    As witness the hands and seals of the parties on the day and date first written above:

CHEF GARCIA, INC.


By _____ (SEAL)       _____ (SEAL)
  Ronald D. Kirstien                        Jaime Garcia
  Chairman

                                        _____ (SEAL)
                                        Elvira Garcia

a:garciast.agm