IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

(Northern Division)

| | | |
|---|---|---|
| JAIME GARCIA, et ux. | * | |
| Plaintiffs | * | Civil No.:  BEL 01 CV 0103 |
| v. | * | |
| RONALD D. KIRSTIEN, et al. | * | |
| Defendants | * | |

\*       \*       \*       \*       \*       \*       \*

Consolidated Opposition of the Plaintiffs, Jaime Garcia and Elvira Garcia, to the
Motions for Summary Judgment of Defendants Ronald Kirstien, Harvey
Rothstein, and Randy Habeck

Introduction

While the Defendants have filed two separate motions, one by Defendant
Habeck and the other by Defendants Kirstien and Rothstein, much of the same
arguments appear in both memoranda.  This opposition will address all the
arguments raised by separate subject matter.  The order of this Consolidated
Opposition will differ somewhat from the Defendants' separate treatment of the
included subjects.

Argument

Defendants' arguments are all fallacious because they ignore disputed and undisputed facts that require a different rule than cited by Defendants. This fundamental defect goes throughout all Defendants papers.

I.  Under the Facts of this Case, There is No *Res Judicata* Effect of Prior Bankruptcy Proceedings.  The prior Bankruptcy *res judicata* defense is not applicable at all since the prior bankruptcy cases were voluntarily dismissed and the provisions of 11 U.S.C. Section 349 (b)(3) are applicable.  Williams v. Stewart, 97 Md. App. 620 (1933).

Both Motions for Summary Judgment use as a defense that there was a sale of assets during the bankruptcy proceedings that resolve issues against the Plaintiffs under the doctrine of *res judicata*.  There are many difficulties with this argument including the fact that the Bankruptcy cases were not completed, that is there was no plan of confirmation – they were voluntarily dismissed. The effect of dismissal under these specific circumstances is addressed in 11 U.S.C. Section 349, where in 349 (b)(3) Congress decided that upon a dismissal, the property of the estate reverts to the debtors as it existed immediately prior to the filing of the petition for bankruptcy.  This is clear Bankruptcy law, and this provision is so clear on its face, and unambiguous, no case law is required to construe it. A case in point citing this section is Williams v. Stewart, 97 Md. App. 620 (1993).  It decided specifically the issue of *res judicata* in the context of dismissal without confirmation, and discussed in detail the effect of 11 U. S. C. Section 349 (b).  There is absolutely no merit to the Defendants' argument on *res judicata*, and Defendants' argument being contrary to the specific language of the Code should be considered as frivolous.

II.  Plaintiffs Do Have Standing to Bring Claims against Defendants Individually when the Corporate Charters have been Forfeited.
All Defendants assert that Plaintiffs lack standing to bring the claims asserted in the Amended Complaint.  This defense is wholly without merit.  Nowhere in the

Defendants' papers do they confront the point that at the time this suit was brought, and at all subsequent times, all of the three corporations had forfeited or terminated charters.

Thus, the Defendants, as directors of the three corporations, hold all the assets of the defunct corporations as trustees. In addition the defunct corporation cannot bring suit, and cannot be sued. Plaintiffs have standing, and the directors are the proper parties defendant.

In addition, the Defendants are in error where they state or suggest that Chef Garcia, Inc. was put into bankruptcy. Chef Garcia, Inc. was never put into Bankruptcy, and the assets of Chef Garcia, Inc. were never sold. Chef Garcia Inc., as the parent company, owned the stock of the two corporations that the Defendants put into Bankruptcy. Neither of the Plaintiffs were directors of Chef Garcia Inc. at that time. In addition, Chef Garcia, Inc. no longer existed as of February 25, 1999, just before the voluntary dismissals. Since the Defendants are the surviving directors of the controlling parent Chef Garcia, Inc., they controlled the corporate affairs of the two subsidiaries. Since the Defendants were the directors of Chef Garcia, Inc. at the time of forfeiture, they received also the assets of the other two corporations whose charters had previously been forfeited. There is no dispute that Defendants Rothstein and Kirstien were directors at that time, but Defendant Habeck, while admitting that he was a Director from 1994, his claim that he resigned is disputed. Defendant Habeck readily admitted that he was a director from 1994 until sometime in late 1997. Since Mr. Habeck has produced no document showing actual corporate action, or a resignation from him, it is certainly at least a jury question as to whether he continued as a director. Particularly is this the case in view of the memorandum of March 1998, produced in discovery by Defendants, Kirstien and Rothstein, hereto showing Mr. Habeck acting with broad authority as if he had never left the management of the business.

