# CHEF GARCIA, INC.

## UNANIMOUS WRITTEN CONSENT OF DIRECTORS IN LIEU OF MEETING OF BOARD OF DIRECTORS

The undersigned, being all of the members of the Board of Directors of Chef Garcia, Inc., a Delaware corporation (the "Corporation"), in lieu of holding a meeting of the Board of Directors of the Corporation, hereby take the following actions and adopt the following resolutions by unanimous written consent pursuant to Section 141 (f) of the General Corporation Law of the State of Delaware and to evidence their waiver of any right to dissent from such actions, do hereby consent as follows.

WHEREAS, this Corporation is in need of funds for its corporate purposes and the officers of this Corporation have arranged for financial accommodations from First National Bank of Maryland (the "Bank") upon terms and conditions satisfactory to such officers and to this Board.

> RESOLVED: That this Corporation borrow from the Bank funds under certain credit facilities, including, without limitation, an equipment term loan, a line of credit and an overdraft credit facility in an aggregate principal amount not to exceed Five Hundred Fifty Thousand Dollars ($550,000.00) (hereinafter referred to as the "Loan" or "Loans"), and that the President or a Vice President and the Secretary of the Corporation be and such officers are hereby authorized and empowered in the name of and on behalf of the Corporation (a) to execute, seal, acknowledge and deliver to the Bank the promissory note or notes or other instruments of this Corporation evidencing any such Loan or Loans or any extensions or renewals thereof, maturing upon such date or dates, bearing interest at such rate or rates, in such form, and containing such terms and conditions as may be agreed upon by the Bank and said officers, the execution, sealing, acknowledgment and delivery of any such promissory note or notes or other instruments by such corporate officers to be conclusive evidence of such agreement, (b) to execute, seal, acknowledge and deliver to the Bank any other instruments, documents, agreements or certifications of this Corporation which may at any time or from time to time be required by the Bank in connection with such Loan or Loans, the execution, sealing, acknowledgment and delivery of any such other instruments, documents, agreements or certifications by such corporate officers to be conclusive evidence of such requirement, and (c) to receive or endorse on behalf of and in the name of this Corporation any checks, drafts or credits representing the proceeds of such Loan or Loans.
>
> RESOLVED: That said officers be and they are hereby authorized and empowered in the name of and on behalf of this Corporation to execute,


EXHIBIT A

seal, acknowledge and deliver to the Bank a Promissory Note, a Loan Agreement and a Security Agreement in connection with such Loan or Loans containing such terms, conditions, covenants and agreements of this Corporation as may be agreed upon by the Bank and said officers, the execution, sealing, acknowledgment and delivery of any such security agreement by such corporate officers to be conclusive evidence of such agreement.

RESOLVED: That said officers be and they are hereby authorized and empowered at any time and from time to time in the name of and on behalf of this Corporation to mortgage, pledge, assign, hypothecate or grant a security interest in any or all of the assets or properties of this Corporation, now owned or hereafter acquired, to secure any such Loan or Loans or any extensions and renewals thereof and in connection therewith said officers be and are hereby authorized and empowered at any time and from time to time in the name of and on behalf of this Corporation to execute, acknowledge, seal and deliver to the Bank any instruments and agreements including, without limitation, mortgages, deeds of trust, pledges, assignments and security agreements, containing such terms, conditions, covenants and agreements of this Corporation as may be agreed upon by the Bank and said officers, the execution, sealing, acknowledgment and delivery of any such mortgages, deeds of trust, pledges, assignments and security agreements by such corporate officers to be conclusive evidence of such agreement.

RESOLVED: That for action of the Bank in reliance thereon, the Secretary of this Corporation be and is hereby authorized and empowered to certify to the Bank a copy of this unanimous written consent and that the Bank may consider such officers to continue in office and this unanimous written consent to remain in full force and effect until written notice to the contrary shall be received by an officer of the Bank.

The actions taken by this consent shall have the same force and effect as if taken at a meeting of the Board of Directors duly called and constituted pursuant to the bylaws of the Corporation and the laws of the State of Delaware.

This consent may be executed in one or more counterparts each of which shall be deemed an original for all purposes, and together shall constitute one and the same consent.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the 27th day of January, 1997.

