The case of JP Foodservice clearly outlines the embezzlement, deeply discounted sales, hidden deductions, bogus sales and other elements of competition by Defendants.

Defendants entered into contracts with JP Foodservice, unbeknownst to Plaintiffs, that used projected earnings as a way to figure deductions and incentives for the distributor. The higher the projected earnings, the larger the percentage of deductions that JP was able to take off the food it purchased from Chef Garcia. The deductions were credited ahead of the actual sales, but would be refunded later if sales did not reach projections. This type of accounting practice was common at JP Foods, now US Foodservice, which is under investigation currently by the SEC in relation to Royal Ahold.

Defendants made projected earnings for 1997 that were several times the amount sold to JP Foods in 1996. In 1996, gross sales to JP Foods were $129,000. (exhibit 136) Projected sales for 1997 jumped to $633,000, (exhibit 140) for a 490% increase over 1996. The higher projected sales translated into higher deductions to JP Foods. The higher deductions were taken, even though actual sales did not come near projected sales.

Plaintiffs knew nothing about the arrangements defendants made for the deductions given to JP Foods. Plaintiffs were told that JP Foods would take the standard deduction that other food service distributors would take: samples .5%, promotion 2%, distributors 4%, shows .1%. The other fees, brokerage 4.5% and

4


EXHIBIT K

intermark 4% were paid separately and were not included in deductions referenced here. (Exhibit 140) In fact total deductions amounted to 66% off gross sales.

Defendants used the accounting practices of JP Foods to their benefit to create a cash flow crisis at Chef Garcia, Inc. By the end of 1997, $112,000 was owed to Chef Garcia for $178,000 of food bought by JP Foods. Chef Garcia had been paid only $66,000 or 37% of the gross purchase price. Plaintiffs complained about the deductions taken by JP Foods, defendants promised on numerous occasions to take care of the money owed from JPFoods, but the money was never recovered while plaintiffs were employed by Chef Garcia.

JP Foods had been given deductions unknown to Plaintiff Garcia but known to Defendant Habeck at least since 1996. In a memo from Randall (Randy) McDonald, Director of Accounting for Chef Garcia, to Plaintiff Jim Garcia dated November 4, 1996, a telephone call from JP Foods Corporate Office Accounts Payables is detailed during which Tanya, the spokesperson for the company " said the authorization for all deductions" i.e., delinquent receivables, deductions, samples and bill backs, " are coming from the broker." (Exhibit No. 1). Randy McDonald reiterated that Plaintiff Jim Garcia' s signature must be on all deductions, which Tanya related to each satellite office. Habeck and Zaitz, one of Defendant Habeck' s companies, assumed responsibility to resolve all discrepancies with the individual brokers. Habeck and Zaitz had the final responsibility of the broker deals. Two weeks later on November 16, 1996 another memo was sent from

Garcia to Habeck and his agents, placing JP Foods on credit hold until Habeck could clear up deductions. (Exhibit No. 2)

The problem of reconciling JP Foods' numbers for 1996 appeared again on January 24, 1997, when the company attempted to get a $150,000 loan from First National Bank of MD secured by equipment. (See Exhibit No. 3). Of the eleven questions FNB asks, one was, " Why does JP Foodservice have a large portion of its A/R over 90 days?" Also questioned was why $75,000 of A/R (accounts receivable) was written off in 11/96. Defendant Habeck was fully aware of the deductions given to JP Foods, because he was the one responsible for all the deductions. He repeatedly promised to clarify the problems, but he never did. Instead he took actions that resulted in more deductions.

In a memo dated March 7, 1997 from Randy McDonald, and copied to Plaintiff Jim Garcia, and Defendants Randy Habeck, Ron Kirstien and Harvey Rothstein, Plaintiff Garcia implored Marjorie Robinson, agent for Defendants, for paper work to substantiate deductions for JP Foods and to help reconcile JP' s numbers for 1996. (Exhibit No. 4) This memo shows that there had been an ongoing problem with JP Foods that all Defendants were well aware of. As well in this memo unexplained problems for 1997 appeared, outlining pricing discrepancies.