3

Under standard law, all Defendants remain as trustees of the assets of the defunct corporations. The non-existent corporations cannot be a party to any suit.

The arguments of Defendants of lack of standing on the part of the Plaintiffs and that Defendants are not the proper parties, are not valid since all the corporations involved have had their charters forfeited or terminated prior to the institution of suit, and the Defendants are not only proper parties, but the only parties to be sued, as trustees of the assets of the defunct corporations. See e.g. Cloverfields v. Seabreeze, 32 Md. App. 421, 424-425 (1976), where the Court stated that the assets of the corporation are immediately transferred to Directors as trustees at the time of forfeiture.

III. Unfair Competition.

Maryland law has long held that it is unfair for anyone to engage in various dirty tricks and unfair competition of any sort. Baltimore Bedding Corp. v. Moses, et al., 182 Md. 229 (1943 – as stated at page 235:

> This law, both in letter and spirit, is laid upon the premise that, while it encourages fair trade in every way and aims to foster, and not to hamper, competition, no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort. This necessarily precludes the trading by one dealer upon the good name and reputation built up by another.

The Defendants did the following acts of unfair competition as set forth in answer to interrogatory 16 by Plaintiff Jim Garcia.

(1) "After Plaintiff Jim Garcia was fired he went to North Carolina to help run the manufacturing end of Casa Christina. In June, 1998 Defendants' agent, Marjorie Robinson called Chester Brunty, President of Casa Christina, and complained vehemently about Plaintiff Garcia. She told him that Plaintiff Garcia was "bad news", and that he had a contract

4

with investors and should not be working at Casa Christina.  She said that he tried to "screw" customers, did not know how to produce products, and could not produce any sales.  She also told him the Jim Garcia inflated inventory to cover-up numbers.  She told Mr. Brunty if Jim Garcia stayed with Casa Christina, her company, Chef Garcia, Inc., would "cut him off".

"Ms. Robinson's phone call also impacted Jim Garcia's relationship with the other partners at Casa Christina.  Mr. Brunty mentioned Ms. Robinson's phone call to the other partners.  They in turn received a letter from the Defendants' attorney, Stephen Leach on November 12, 1998, saying that Plaintiff Garcia "appear(ed) to violate the ...covenants of his Employment Agreement," and "demand(ed) that Casa Christina immediately cease and desist from all actions that interfere with Chef Garcia's rights." At all times after Plaintiffs were wrongfully dismissed from Chef Garcia, they followed their contracts conservatively and did not breech them.

"Defendants' agent, Marjorie Robinson, contacted Casa Christina at a later date, sometime in March 2000 offering that Habeck and Zaitz would give Casa Christina substantial business if Casa Christina would fire Plaintiff Garcia.

"Defendants further slandered Plaintiff Garcia and again caused him loss of livelihood by accusing him of producing products at Casa Christina, putting his name on them and selling them in the D.C. area. This occurred at or around the end of March to the beginning of April 2000.  Even though Plaintiff Garcia had kept all proof to refute the Defendants' charge and showed this to the partners, Casa Christina's partners fired him. It was later discovered that the product in question that had been sold in the D.C. area under the "Chef Garcia" name had actually been produced by Chef Garcia, Inc., and not by Plaintiff Garcia. Defendants completely fabricated this story.  Defendants wrongfully and maliciously slandered Plaintiff Garcia, once again ruining his ability to

perform in the Mexican Food business. At the time that Plaintiff Garcia was fired from Casa Christina, he was earning $85,000 plus expenses. Shortly after Plaintiff Garcia was fired, Casa Christina's business fell dramatically and the company was sold to another company in Texas.