_____ 2-10-97
Jaime Garcia

_____
Elvira Garcia

_____
Ronald D. Kirstien

_____
Harvey Rothstein

_____ 2/10/97
Randolph Habeck

h:\jbw\jej\uwc-gar.dir

**Page 45**

1  you seen this document at any other point?
2  A    I may have.
3  Q    Do you have any other written
4  agreements between yourself and O'Stein Brothers
5  Limited Partnership No. 4?
6  A    I believe there is other agreement.
7  Q    What is the other agreement?
8  A    That is the -- either that -- I mean
9  this may be the only one. I don't know. I got
10 to read it and see what it says because there was
11 a job agreement and there was also a stock
12 purchase agreement.
13 Q    An employment agreement?
14 A    An employment agreement, right.
15 Q    Was that between you and O'Stein
16 Brothers or between you and Chef Garcia?
17 A    Between us and Chef Garcia.
18 Q    Well, you said you wanted a chance to
19 read that. Please feel free. I do want to ask
20 you some questions about it, so if you would like
21 to look through it --
22 A    Go ahead.

**Page 46**

1  Q    You have had a chance to review the
2  document?
3  A    A little bit.
4  Q    There are references in here to a
5  forbearance agreement with Riggs Bank. Was there
6  a concern that Riggs Bank was going to issue a
7  default on the loan?
8  A    I am trying to recall. I don't
9  remember them saying they will recall the loan or
10 anything back then.
11 Q    You do not recall that?
12 A    No.
13 Q    Do you recall hearing any discussion of
14 a possible default?
15 A    There is a possibility.
16 Q    Did you attend a meeting with
17 Mr. Norman, Mr. Habeck, Mr. Rothstein, and
18 representatives of Riggs Bank?
19 A    Yes, I did.
20 Q    Do you recall what the meeting was
21 about?
22 A    They were trying to, I guess, make

**Page 47**

1  clear that Rothstein and Kirstien were coming as
2  investors. And if I recall, also that Randy
3  Habeck represented himself as a CF -- FCO of the
4  company.
5  Q    Mr. Habeck represented himself as a CFO
6  of the company?
7  A    CFO of the company, right.
8  Q    In front of these representatives of
9  Riggs Bank?
10 A    That is correct.
11 Q    Did you correct him?
12 A    Yes, I did.
13 Q    At that meeting?
14 A    They asked me, they said is that
15 right. I say I am not aware of, I say, you know,
16 if O'Stein made any changes. You know, I am not
17 -- he says, well, you know, I am helping you, I
18 am directing the company. And I said, well.
19 Q    Who was present at that meeting?
20 A    That was Norman and Rothstein.
21 Q    Anybody else?
22 A    I am trying to remember if Kirstien was

**Page 48**

1  there as well. I believe, yeah, that they both
2  were there.
3  Q    Was Mr. Habeck there?
4  A    Yes. Of course. He is the one that
5  said that he was the CFO of the company.
6  Q    Do you recall who was there from Riggs
7  Bank?
8  A    I don't recall his name.
9  Q    Do you know a Richard Amador?
10 A    Amador. No. He was not a
11 representative of the company.
12 Q    How about Robert Roan, R O A N?
13 A    It could be. I don't recall because,
14 you know, they changed people a couple, three
15 times.
16 Q    How many meetings did you attend with
17 Riggs Bank after O'Stein Brothers became
18 involved?
19 A    Just that one.
20 Q    Just the one meeting?
21 A    Yeah.
22 Q    Was there any discussion at that

Case 1:01-cv-00103-BEL   Document 55-2   Filed 05/05/2004   Page 5 of 14
DEPOSITION OF JOSE JAIME GARCIA
CONDUCTED ON THURSDAY, JANUARY 8, 2004

13 (Pages 49 to 52)

Page 49

1 meeting about accounting issues?
2    A  Not that I recall.
3    Q  Any discussions of work in progress
4 debiting?
5    A  Not that I recall.
6    Q  Did anyone ever bring to your attention
7 issues about inventory at this time?
8    A  Yes. Apparently something about in the
9 progress line of the report that never --
10      (Interruption by the reporter.)
11    A  That never occurred there before. And
12 I believe Randy Habeck had a lot to do with that
13 because he was working directly with the
14 accountant and --
15      (Interruption by the reporter.)
16    Q  In 1994?
17    A  Yes.
18    Q  This accountant, Walter?
19    A  Walter, right. Randy Habeck spent
20 about a month because he was trying to uncover
21 everything supposedly, you know, to make sure
22 that this -- he knew all of the issues so he can