Three days later on March 10, 1997, Randy McDonald, acting for Plaintiffs, vehemently complained to Defendants Habeck and Kirstien, by memo, that the problems of JP continue, highlighting the receipt of a check of only $22.83, for

6

$1,854.65 of merchandise invoiced. He stated that the numerous communications that they have had, have " had no effect", the practice " is out of control" and that Garcia " will not tolerate this any longer" because it " is now becoming a financial issue." He concluded by saying that Garcia " is expecting immediate results". (Exhibit No. 5)

JP Deductions were also discussed at the Chef Garcia Board Meeting on March 26, 1997 for which Defendant Kirstien was present. Yet in May 1997 problems with JP persisted. In a memo from May 29, 1997 to Marjorie Robinson and copied to Jim Garcia, Ron Kirstien and Randy Habeck, JP was sending invoices without authorization, given a deduction for a product Garcia did not sell and most importantly, there had been no response from JP Foods regarding past deductions. (Exhibit No. 6) It is clear that " no response" was given because there were secret dealings behind Plaintiffs' backs.

During the same time period, between 6/4/97 and 6/18/97, several very old accounts were being cleared possibly to mollify Jim Garcia. Check remittance advice reports show three invoices "paid" from (estimated) late summer 1996, one five months, one four and one half months, and one over three months past invoice date.

At the Chef Garcia Board Meeting of 6/17/97 Defendant Kirstien asked the Board "where the company stands with unpaid accounts?' ' (See Exhibit No. 7) He was told by Randy McDonald that JP Foods still owed money for deductions. Defendant Habeck's agent Marjorie Robinson then stated, " (we) will have the

situation resolved in two weeks." At this point the cover-up by the Defendants was made extremely clear to Plaintiffs. It was obvious to them that the Defendants were not being truthful, and that the Defendants' attempts to clear up deductions were non-existent; they were deceiving Plaintiffs. In the several dozen documents of actual JP deductions, the irregularities, and the discrepancies are evident.

JP deductions were also mentioned in a letter to Defendant Kirstien from Plaintiff Jim Garcia dated 7/21/97 (Exhibit No. 8), five days before the July Board Meeting, and in a memo to Defendant Habeck from the same date copied to Defendants Kirstien and Rothstein. (Exhibit No. 9) Garcia complained that he received only 28% of the purchase price of the invoices referenced for a check. When open receivables are mentioned at the July Board Meeting, 7/26/97, Defendant Kirstien again passed the onus to Marjorie Robinson, but did nothing to follow through with these deductions, the deductions that were causing severe economic shortfalls to Plaintiffs Garcia and to the company. (Exhibit No. 10) The economic shortfalls were so severe as to cause a lack of cash flow that inhibited production on several occasions. Plaintiff Elvira Garcia took many personal loans from her personal credit cards to relieve this cash crisis. (Exhibits Nos. 112 – 119) It is clear from these memos and the actual check remittance advice reports from JP that there was a pattern to the JP deductions. The pattern is as follows: JP was given deductions by the Defendants; the Garcias did not know about the deductions until they received payments often grossly reduced from the invoices referenced; the Garcias tried to resolve the issue, by bringing it to the attention of the Board, to JP

Foods and to Sales and the brokers; JP assures Plaintiffs Garcia that the deductions were coming from the brokers; nothing was done by any of the Defendants for several months, causing a cash flow crisis to occur; the Plaintiffs receive small partial payments from JP, then the cycle repeated itself.

In the following memos Plaintiff Jim Garcia continually asked Defendants for proof of deductions, help in collecting open accounts receivables and continually asserted and reminded Defendants that no deductions could be allowed without his approval. Plaintiff Garcia, frustrated with the lack of results from Defendants, contacted JP Foods directly for open accounts receivable of over $80,000, by letter of September 8, 1997. (Exhibit No. 11) After no results Plaintiff Jim Garcia sent a memo on October 24, 1997 to Marjorie Robinson (Exhibit No. 12) and another on October 27, 1997, and copied to Defendants Ron Kirstien, Harvey Rothstein, and Randy Habeck, stating that the $80,000 was still owed to Chef Garcia. (Exhibit No. 13) (Plaintiff Garcia did not add to this figure the el Pasado line reimbursement that he was promised by Defendants; see below) All Defendants knew about these deductions. It was the fiduciary responsibility of Defendants Kirstien, Rothstein and Habeck to investigate these and other deductions fully. They did not. They stood silently and watched as the company proceeded in its downward spiral. Plaintiff continually asked them for support at Board Meetings, in letters and in memos, since at least November 1996, but none but the most cursory assistance was ever given.

In Fall of 1997, JP Foods discontinued its el Pasado line with Garcia, but Sales reported that JP Foods had promised to purchase all of the inventory and packaging for this line by the end of September 1997. (Exhibit no. 14) Then in a later memo the date was moved to October 17 (Exhibit 15). On November 6, 1997, JP had still not paid for this product, and it was still in Halperin's warehouse, as opposed to another storage facility specified by JP Foods. (Exhibit No. 16) On January 8, 1998, days before Plaintiff was fired, he complained to Habeck's agent, Robinson, that JP Foods owed $112,447, of which $30,745 worth of inventory and packaging was from the el Pasado line. (Exhibit No. 17) It is clear that there was never a deal with JP Foods to buy excess packaging and inventory, and that Defendants' old habit of telling Plaintiffs that they were working to resolve issues, was a lie, made to put Plaintiffs' company further and further into debt.