"At this same time Plaintiff Garcia was entering into a business relationship with a woman to establish a restaurant. After she heard of his dismissal from Casa Christina, she altered her business relationship with him. Previously Plaintiff Garcia was to acquire 49% of the proceeds from the restaurant, as well as manage the restaurant. After she heard the slanderous statements made by the Defendants, she withdrew this offer and asked him simply to open and manage the restaurant. Again Defendants caused loss of a business relationship, further destroying Plaintiffs' reputations. Again Plaintiffs were put in the position where they had to start anew.

"Defendants also cheated Casa Christina for $30K worth of chips, during the time that Plaintiff Garcia worked for this company. Casa Christina had manufactured chips ordered by Chef Garcia, Inc. Chef Garcia never paid them for this product. Similar conduct occurred with another company in California for approximately $150-200K worth of product.

"Similar vicious conduct followed Plaintiff Jim Garcia to his next job. After Plaintiff Garcia left Casa Christina in March/April 2000, he went down to Atlanta to another business prospect. Before Plaintiff Garcia was hired, he made it clear to his future bosses that he was in litigation over his former company and that the Defendants may give him a bad reference. 60 days after he was hired, his bosses in Atlanta received a phone call from a person, again slandering Plaintiff Garcia. He was fired as a direct result of this phone call.

"At the present time Plaintiff Jim Garcia is reduced to a much smaller salary, even though he is a proven expert food manufacturer and

seller.    Plaintiff Elvira Garcia, as well, has suffered monetarily and emotionally while trying to rebuild her professional status.    Each time Plaintiff Jim Garcia was forced to find new work, Plaintiff Elvira Garcia moved with him to keep the family together.    Plaintiff Elvira Garcia was not able to find the same kind of salary and benefits as she had earned at Chef Garcia, due to the demands of constant moving and re-settling of the family's home and seeking new work.

"The Defendants were selling Chef Garcia products, while cheating bulk suppliers and co-packers, thus further defaming Plaintiffs Garcia.    To this day Plaintiff Garcia continues to come into contact with past business associates who relate him to the misdeeds of the Defendants and Chef Garcia, Inc. after Plaintiff Garcia was fired.    On or around October 10, 2002, a salesman came to Plaintiff Garcia's new place of work, Marriott, to sell some products, saw Jim Garcia and asked him if he was still associated with Chef Garcia, Inc.    The salesman proceeded to tell Plaintiff Jim Garcia that the company still owed him money from years ago. Plaintiff Garcia explained that he had been fired from the company and that it was the Defendants' who had owned the company at the time. More than four years after Plaintiff Jim Garcia was fired, he is still associated with the company and maligned because of the bad deeds performed after he was fired.

As late as April 29, 2002, Plaintiff Garcia's image was used to promote the Chef Garcia, Inc. line of products, thus causing potential further confusion with past, present and future business associates.    The possibility exists that Plaintiff Garcia's image is still in use."

IV.  Constructive Fraud.

Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.    Ellerin v. Fairfax Savings, F.S.B., 337 Md. 216 (1995).  See, in particular, footnote 11:

Constructive fraud has been defined as follows, Scheve v. McPherson, 44 Md. App. 398, 406, 408 A.2d 1071, 1076 (1979):

> Constructive fraud is a breach of legal or equitable duty which irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.

V. Limitations and Laches.

The argument that limitations apply is clearly erroneous for several reasons, some of which are apparent from the motion papers of the Defendants. For example, Defendant Habeck contends that he is no longer a director asserting that he ceased being a director over three years prior to the filing of suit. First, this is an issue of fact since Defendant Habeck provided no specific date. Second, there is no written evidence of any corporate action reflecting his change of status, or any written resignation. Moreover, there is an abundance of evidence that he actively participated in managing the business in an inside capacity, of high status, after he supposedly no longer was a director.