Page 50

1 bring it back to the investors, that everything
2 was clear.
3    Q  So this was after you had been
4 introduced to Mr. Rothstein and Mr. Kirstien?
5    A  This is before even I was introduced.
6    Q  Did Mr. Norman ever have a discussion
7 with you about an inventory issue?
8    A  Not at -- I guess the board did in
9 December of 1997.
10    Q  How about in 1994?
11    A  No.
12    Q  Did you ever advise anyone in 1994 that
13 any inventory problems were a result of computer
14 issues?
15    A  That is what the accountant -- that is
16 what the accountant, Walter, you know, brought to
17 the attention of Randy Habeck.
18    Q  Did Walter bring it to your attention?
19    A  I found out, you know, at the same time
20 that he brought it in to Randy Habeck.
21    Q  Did you ever advise Mr. Norman that
22 there were some computer issues causing an

Page 51

1 inventory problem?
2    A  That is before we closed, yeah.
3 Everything was disclosed before we even closed.
4    Q  Now, as I understand page 2 of this
5 agreement, actually page 1, the agreement is
6 between O'Stein Brothers Limited Partnership No.
7 4, your two companies, and yourself and
8 Mrs. Garcia. Is that correct?
9    A  That's correct.
10    Q  And then on page 2 it's my
11 understanding that O'Stein No. 4 transferred
12 $60,000 to Riggs National Bank for a payroll
13 obligation?
14    A  That could have been.
15    Q  Were they to do that?
16    A  Did they do that?
17    Q  First of all, according to this
18 agreement they were supposed to do that, correct?
19    A  Right.
20    Q  Did they do that?
21    A  That was in?
22    Q  September.

Page 52

1    A  September?
2    Q  1994.
3    A  I don't recall.
4    Q  Did you need $60,000 to fund the
5 September 30, 1994 payroll obligation?
6    A  I don't recall in particular.
7    Q  Were you having any problems meeting
8 your payroll obligations in September, 1994?
9    A  We might have. Again, you know, we
10 were living, you know, and our cash flow issue
11 was -- came along.
12    Q  Additionally, O'Stein No. 4 was to
13 transfer $86,000 to the accounts of trade
14 creditors of JEJ and McWax. Did they do that?
15    A  Again, I don't recall. I don't
16 remember seeing those particular --
17    Q  The agreement continues that the
18 "$86,000 in satisfaction of outstanding and
19 overdue claims so that JEJ and McWax may continue
20 to receive manufacturing supplies and inventory
21 to continue to produce salable goods."
22      Were you having a problem receiving

1   A.   I don't understand your question.

2   Q.   Well, you mentioned that you were in the
3   40 percent owner -- you had 40 percent ownership.

4   A.   But what is your question as it relates
5   to me?

6   Q.   What is your percentage of ownership of
7   the -- of that -- of the Impact Key Sales (sic)?

8   A.   Today?

9   Q.   Well, when it was merged.

10  A.   I don't know exactly.  Around 14 or
11  15 percent.  I'm not sure of the exact amount,
12  number.

13  Q.   And what positions have you held in the
14  company in this same corporation that goes back
15  twenty-some years?

16  A.   At what time?

17  Q.   In the beginning and at the present time
18  and during in between.  Were you president of the
19  company?

20  A.   When it started I was president.

21  Q.   What are you right now?

22  A.   Partner.

EXHIBIT C

```
1      Q.   Are you a general partner?
2      A.   No.  It's not a partnership.  It's a
3  corporation.
4      Q.   How then are --
5      A.   That's my title.  My title is called
6  partner.
7      Q.   And are you the managing partner of
8  the --
9      A.   No.
10     Q.   What's the purpose of naming you
11 partner?
12     A.   Sounded like a good thing to do.
13     Q.   What type of business does -- did the
14 three companies that you have named or three names
15 that you have given for the same company, what kind
16 of business is it?
17     A.   It's a food brokerage company.
18     Q.   What kind of activities does a food
19 brokerage company do?
20     A.   It's responsible -- the corporation
21 is responsible for representing principals who
22 manufacture or market products.  We are the sales
```