In the memo of January 8, 1998 from Plaintiff Jim Garcia to Marjorie Robinson, Plaintiff Jim Garcia referred to "all the discussions we have had in the past about these two customers in particular" (Giant Foods also owed $78,021.60.) He urged her to "pay attention to this matter as quickly as (she) can," as it had been "so long and too many times (they) have talked about this." (Exhibit 17) Marjorie Robinson worked directly with Defendant Habeck and took directives from him. She did not clarify amounts owed to the company or seek proper paperwork for deductions because the Defendants did not want her to. They wanted to be able to take deductions and offer deals when and how it suited their interests. When the Defendants saw how well the company was doing in April of

1997, they made sure they put themselves in the position to produce a cash flow problem that resulted in the demise of Chef Garcia, Inc.

Although no other broker contract exists than that of 1993 (Exhibit No. 18), Defendant Habeck had proposed the following percentages for 1997: x 140 samples equaled .5%, promos 2%, shows .1%, spoilage .5% for Food Service. Total sales for JP Foods in 1997 were $178,584.79. When promotions, discounts, spoilage, deductions on check remittance advices, discontinued inventory and accompanying packaging, etc. are combined and subtracted from total sales for 1997, the resulting figure is $66,137, a loss of $112,447.62 (or a loss of 63% of all sales). (See Sales and Marketing 1997, Exhibits 15, 120-130, 132, 133, 135, 137, 138, 141, 144-162) The margin for these products combined was only $34,004.49. So not only did the Defendants' practices obliterate any margin, but incurred almost $80,000 of extra debt.

Other irregularities include the following: 1) certain JP branches were given dollar deductions that far exceed the dollar amount of product sent to the branch, 2) a large deduction for spoilage given to a JP branch, but not explained to Garcia until 4 months later, 3) A/R's allowed to be paid by branches as late as six months after the shipment of goods, 4) a large portion of JP A/R over 90 days, 5) Garcia having to pay back money owed after receiving and cashing a check from JP Foods, even though that money was owed to him 6) the great disparity between 1996 figures and 1997, 7) individual checks with greatly reduced payments on them, 8) orders

Habeck93

## Habeck & Associates 1993 Commissions

| Customer Name | Gross Sales | Military Sales | Promotions | Sample/Spoil | Total Sales | Commission |
|---|---|---|---|---|---|---|
| Giant Foods | 752,292.15 | 188,073.04 | 45,137.53 | 15,045.84 | 504,035.74 | 12,600.89 |
| Halperin | 1,059,371.28 | | 63,562.28 | 21,187.43 | 974,621.58 | 48,731.08 |
| Mazo Lerch | 420.00 | | 25.20 | 8.40 | 386.40 | 19.32 |

Total Commission for 1993    61,351.29

Payments Made in 1993    31,808.33

Balance owed to Habeck & Zaitz as of 12/31/93    29,542.96

Page 1

EXHIBIT 136

Habeck94

## Habeck & Associates 1994 Commissions

| Customer Name | Gross Sales | Military Sales | Promotions | Sample/Spoilage | Total Sales | Commission |
|---|---|---|---|---|---|---|
| Giant Foods | 1,193,387.55 | 298,346.89 | 71,603.25 | 23,867.75 | 799,569.66 | 19,989.24 |
| Halperin | 2,001,340.46 | | 120,080.43 | 40,026.81 | 1,841,233.22 | 92,061.66 |
| Carrol County Food | 1,320.00 | | 79.20 | 26.40 | 1,214.40 | 60.72 |
| Lankford/Sysco | 50,572.69 | | 3,034.36 | 1,011.45 | 46,526.87 | 2,326.34 |
| Mazo Lerch | 978.00 | | 58.68 | 19.56 | 899.76 | 44.99 |
| Smelkinson/Sysco | 1,063.96 | | 63.84 | 21.28 | 978.84 | 48.94 |
| | | | - | - | . | - |
| Total Commission for 1994 | | | | | | 114,531.90 |
| Balance forward from 1993 | | | | | | 29,542.96 |
| Payments made in 1994 | | | | | | 83,282.83 |
| Balance owed as of 12/31/94 | | | | | | 60,792.03 |