In any event as conceded by Defendant Habeck in his motion papers at page 8, there is a continuation theory of limitations set forth in Supik v. Bodie, Nagle, Dolina, 152 Md. App. 698 (2003) that applies to Defendant Habeck's situation, no matter whether he resigned as a director before January 12, 1998, or not, since Defendant Habeck, as stated above, did in fact participate within three years, in the same activities as he had participated in the past.

Habeck's argument that Plaintiffs are seeking to pierce the corporate veil are not valid. Habeck's corporation does not sit as a director. Habeck's taking Mrs. Robinson's place in March of 1998, in an officer capacity, is not his corporation doing that – it is Mr. Habeck, the individual. Furthermore, there is much evidence that Habeck did not in any way abide by corporate protocol. He claims he is an employee of a corporation, but he refers to himself as "partner". At another time Mr. Habeck declared that he was the Chief Financial Officer of Chef Garcia.

Defendant Habeck admits that the only written agreement as to brokerage fees payable to him is an agreement signed in June 1993. There is no question that the sums demanded by Mr. Habeck were in excess of the written agreement of June 1993. Mr. Habeck admits that he was paid these sums that are in excess of the written agreement of June 1993, while he was a director.

Defendants refer to Plaintiffs' interrogatory responses and include a large portion of these responses with their Memoranda in Support of their Motions for Summary Judgment. They omit in their motions, however, the several hundred pages of documentation submitted by Plaintiffs in support of Plaintiffs' responses to all Defendants' interrogatory requests. All Defendants have ignored these documents. Defendants have never explained their activities in relationship to these specific documents; no Defendant has ever produced any document that justifies his actions.

Defendant Habeck complains that Plaintiffs took 8 months to produce highly detailed interrogatory responses. Defendant Habeck's responses, which contained little information, took one year and three months to be produced. These interrogatory responses are partly included in Mr. Habeck's Motion for Summary Judgment, as Exhibit E. Just a sampling of the total interrogatory response is as follows:

"The case of JP Foodservice clearly outlines the embezzlement, deeply discounted sales, hidden deductions, bogus sales and other elements of competition by Defendants.

"Defendants entered into contracts with JP Foodservice, unbeknownst to Plaintiffs that used projected earnings as a way to figure deductions and incentives for the distributor. The higher the projected earnings, the larger the percentage of deductions that JP was able to take off the food it purchased from Chef Garcia. The deductions were credited ahead of the actual sales, but would be refunded later if sales did not reach projections. This type of accounting practice was common at JP

Foods, now US Foodservice, which is under investigation currently by the SEC in relation to Royal Ahold.

"Defendants made projected earnings for 1997 that were several times the amount sold to JP Foods in 1996. In 1996, gross sales to JP Foods were $129,000. Projected sales for 1997 jumped to $633,000, for a 490% increase over 1996. The higher projected sales translated into higher deductions to JP Foods. The higher deductions were taken, even though actual sales did not come near projected sales.

"Plaintiffs knew nothing about the arrangements defendants made for the deductions given to JP Foods. Plaintiffs were told that JP Foods would take the standard deduction that other food service distributors would take: samples .5%, promotion 2%, distributors 4%, shows .1%. The other fees, brokerage 4.5% and intermark 4% were paid separately and were not included in deductions referenced here. In fact total deductions amounted to 66% off gross sales.

"Defendants used the accounting practices of JP Foods to their benefit to create a cash flow crisis at Chef Garcia, Inc. By the end of 1997, $112,000 was owed to Chef Garcia for $178,000 of food bought by JP Foods. Chef Garcia had been paid only $66,000 or 37% of the gross purchase price. Plaintiffs complained about the deductions taken by JP Foods, defendants promised on numerous occasions to take care of the money owed from JPFoods, but the money was never recovered while plaintiffs were employed by Chef Garcia.