None ☐   b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|
| Ronald Kirstien | President and director | |
| Harvey Rothstein | Secretary and director | |
| Marjorie Robinson | Vice President | |
| Jaime Garcia | Director | |
| Chef Garcia, Inc.<br>1657 Crofton Blvd.<br>Crofton, MD 21114 | | 100 percent shareholder |

**20. Former partners, officers, directors and shareholders**

None ■   a. If the debtor is a partnership, list each member who withdrew from the partnership within one year immediately preceding the commencement of this case.

NAME AND ADDRESS                    DATE OF WITHDRAWAL

None ☐   b. If the debtor is a corporation, list all officers or directors whose relationship with the corporation terminated within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS | TITLE | DATE OF TERMINATION |
|---|---|---|
| Elvira Garcia | Former Vice President, Director and Secretary | 12/97 as Secretary and Director<br>1/98 as Vice President |
| Jaime Garcia | Former president | 1/98 |

**21. Withdrawals from a partnership or distributions by a corporation**

None ■   If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during one year immediately preceding the commencement of this case.

| NAME & ADDRESS OF RECIPIENT, RELATIONSHIP TO DEBTOR | DATE AND PURPOSE OF WITHDRAWAL | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|



EXHIBIT D

1  ever sent or what they're for.

2      Q.   Did Habeck Zaitz or any of these other
3  companies that you control ever receive any
4  payments by wire directly from any financing?

5      A.   I don't know the answer to that.

6      Q.   How many people were employed by
7  Intermark?

8      A.   It was just the employees that worked
9  for Jim Garcia.

10     Q.   How many?

11     A.   Two.  Steve Froemming and Marjorie
12  Robinson were the first two employees.

13     Q.   In 1997 who did they -- who was employed
14  by Intermark in '97?

15     A.   I don't know.

16     MR. KEARNEY:  You have to wait until he
17  asks the question.

18     BY MR. ALBRIGHT:

19     Q.   Do you know if Marjorie Robinson was one
20  of those?

21     A.   Yes.  She was.

22     Q.   And did she stay -- was she at your

r-20-98 04:38P Chef Garcia Mexican Foods 703 451-8917                P.01



EXHIBIT
P-13

To: File

From: Dan Butz  *D.B.*

Date: March 20, 1998

Re: Recap of 3/19/98 meeting with Randy Habeck

- Current promotions were forwarded to Chef Garcia and are being summarized in a spreadsheet by Impact, who will forward the summary to Chef Garcia on 3/23/98. All new promotions will be approved by Marjorie Robinson, (Randy Habeck while Marjorie is on leave), and reviewed by Dan Butz. All deductions taken by our customers must reference an agreement reference number ("ARN"). The ARN's will be maintained by both Chef Garcia and Impact. Randy Habeck stated that he expects promotions to be 7% of sales this year, and utilizing the information provides by Impact, Chef Garcia should and will be doing the proper accounting for promotions. This will improve the accuracy of cash projections, budgets and cost analyses.

- It was discussed and agreed that Chef Garcia needs to bill our customers for amount of cash we will receive, hence the accounts receivable balance will equal the amount of cash expected. This will be implemented as soon as possible, for example, Halperin will be invoiced less $.71 per case because we know they deduct $.71 per case for dreyage on their payment.

- Chef Garcia will distribute a fiscal calendar, which will contain a 52 week fiscal year with four quarters which will consist of 5-4-4 week months.

- A weekly sales conference call will occur with the appropriate parties. The mandatory participants will be Randy Habeck, Ron Kirstien, Marjorie Robinson and Dan Butz. A recap memo of these conference calls will also be distributed by Chef Garcia.

- A cost analysis/budget/financial projection/financial results meeting will be set up.

- Randy Habeck will be attending the Sodexho USA meeting next Thursday, 3/26/98.

- Randy Habeck also states that Impact Sales has been performing "Store Audits" that this is a reoccurring function at Impact. Dan Butz will follow-up with Impact for support.