"JP Foods had been given deductions unknown to Plaintiff Garcia but known to Defendant Habeck at least since 1996. In a memo from Randall (Randy) McDonald, Director of Accounting for Chef Garcia, to Plaintiff Jim Garcia dated November 4, 1996, a telephone call from JP Foods Corporate Office Accounts Payables is detailed during which Tanya, the spokesperson for the company "said the authorization for all deductions" i.e., delinquent receivables, deductions, samples and bill

backs, "are coming from the broker."    Randy McDonald reiterated that Plaintiff Jim Garcia's signature must be on all deductions, which Tanya related to each satellite office.    Habeck and Zaitz, one of Defendant Habeck's companies, assumed responsibility to resolve all discrepancies with the individual brokers.  Habeck and Zaitz had the final responsibility of the broker deals.  Two weeks later on November 16, 1996 another memo was sent from Garcia to Habeck and his agents, placing JP Foods on credit hold until Habeck could clear up deductions.

"The problem of reconciling JP Foods' numbers for 1996 appeared again on January 24, 1997, when the company attempted to get a $150,000 loan from First National Bank of MD secured by equipment.  Of the eleven questions FNB asks, one was, "Why does JP Foodservice have a large portion of its A/R over 90 days?"  Also questioned was why $75,000 of A/R (accounts receivable) was written off in 11/96.  Defendant Habeck was fully aware of the deductions given to JP Foods, because he was the one responsible for all the deductions.  He repeatedly promised to clarify the problems, but he never did.  Instead he took actions that resulted in more deductions.

"In a memo dated March 7, 1997 from Randy McDonald, and copied to Plaintiff Jim Garcia, and Defendants Randy Habeck, Ron Kirstien and Harvey Rothstein, Plaintiff Garcia implored Marjorie Robinson, agent for Defendants, for paper work to substantiate deductions for JP Foods and to help reconcile JP's numbers for 1996.  This memo shows that there had been an ongoing problem with JP Foods that all Defendants were well aware of.   As well in this memo unexplained problems for 1997 appeared, outlining pricing discrepancies.

"Three days later on March 10, 1997, Randy McDonald, acting for Plaintiffs, vehemently complained to Defendants Habeck and Kirstien, by memo, that the problems of JP continue, highlighting the receipt of a check of only $22.83, for $1,854.65 of merchandise invoiced.  He stated

that the numerous communications that they have had, have "had no effect", the practice "is out of control" and that Garcia "will not tolerate this any longer" because it "is now becoming a financial issue." He concluded by saying that Garcia "is expecting immediate results".

"JP Deductions were also discussed at the Chef Garcia Board Meeting on March 26, 1997 for which Defendant Kirstien was present. Yet in May 1997 problems with JP persisted. In a memo from May 29, 1997 to Marjorie Robinson and copied to Jim Garcia, Ron Kirstien and Randy Habeck, JP was sending invoices without authorization, given a deduction for a product Garcia did not sell and most importantly, there had been no response from JP Foods regarding past deductions. It is clear that "no response" was given because there were secret dealings behind Plaintiffs' backs.

"During the same time period, between 6/4/97 and 6/18/97, several very old accounts were being cleared possibly to mollify Jim Garcia. Check remittance advice reports show three invoices "paid" from (estimated) late summer 1996, one five months, one four and one half months, and one over three months past invoice date.

"At the Chef Garcia Board Meeting of 6/17/97 Defendant Kirstien asked the Board "where the company stands with unpaid accounts?" He was told by Randy McDonald that JP Foods still owed money for deductions. Defendant Habeck's agent Marjorie Robinson then stated, "(we) will have the situation resolved in two weeks." At this point the cover-up by the Defendants was made extremely clear to Plaintiffs. It was obvious to them that the Defendants were not being truthful, and that the Defendants' attempts to clear up deductions were non-existent; they were deceiving Plaintiffs. In the several dozen documents of actual JP deductions, the irregularities, and the discrepancies are evident.