CC: Ron Kirstien
    Harvey Rothstein ✓
    Randy Habeck
    Chef Garcia ( M.K, R.M, I.S)



EXHIBIT
F

1  equipment to make it, the bankruptcy of the first
2  Chef Garcia?
3     A.   Not to my knowledge, but they could
4  have been.
5     (Whereupon, letter marked Plaintiff's
6  Deposition Exhibit No. P-17.)
7  BY MR. ALBRIGHT:
8     Q.   I show you P-17.
9     A.   P-17?
10    Q.   Yes.  Does P-17 refresh your
11  recollection of having sold or having a
12  bankruptcy sale to S&K?
13    A.   No, sir.
14    Q.   Who are S&K?
15    A.   I think they may be one of our
16  suppliers.
17    Q.   And they supply you with chips?
18    A.   I would be guessing at the product.
19  Tortillas, chips, I couldn't tell one from the
20  other.
21    Q.   What is the precise name of the present

```
 1   Chef Garcia?
 2        A.   I don't know.
 3        Q.   Is it a company?
 4        A.   It's a corporation.
 5        Q.   Do you know anything about it?  For
 6   example, where it's incorporated?
 7        A.   No, I couldn't tell you where.
 8        Q.   Do you know any other parts of those
 9   words?  Is it Chef Garcia, Inc.?
10        A.   That's what I believe it to be, but I'm
11   not sure.
12        Q.   Do you believe it to be a new company
13   that was formed after the bankruptcy?
14        A.   Yes, sir.
15             MR. ROSWELL:  Objection.  Go ahead.
16             THE WITNESS:  Sorry, counsel.  Yes,
17   sir.
18   BY MR. ALBRIGHT:
19        Q.   Did you in any way have anything to do
20   were attempting to relieve Mr. and Mrs. Garcia
21   from guarantees?
```



**Chef Garcia**
*Mexican Foods, Inc.*

December 14, 1999

Abuelita
Attn. Mr. Eugene Suarez, Sr.
9209 Enterprise Court
Manassas Park, VA 20111

Dear Gene:

I have reviewed your letter dated December 8, 1999 and was disappointed. I have been working towards assisting my customer in making a decision and have found that the information I have been receiving from you has been inconsistant. In order to maintain and grow our mutual business, I need the appropiate tools. I am enclosing copies of my notes and correspondance.

I have obtained pricing from a bag company of $.22 per bag. This would represent a packaging cost (bags) per case of $2.64.

In addition your line would require 2 additional employee's at $7.00 per hour producing 900 lbs per hour. This would add .14 in costs per case (9 lb case)

Our current packaging costs .07 for film and .04 per label. This equals .11 per bag or $1.32 per case.

Therefore our prices should be increased with paper by $1.46 per case
2.64 - .14 = 2.78
2.78 - 1.32 = 1.46

Therefore for a 12 / 12 oz bag, our prices should increase by $1.46 per case.

I have shared these figures (additional labor and packaging costs) with my customers. Your new numbers do not match the information you had provided me with previously. I am also enclosing my letter to Gene Jr., which he signed off on as being correct.

Please confirm the corrected prices as I have indicated. Thank you.

Sincerely,

*Marjorie Robinson*

Marjorie Robinson
President

Chef Garcia Mexican Foods, Inc.
• 301 Maple Ave. West • Dogwood Bldg. - Suite G • Vienna, VA 22180 • Phone: 800-925-3550 • Fax: 703-319-8037

(4)




# State of Delaware
The Official Website for the First State

Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & L

State Directory | Help | Search Delaware:  [go]    Citizen Services | Business Services |

**Department of State: Division of Corporations**

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
Taxes
Expedited Services
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions   View Search Results   Summary of Charges   Logout

## Entity Details

| | | | |
|---|---|---|---|
| File Number: | 2546064 | Incorporation Date / Formation Date: | 09/26/1995 (mm/dd/yyyy) |
| Entity Name: | CHEF GARCIA, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |
| Status: | FORFEITED | Tax Status: | DELINQUENT |

**REGISTERED AGENT INFORMATION**

Name:    **No registered agent on record.**

Additional Information is available for a fee of $20.00. This information will include current franchise tax assessment, current filing history and more..

Would you like ◯ Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov

https://sos-res.state.de.us/tin/controller                                5/4/2004



EXHIBIT H