"JP deductions were also mentioned in a letter to Defendant Kirstien from Plaintiff Jim Garcia dated 7/21/97, five days before the July

Board Meeting, and in a memo to Defendant Habeck from the same date copied to Defendants Kirstien and Rothstein. Garcia complained that he received only 28% of the purchase price of the invoices referenced for a check. When open receivables are mentioned at the July Board Meeting, 7/26/97, Defendant Kirstien again passed the onus to Marjorie Robinson, but did nothing to follow through with these deductions, the deductions that were causing severe economic shortfalls to Plaintiffs Garcia and to the company. The economic shortfalls were so severe as to cause a lack of cash flow that inhibited production on several occasions. Plaintiff Elvira Garcia took many personal loans from her personal credit cards to relieve this cash crisis. It is clear from these memos and the actual check remittance advice reports from JP that there was a pattern to the JP deductions. The pattern is as follows: JP was given deductions by the Defendants; the Garcias did not know about the deductions until they received payments often grossly reduced from the invoices referenced; the Garcias tried to resolve the issue, by bringing it to the attention of the Board, to JP Foods and to Sales and the brokers; JP assures Plaintiffs Garcia that the deductions were coming from the brokers; nothing was done by any of the Defendants for several months, causing a cash flow crisis to occur; the Plaintiffs receive small partial payments from JP, then the cycle repeated itself.

"In the following memos Plaintiff Jim Garcia continually asked Defendants for proof of deductions, help in collecting open accounts receivables and continually asserted and reminded Defendants that no deductions could be allowed without his approval. Plaintiff Garcia, frustrated with the lack of results from Defendants, contacted JP Foods directly for open accounts receivable of over $80,000, by letter of September 8, 1997. After no results Plaintiff Jim Garcia sent a memo on October 24, 1997 to Marjorie Robinson and another on October 27, 1997, and copied to Defendants Ron Kirstien, Harvey Rothstein, and Randy

Habeck, stating that the $80,000 was still owed to Chef Garcia. (Plaintiff Garcia did not add to this figure the el Pasado line reimbursement that he was promised by Defendants;) All Defendants knew about these deductions. It was the fiduciary responsibility of Defendants Kirstien, Rothstein and Habeck to investigate these and other deductions fully. They did not. They stood silently and watched as the company proceeded in its downward spiral. Plaintiff continually asked them for support at Board Meetings, in letters and in memos, since at least November 1996, but none but the most cursory assistance was ever given.

"In Fall of 1997, JP Foods discontinued its el Pasado line with Garcia, but Sales reported that JP Foods had promised to purchase all of the inventory and packaging for this line by the end of September 1997. Then in a later memo the date was moved to October 17. On November 6, 1997, JP had still not paid for this product, and it was still in Halperin's warehouse, as opposed to another storage facility specified by JP Foods. On January 8, 1998, days before Plaintiff was fired, he complained to Habeck's agent, Robinson, that JP Foods owed $112,447, of which $30,745 worth of inventory and packaging was from the el Pasado line. It is clear that there was never a deal with JP Foods to buy excess packaging and inventory, and that Defendants' old habit of telling Plaintiffs that they were working to resolve issues, was a lie, made to put Plaintiffs' company further and further into debt.

"In the memo of January 8, 1998 from Plaintiff Jim Garcia to Marjorie Robinson, Plaintiff Jim Garcia referred to "all the discussions we have had in the past about these two customers in particular" (Giant Foods also owed $78,021.60.) He urged her to "pay attention to this matter as quickly as (she) can," as it had been "so long and too many times (they) have talked about this." Marjorie Robinson worked directly with Defendant Habeck and took directives from him. She did not clarify amounts owed to the company or seek proper paperwork for deductions

because the Defendants did not want her to. They wanted to be able to take deductions and offer deals when and how it suited their interests. When the Defendants saw how well the company was doing in April of 1997, they made sure they put themselves in the position to produce a cash flow problem that resulted in the demise of Chef Garcia, Inc.

"Although no other broker contract exists than that of 1993, Defendant Habeck had proposed the following percentages for 1997: x 140 samples equaled .5%, promos 2%, shows .1%, spoilage .5% for Food Service. Total sales for JP Foods in 1997 were $178,584.79. When promotions, discounts, spoilage, deductions on check remittance advices, discontinued inventory and accompanying packaging, etc. are combined and subtracted from total sales for 1997, the resulting figure is $66,137, a loss of $112,447.62 (or a loss of 63% of all sales). The margin for these products combined was only $34,004.49. So not only did the Defendants' practices obliterate any margin, but incurred almost $80,000 of extra debt."

The claims asserted in this case all matured within three years of the filing of the Complaint. The unexpected termination of the employment of the Plaintiffs took place less than three years before the filing of the Complaint. The failure of the Defendants to take steps to obtain releases from the entities as to which the Plaintiffs guaranteed obligations, was not done, or even tried.

The actual total destruction of the companies, with bankruptcies that were not completed, and purchases by the Defendants of the assets of these defunct corporations to themselves who were then holding the property in trust, occurred within three years.

Defendant Habeck has produced no documents in response to the Discovery Requests, including documents he would have received or sent as a

15

Director.  Mr. Habeck does not rely on any written document to support his excessive commission claims.

Moreover, Mr. Habeck has never submitted an invoice showing what sums and for what amounts are owed; and during the later years has been paid only in round numbers and at the specific direction of the other two defendants.

Although Plaintiffs protested continually to all Directors, including Mr. Habeck, about the excessive deductions, on sales to customers such as JP Foods, he clearly did not adhere to the deductions permitted by the contract, while Plaintiffs were employed by Defendants.  Furthermore, as soon as Plaintiffs were ousted without warning, the two other Defendants proceeded to implement strong and clear policies that would rein in all deductions and promotions, including those taken by Defendant Habeck.  Clearly all Defendants were aware of the excessive deductions and promotions, and clearly all Defendants were in a position to stop these excessive deductions and promotions.

Defendant Habeck admitted that he became a Director in 1994; and states with vague facts that he no longer was a director at the time that the Plaintiffs were fired without warning.  No one has produced any document showing that Defendant Habeck had resigned.  In fact Defendant Habeck continues to operate in a fiduciary capacity as can be seen from a March 20, 1998 memorandum. Note that Mr. Habeck's position on March 20, 1998 means that he will take Marjorie Robinson's position while she is "on leave".

Marjorie Robinson, as shown by the bankruptcy filings, was a vice president of the company, so Mr. Habeck is clearly acting as an officer of the company, as well as her employer.  Mr. Habeck controlled the company as if he were an officer and a director.  Note in this connection that Mr. Norman's declaration does not rule out Mr. Habeck's control of governance of the company in a capacity that might not technically be called "director", but in fact was a director.

As can be seen from the above partial answer, the facts are very precisely detailed in the interrogatory answer with the citations of supporting documents.

The entire answer is much longer, and has been put in the record by Mr. Habeck. However, Mr. Habeck gives no meaningful response or defense to the accusations made in the interrogatory answers.

The Defendants turned extremely hostile to Plaintiffs, and fired both without notice on January 14, 1998, in breach of the employment agreement. The Defendants are operating a company by the name of Chef Garcia, which they claim is a separate company from the defunct Chef Garcia, Inc., but they have shown no proof of the existence of the "new" company. The Defendants are in present agreement that Defendants Kirstien and Rothstein own and operate 50/50 the new Chef Garcia, selling the same products: chips, salsa, and tortillas under the name Chef Garcia and other names as well.

<u>Conclusion</u>

It is respectfully requested that all motions for summary judgment be denied in their entirety.

_____/s/_____
David F. Albright, Bar #01454
Albright & Goertemiller, LLC
120 E. Baltimore Street
Suite 2150
Baltimore, Maryland 21202
(410) 234-8003

Attorneys for Plaintiffs, Jaime and Elvira Garcia

17